```
 1                 UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
 2                         IN TACOMA

 3    ------------------------------------------------------------

 4    MARIA VARNEY, Individually   )
      and as Personal              )
 5    Representative for the       )   No. CV18-5105RJB
      Estate of DONALD VARNEY,     )
 6                                 )
                 Plaintiffs,       )
 7                                 )
        v.                         )
 8                                 )
      AIR & LIQUID SYSTEMS         )
 9    CORPORATION, et al.,         )
                                   )
10               Defendants.

11
      ------------------------------------------------------------
12
                        EVIDENTIARY HEARING
13
      ------------------------------------------------------------
14

15                       April 15, 2019

16

17         BEFORE THE HONORABLE ROBERT J. BRYAN
             UNITED STATES DISTRICT COURT JUDGE
18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:

 2    For the Plaintiffs:        Benjamin Adams
                                 Ethan A Horn
 3                               DEAN OMAR BRANHAM

 4    For the Defendant Air &
      Liquid Systems:            Kevin Craig
 5                               GORDON REES SCULLY MANSUKHANI

 6    For the Defendant
      Armstrong
 7    International:             Stephanie Ballard
                                 PREG O'DONNELL & GILLETT
 8
      For the Defendant
 9    Flowserve US:             Marc Carlton
                                 LEWIS BRISBOIS BISGAARD & SMITH
10
      For Defendants Foster
11    Wheeler & CBS:            Alice Serko
                                 TANENBAUM KEALE
12
      For the DefendantIMO
13    Industries:              Michael Ricketts
                                 GORDON THOMAS HONEYWELL
14
      For Defendants
15    Ingersoll-Rand & Velan
      Valve:                   Kevin Craig
16                               GORDON REES SCULLY MANSUKHANI

17    For the Defendant John
      Crane:                   Claire Weglarz
18                               Daira Waldenberg
                                 HAWKINS PARNELL & YOUNG
19
      For the Defendant
20    Parker-Hannifin:          Nicole MacKenzie
                                 WILLIAMS KASTNER & GIBBS
21
      For the Defendant
22    Warren Pumps:             Allen Eraut
                                 RIZZO MATTINGLY BOSWORTH
23
      For the Defendant
24    Crosby Valves:            Ronald C Gardner
                                 GARDNER TRABOLSI & ASSOCIATES
25
```

```
1
2    For the Defendant SB
     Decking: (Telephonic)      John Michael Mattingly
3                               RIZZO MATTINGLY BOSWORTH

4    For the Defendant Weir
     Valves & Control:          Dana C Kopij
5    (Telephonic)               WILLIAMS KASTNER & GIBBS

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Proceedings stenographically reported and transcript
          produced with computer-aided technology
```

```
1                        EXAMINATION INDEX

2    EXAMINATION OF                                        PAGE

3     STEPHAN PARRIS        DIRECT EXAMINATION              60
      (Video deposition)   By Mr. Adams
4                          CROSS-EXAMINATION                70
                           By Ms. Weglarz
5                          CROSS-EXAMINATION                74
                           By Mr. Harris
6                          CROSS-EXAMINATION                76
                           By Ms. SERKO
7                          CROSS-EXAMINATION                76
                           By Mr. Carlton
8                          RECROSS-EXAMINATION              79
                           By Mr. Carlton
9                          RECROSS-EXAMINATION              81
                           By Ms. Serko
10                         REDIRECT EXAMINATION             87
                           By Mr. Adams
11                         CROSS-EXAMINATION                93
                           By Ms. Weglarz
12                         FURTHER RECROSS-EXAMINATION      93
                           By Mr. Harris
13                         FURTHER RECROSS-EXAMINATION      94
                           By Ms. Weglarz
14    DAWN BROWN           DIRECT EXAMINATION              106
                           By Mr. Adams
15                         CROSS-EXAMINATION               120
                           By Ms. Weglarz
16                         CROSS-EXAMINATION               127
                           By Mr. Vega
17                         REDIRECT EXAMINATION            154
                           By Mr. Adams
18                         RECROSS-EXAMINATION             157
                           By Mr. Vega
19

20
                          EXHIBIT INDEX
21
     EXHIBITS ADMITTED                                     PAGE
22    1                                                    160
      2                                                    160
23    3                                                    160
      12-019 to 12-027                                     164
24    12-028 to 12-032                                     164
      12-033 through 12-059                                164
25    12-066 through 12-074                                164
      12-075 through 12-082                                165
```

09:35:43AM 1          THE COURT:  Well, we have quite a gang of lawyers

09:35:46AM 2    this morning.  I had an environmental case involving the

09:35:50AM 3    Tacoma Tar Pits, and there were this many lawyers in the

09:35:55AM 4    courtroom.  I made the remark that if they each got a

09:36:00AM 5    shovel and went down there and cleaned it up, we could

09:36:04AM 6    forget the lawsuit.

09:36:05AM 7          Anyway, this is in Cause No. 18-5105, Varney against

09:36:18AM 8    a number of defendants.  It comes on today for a special

09:36:25AM 9    hearing regarding the admissibility of what's in the file

09:36:32AM 10   as Docket No. 231-1, the affidavit of the decedent

09:36:43AM 11   plaintiff, and also regarding the admissibility of an

09:36:50AM 12   expert witness' testimony based on that affidavit.

09:36:57AM 13         I want to keep this hearing to the issues outlined in

09:37:04AM 14   the order that set it up.  My gosh, I had all the papers

09:37:17AM 15   lined up here and now I've lost them.  Did you steal some

09:37:22AM 16   of my stuff?  Let me call the roll and get your

09:37:44AM 17   appearances.  For plaintiffs, Mr. Horn.

09:37:51AM 18           MR. ADAMS:  Good morning, your Honor.

09:37:52AM 19           THE COURT:  Mr. Adams.

09:37:55AM 20           MR. ADAMS:  Good morning, your Honor.

09:37:57AM 21           MR. HORN:  Good morning.

09:38:01AM 22           MR. ADAMS:  Dawn Brown is also here.  She is Don

09:38:04AM 23   Varney's daughter.

09:38:05AM 24           THE COURT:  Fine.  For Air & Liquid Systems,

09:38:11AM 25   Mr. Craig.

```
09:38:13AM  1          MR. CRAIG:  Good morning, your Honor.
09:38:14AM  2          THE COURT:  For Armstrong International,
09:38:17AM  3  Ms. Ballard.
09:38:18AM  4          MS. BALLARD:  Good morning, your Honor.
09:38:19AM  5          THE COURT:  For Flowserve U.S., Mr. Carlton.
09:38:25AM  6          MR. CARLTON:  Good morning, your Honor.
09:38:26AM  7          THE COURT:  For Foster Wheeler Energy,
09:38:35AM  8  Ms. Johnson, I guess, right?
09:38:37AM  9          MS. JOHNSON:  Good morning.
09:38:39AM 10          THE COURT:  Mr. Vega.
           11          MR. VEGA:  Good morning.
09:38:42AM 12          THE COURT:  And also Ms. Serko.
09:38:45AM 13          MS. SERKO:  Good morning, your Honor.
09:38:46AM 14          THE COURT:  For General Electric, Mr. Nadolink.
           15          MS. JOHNSON:  The plaintiffs and General Electric
           16  have --  It is my understanding that plaintiffs and --
09:38:58AM 17          THE COURT:  Let me warn you all, I have a not
09:39:01AM 18  good hearing problem, so you need to speak right into the
09:39:04AM 19  mic.  If it is easier to remain seated, that's fine.  But
09:39:08AM 20  you need to talk right into the mic for me to pick it up.
09:39:11AM 21          MS. JOHNSON:  It is my understanding that
09:39:13AM 22  plaintiffs and General Electric have reached a resolution.
09:39:17AM 23          THE COURT:  I'm sorry.  See, I missed that.
09:39:18AM 24          MS. JOHNSON:  My understanding is plaintiffs and
09:39:21AM 25  General Electric have reached a resolution in this matter.
```

09:39:24AM 1          MR. ADAMS:  That's correct, your Honor.

09:39:28AM 2          THE COURT:  For IMO Industries, Mr. Ricketts.

09:39:33AM 3          MR. RICKETTS:  Good morning, your Honor.

09:39:35AM 4          THE COURT:  And for Ingersoll-Rand, Mr. Craig.

09:39:39AM 5          MR. CRAIG:  Yes.

09:39:40AM 6          THE COURT:  And for John Crane, Inc.,

09:39:46AM 7  Ms. Weglarz.

09:39:47AM 8          MS. WEGLARZ:  Yes, your Honor.

09:39:48AM 9          THE COURT:  And Ms. Waldenberg.

09:39:52AM 10         MS. WALDENBERG:  Yes, your Honor.

09:39:54AM 11         THE COURT:  For McNally Industries, Mr. Wheeler.

09:39:59AM 12 I don't think he is here.  For Parker-Hannifin,

09:40:03AM 13 Ms. MacKenzie.

09:40:06AM 14         MS. MacKENZIE:  Yes, your Honor.

09:40:07AM 15         THE COURT:  For Sterling Fluid Systems, anyone

09:40:11AM 16 present?  I don't think they are present.

09:40:16AM 17      Velan Valve, Mr. Craig.

09:40:19AM 18         MR. CRAIG:  Yes, again, your Honor.

09:40:22AM 19         THE COURT:  Warren Pumps, Mr. Eraut.

09:40:25AM 20         MR. ERAUT:  Eraut.  Good morning, your Honor.

09:40:27AM 21         THE COURT:  And do we have people on the phone,

09:40:35AM 22 the ones listed here?

09:40:36AM 23         THE CLERK:  I believe so.

09:40:37AM 24         THE COURT:  For Crosby Valve, Mr. Gardner.  Are

09:40:43AM 25 you on the phone?  Mr. Gardner.  I don't know where he is.

09:40:56AM 1          THE CLERK:  I think we might be having some

09:40:58AM 2    problems with the courtroom technology system.  It froze

09:41:02AM 3    up on me.

09:41:02AM 4          THE COURT:  And SB Decking, Mr. Mattingly.  He is

09:41:08AM 5    supposed to be on the phone, too.

09:41:12AM 6          MS. KOPIJ:  Good morning, your Honor.  Dana Kopij

09:41:15AM 7    for Weir Valves.

09:41:16AM 8          THE COURT:  I'm sorry?

09:41:23AM 9          MS. KOPIJ:  Dana Kopij for Weir Valves &

09:41:26AM 10   Controls.  I think it is on the second page, at the top.

09:41:30AM 11         THE COURT:  Yes.  Thank you.  Anybody I missed?

09:41:43AM 12         MR. MATTINGLY:  Good morning, your Honor.  I am

09:41:44AM 13   not sure if you can hear me okay.

09:41:46AM 14         THE COURT:  Yeah.  Who are you?

09:41:50AM 15         MR. MATTINGLY:  My name is Michael Mattingly.  I

09:41:54AM 16   am appearing on behalf of SB Decking.

09:41:57AM 17         THE COURT:  Anyone else on the phone?  All right.

09:42:02AM 18    I have read everything on this subject that is in the

09:42:06AM 19   file.  I must say that I read a lot of things over and

09:42:14AM 20   over and over that were repeated in the briefing.  I hope

09:42:20AM 21   we won't have that trouble with argument here.

09:42:30AM 22    I indicated that I wanted the plaintiffs to go first,

09:42:37AM 23   I guess out of efficiency rather than concern about burden

09:42:44AM 24   of proof and so forth.  Let's proceed first with any

09:42:51AM 25   opening statement you wish to make.

09:42:53AM 1          MR. ADAMS:  Thank you, your Honor.

09:42:57AM 2          MR. VEGA:  Your Honor, this is Dennis Vega for

09:42:59AM 3   Foster Wheeler.  If I may, before we proceed?  There is an

09:43:02AM 4   issue that I think we need to deal with before we begin

09:43:07AM 5   the hearing.  And that is, we issued a subpoena on

09:43:13AM 6   plaintiffs' counsel for the metadata related to the

09:43:16AM 7   statement which is very important to this case.  I think

09:43:20AM 8   before we proceed with the hearing we should get a ruling

09:43:22AM 9   at least on whether in fact plaintiffs' claimed work

09:43:29AM 10  product privilege actually exists.

09:43:32AM 11      It is our position that because they produced this

09:43:34AM 12  exhibit to the defendants they have waived any and all

09:43:38AM 13  privileges related to that declaration pursuant to Federal

09:43:43AM 14  Rule of Evidence 502, and we are entitled to the metadata

09:43:48AM 15  associated with that under Federal Rule 106, because we

09:43:51AM 16  want the entire complete picture, not just the portion

09:43:55AM 17  that plaintiff decided to give us in the declaration.

09:43:59AM 18          THE COURT:  I don't know what plaintiffs'

09:44:01AM 19  position is about privilege and work product and so forth.

09:44:07AM 20  I sort of assumed we would deal with that as we went along

09:44:10AM 21  here.  Do you have some response now, counsel?

09:44:16AM 22          MR. ADAMS:  Sure, your Honor.  We are prepared to

09:44:18AM 23  proceed with the evidentiary hearing.  There was a

09:44:22AM 24  subpoena served on my law firm which gave, I think, less

09:44:28AM 25  than three days' notice for the production of privileged

09:44:32AM 1    materials.

09:44:34AM 2         We objected to the subpoena based on untimeliness,

09:44:40AM 3    the location for the subpoena was too far away, and based

09:44:45AM 4    on privilege and work product.  When I say "we," my law

09:44:54AM 5    firm, which, based on my understanding of the law, puts

09:44:56AM 6    the burden on the moving party to file a motion to compel

09:45:00AM 7    or to seek some other type of relief and bring it to the

09:45:02AM 8    Court's attention, which they have not done.

09:45:05AM 9         Certainly we maintain that preparing a declaration,

09:45:11AM 10   which lawyers do regularly in litigation, does not waive

09:45:14AM 11   any attorney-client privilege.

09:45:18AM 12        MS. JOHNSON:  Your Honor, if I may address that

09:45:20AM 13   briefly?  We actually did file, so --  It is Docket No. --

09:45:24AM 14        THE COURT:  Just a second.  Consider the court

09:45:39AM 15   reporter.  He has to get your names down.  So before you

09:45:41AM 16   start talking, reintroduce yourself for the benefit of the

09:45:47AM 17   court reporter.

09:45:47AM 18        MS. JOHNSON:  Thank you, your Honor.  Malika

09:45:49AM 19   Johnson on behalf of Foster Wheeler.  Your Honor, we

09:45:52AM 20   actually did file with the court the subpoena that was

09:45:54AM 21   issued in this case, that's Docket No. 348.  The subpoena

09:46:00AM 22   was issued pursuant to Federal Rule 45.  It called for

09:46:08AM 23   certain electronically stored data to be produced in

09:46:12AM 24   Seattle.  The time for production was April 11th, at noon.

09:46:22AM 25        The plaintiff had -- under the federal rules the

09:46:25AM 1  plaintiffs had until noon on Thursday to file their

09:46:28AM 2  objections, or else those objections were waived.  They

09:46:32AM 3  did not file -- I say "file," but I mean serve.  They did

09:46:36AM 4  not serve those objections prior to noon on Thursday.

09:46:41AM 5  They served the objections at 7:10 p.m. on Thursday.

09:46:48AM 6      The objections that were served were, furthermore,

09:46:51AM 7  deficient under the rule, because while they claimed work

09:46:55AM 8  product privilege, they failed to produce a privilege log

09:47:02AM 9  identifying the documents and other materials that they

09:47:05AM 10 had and why they were privileged.

09:47:10AM 11     So plaintiff has not complied with Federal Rule 45,

09:47:15AM 12 and at this time Foster Wheeler is seeking an order

09:47:19AM 13 directing compliance with the valid, properly issued

09:47:24AM 14 subpoena.

09:47:27AM 15         MR. ADAMS:  I don't know if you want a response,

09:47:30AM 16 your Honor?  This is Ben Adams for the plaintiff.

09:47:34AM 17         THE COURT:  No.  I am not going to deal with that

09:47:37AM 18 this morning.  We will see in the course of this

09:47:41AM 19 evidentiary hearing if privileges are claimed, and we will

09:47:51AM 20 go from there.  If privilege is not claimed, that is one

09:47:58AM 21 thing.  If it is claimed, then we will deal with it at

09:48:04AM 22 that time or bypass it.

09:48:07AM 23     That appears to me to be a side issue to what we are

09:48:11AM 24 talking about here.  Not that it might not be important at

09:48:19AM 25 some point, but at this point I think we should proceed

09:48:21AM 1    with our hearing.

09:48:26AM 2         Okay.  Opening statement.  Bear in mind that I have

09:48:31AM 3    read, and read, and read, and read the stuff in the file.

09:48:36AM 4    Be gentle with me.

09:48:40AM 5              MR. ADAMS:  I will be brief, your Honor.  Good

09:49:03AM 6    morning, your Honor.  Again, this is Ben Adams.

09:49:09AM 7              THE COURT:  Just a second.  Okay.  I've got it.

09:49:13AM 8              MR. ADAMS:  This is Gloria and Don Varney.

09:49:16AM 9    Gloria's name is Maria.  She goes by Gloria.  This is

09:49:20AM 10   Gloria and Don Varney.  They were married for 28 years.

09:49:27AM 11        Don died of mesothelioma on February 8th, 2018.  When

09:49:34AM 12   he was young, he worked in the shipyards, and he was

09:49:37AM 13   exposed to asbestos for twelve years in the shipyards.

09:49:41AM 14        When he got sick with mesothelioma, he told his wife,

09:49:46AM 15   "I was exposed to asbestos in the shipyards."  He told his

09:49:51AM 16   daughter, "I was exposed to asbestos in the shipyards."

09:49:55AM 17   He told his doctors, "I was exposed to asbestos in the

09:49:58AM 18   shipyards."  He told all of them.

09:50:01AM 19        And then the day before he died, he signed a document

09:50:05AM 20   saying he was exposed to asbestos in the shipyards,

09:50:09AM 21   entirely consistent with everything he had told everyone

09:50:12AM 22   in his life when he got the disease.

09:50:16AM 23        Like I said, they were married for 28 years.

09:50:25AM 24   Mr. Varney did a lot of nice things for Gloria.  When they

09:50:29AM 25   were married --  They got married twice, once here in the

09:50:33AM 1    United States, and then Don Varney had another wedding for

09:50:38AM 2    Gloria in Mexico.  He would cook for her, he would clean

09:50:42AM 3    for her, he would do the laundry, he would pay the bills,

09:50:48AM 4    he would do things that husbands do, like fill up her gas

09:50:54AM 5    when she didn't ask.

09:50:55AM 6         He told her, "Gloria, I'm your husband, and I'm going

09:50:59AM 7    to take care of you.  You're never going to have to worry

09:51:04AM 8    about anything in your life."

09:51:06AM 9         And when Don got sick he got a death sentence.  He

09:51:13AM 10   got mesothelioma, a cancer with only one cause, that is

09:51:18AM 11   one of the most aggressive, virulent, and deadly cancers

09:51:22AM 12   that exist.

09:51:25AM 13        There are a number of different types of

09:51:29AM 14   mesothelioma.  The mesothelioma that Mr. Varney got was

09:51:33AM 15   the most aggressive, most deadly,

09:51:40AM 16   quickest-at-ending-your-life version of all of the

09:51:43AM 17   mesotheliomas.  It was the sarcomatoid type of

09:51:50AM 18   mesothelioma.  And so Don got sick very quickly.

09:52:00AM 19        But he held on to life because he promised Gloria he

09:52:06AM 20   would take care of her.  And so he held on, and he held

09:52:10AM 21   on, and he held on, because he wanted to get his

09:52:15AM 22   deposition done.  But he got so sick that he couldn't

09:52:21AM 23   complete his deposition, but he still held on to life.

09:52:27AM 24   And he held on and he signed this declaration.  Every

09:52:33AM 25   witness in the room says the same thing, he stood up in

09:52:38AM 1   bed, he held the declaration, he looked at it, he read it,

09:52:42AM 2   he seemed to understand it, he said he understood it, and

09:52:45AM 3   he signed it with his own hand.  And then he laid back in

09:52:50AM 4   bed, closed his eyes, he never moved again, he never

09:52:55AM 5   opened his eyes again, he never spoke again, he never left

09:52:58AM 6   the bed again, and he died the next day.

09:53:02AM 7       We believe that the evidence at this hearing will

09:53:07AM 8   show two things:  One, Mr. Varney signed a document that

09:53:16AM 9   is his dying declaration, that satisfies all of the

09:53:19AM 10  elements of Evidence Rule 804(b)(2).  And it was a dying

09:53:26AM 11  declaration when he signed it.  And he was competent to

09:53:31AM 12  sign it on February 7th, 2018, when he did so.

09:53:36AM 13      Most of the elements, the evidence will show, to

09:53:46AM 14  satisfy a dying declaration are undisputed.  Number one,

09:53:50AM 15  Don Varney is unavailable.  He is gone.

09:53:54AM 16      Number two, this is a civil action.  Undisputed.

09:53:57AM 17      Number three, he made a statement.  Largely

09:54:01AM 18  undisputed.  The statutes say --  When he signed the

09:54:07AM 19  document --  He can make an oral or a written statement.

09:54:11AM 20  His signing of a document was a written statement.

09:54:14AM 21  Undisputed.

09:54:16AM 22      Number four, he did so while believing his death was

09:54:20AM 23  imminent.  There will be evidence about that.  Number one,

09:54:23AM 24  he had a terminal cancer, and he knew it.  Number two, he

09:54:27AM 25  signed the declaration, and it said right in the

09:54:30AM 1    declaration, "I have no hope or expectation of recovery

09:54:35AM 2    from this terminal disease.  I know my death is imminent."

09:54:41AM 3         His treating physician, Dr. Kercheval, signed a

09:54:45AM 4    declaration the same day saying Mr. Varney has lost

09:54:49AM 5    55 pounds; his pain has increased; he has stopped eating;

09:54:54AM 6    he has stopped drinking; his life expectancy is measured

09:54:59AM 7    in days, not weeks; his death is imminent.

09:55:05AM 8         His family members were there.  His wife testified,

09:55:10AM 9    and you will hear that, that she knew the end was near.

09:55:14AM 10   His daughter will testify, "He told me he is never going

09:55:18AM 11   to leave the hospital."

09:55:23AM 12        A priest came, because Mr. Varney was Catholic, and

09:55:28AM 13   gave him the last rites, and final sacred anointments that

09:55:38AM 14   in Catholicism are given immediately before death.  And he

09:55:42AM 15   died the next day.  Most importantly, he died the very

09:55:46AM 16   next day.

09:55:47AM 17        And so we believe the evidence will show

09:55:52AM 18   overwhelmingly that he knew his death was imminent.

09:55:57AM 19        The last element of a dying declaration is that the

09:56:01AM 20   statements in the declaration must be about the cause or

09:56:05AM 21   circumstances of death.  And Mr. Varney had asbestos

09:56:10AM 22   cancer, called mesothelioma, with one cause, asbestos.

09:56:16AM 23   What was in his declaration were the ways he was exposed

09:56:19AM 24   to asbestos which caused his death.

09:56:24AM 25        And so we believe the evidence will show we have

09:56:31AM 1    satisfied the dying declaration exception to the hearsay

09:56:35AM 2    rule.

09:56:37AM 3        The number two issue, that your Honor is well aware

09:56:42AM 4    of, in the order was, was Mr. Varney competent?  Was he

09:56:48AM 5    competent, which is required under the summary judgment

09:56:52AM 6    statute, for an affidavit to be presented to oppose a

09:56:57AM 7    summary judgment motion, which is one of the issues before

09:56:59AM 8    the Court?

09:57:00AM 9        We have endeavored over the last three weeks to

09:57:05AM 10   depose and speak with all of the people who might have any

09:57:09AM 11   information about whether or not Mr. Varney was competent.

09:57:14AM 12       One thing we know for sure is he signed the

09:57:17AM 13   declaration.  He was competent enough to hold a pen and

09:57:23AM 14   sign the declaration in the correct place.

09:57:29AM 15       The medical records show that he was more than just

09:57:36AM 16   able to sign.  The Court will hear that on February 7th,

09:57:46AM 17   2018 --  There are a voluminous number of medical records

09:57:49AM 18   from the nursing staff checking on Mr. Varney every few

09:57:53AM 19   hours, and from his treating physician meeting with him.

09:57:57AM 20   And it is all in a timeline -- a chronological timeline.

09:58:01AM 21       The nursing notes say Mr. Varney was alert, he was

09:58:05AM 22   oriented times four, he knew his name, he knew what day it

09:58:10AM 23   was, he knew what time it was, he knew who the president

09:58:14AM 24   was.  He was communicating with the nurses on the same day

09:58:18AM 25   when he signed the declaration.  His mood was appropriate.

09:58:24AM 1  He was not showing strange behavior.  His thought process

09:58:28AM 2  in the records, coherent.  He was answering questions

09:58:33AM 3  appropriately.  He was calm and cooperative.  His

09:58:37AM 4  attention span was appropriately attentive.

09:58:43AM 5      These are all statements in the medical records

09:58:48AM 6  before any lawyers, before any lawsuits,

09:58:53AM 7  subjective/objective statements in the medical records

09:58:55AM 8  from his treating physicians and nurses.

09:58:57AM 9      He was also communicating with his doctors.  When his

09:59:00AM 10  doctors came to visit they noted his mental status was

09:59:04AM 11  oriented to his own ability, and he denied problems with

09:59:08AM 12  gastrointestinal issues.  He denied problems with urinary

09:59:14AM 13  issues.  He denied problems with his head and his neck.

09:59:18AM 14  The evidence from the medical professionals will be that

09:59:21AM 15  there has to be some communication from the patient to the

09:59:25AM 16  medical professional to write those things down.

09:59:29AM 17      He told his doctors when he was examined that he

09:59:32AM 18  feels the same, and they noted neurologically he followed

09:59:38AM 19  simple commands.  That's all true on February 7th, 2018,

09:59:42AM 20  when he signed this declaration.

09:59:46AM 21      We were able to depose one of his treating

09:59:52AM 22  physicians, and we have a video of that -- portions of

09:59:54AM 23  that deposition that we will play for the Court.  The

09:59:57AM 24  physician said over and over and over and explained the

10:00:00AM 25  medical records.  But this is just one of the things that

10:00:03AM 1   his treating physician, Dr. Sharma, treating

10:00:07AM 2   pulmonologist, said:  Based on the records that Dr. Sharma

10:00:20AM 3   had reviewed, Mr. Varney was alert and oriented.  The

10:00:28AM 4   question to Dr. Sharma was, "Was Mr. Varney alert enough

10:00:32AM 5   to sign this document that he signed?"  And the answer

10:00:35AM 6   Dr. Sharma gave was, "Based on the records" which I will

10:00:40AM 7   present, "I think he was alert and oriented when he signed

10:00:43AM 8   this document."  That's his own treating physician.

10:00:47AM 9       As the Court knows, there was a notary present who

10:00:50AM 10  notarized the document that Mr. Varney signed at the time

10:00:53AM 11  he signed it, Stephan J. Parris.  We were able to depose

10:00:58AM 12  him last Friday.  He said unequivocally, "I would never

10:01:04AM 13  notarize a document if the person was not lucid, ever.  I

10:01:09AM 14  have notarized hundreds and hundreds of documents."  "If a

10:01:12AM 15  person is unable to respond, would you notarize a

10:01:16AM 16  document?"  "Absolutely not."  That was his sworn

10:01:20AM 17  testimony.  He said, "Because I don't notarize people who

10:01:24AM 18  aren't lucid and don't understand what they are doing.  I

10:01:30AM 19  do not, will not ever notarize anyone who is not lucid."

10:01:35AM 20  That was the testimony of the notary that was there when

10:01:38AM 21  Mr. Varney signed the document.

10:01:44AM 22      His family members were deposed.  Gloria Varney was

10:01:48AM 23  deposed.  She said, "He was lucid.  He sat up in bed.  He

10:01:52AM 24  looked at the document.  He read the document.  He

10:01:54AM 25  understood the document.  He signed the document.  I know

10:01:57AM 1    him.  He would never sign anything that wasn't true."

10:02:01AM 2         His daughter was in the room.  She will give similar

10:02:04AM 3    testimony today.

10:02:06AM 4         There was a priest in the room who witnessed the

10:02:10AM 5    signing.  He provided a sworn declaration.  "Mr. Varney

10:02:14AM 6    was handed the attached document and a pen.  Although he

10:02:18AM 7    was very sick, I was impressed that he sat up to sign the

10:02:21AM 8    document rather than stay lying in the bed and make a

10:02:25AM 9    scribble signature, lying down that I have seen other

10:02:28AM 10   patients make when in hospital.  He opened his eyes, held

10:02:31AM 11   the document, responded positively that he knew what he

10:02:35AM 12   was signing, and signed it.  He appeared to understand the

10:02:39AM 13   document."  That's from a priest who was in the room and

10:02:43AM 14   witnessed the signing.

10:02:45AM 15        They tell you in law school not to overstate your

10:02:52AM 16   case in opening statement, but the evidence truly, your

10:02:56AM 17   Honor, is overwhelming from everyone who was there, from

10:03:00AM 18   the medical records, and people who had no interest in

10:03:03AM 19   this case whatsoever that Mr. Varney was coherent when he

10:03:08AM 20   signed the document.

10:03:11AM 21        Just quick mention of the defense, and then I will

10:03:13AM 22   sit down.  The defense, as I understand it, was that there

10:03:19AM 23   is one record from Dr. Kercheval, one of Mr. Varney's

10:03:26AM 24   treating physicians, that at 11:30 a.m. on the date the

10:03:30AM 25   document was signed, Mr. Varney was somewhat or largely

10:03:35AM 1   nonresponsive at that exact moment when the doctor met

10:03:38AM 2   with Mr. Varney.

10:03:40AM 3        You will hear from Dr. Sharma, who is another

10:03:43AM 4   treating physician, who absolutely respects Dr. Kercheval,

10:03:47AM 5   that Mr. Varney could not have been nonresponsive at that

10:03:53AM 6   time, because in the very same record there is an

10:03:56AM 7   examination of Mr. Varney's response to stimuli in his

10:04:04AM 8   eye, and to following light commands, and he is

10:04:09AM 9   responsive, and he does follow commands.  So there is some

10:04:15AM 10  conflict in that medical record within itself.

10:04:20AM 11       But more importantly, Mr. Varney did not sign the

10:04:23AM 12  declaration at 11:30 a.m.  He signed it a half hour

10:04:28AM 13  earlier, at 11:00 a.m.  We know that because the notary

10:04:33AM 14  documented it in his notary book right next to where Don

10:04:37AM 15  signed in the book, and on the declaration.  So we know

10:04:41AM 16  precisely when Mr. Varney signed the document.  It was

10:04:45AM 17  11:00 a.m.  What all of the witnesses have said is that he

10:04:49AM 18  closed his eyes, laid back down in bed, and never spoke or

10:04:53AM 19  responded again.

10:04:55AM 20       And so the evidence, we believe, will show that it is

10:04:59AM 21  entirely consistent that Mr. Varney was responsive at

10:05:04AM 22  11:00 a.m., and then when Dr. Kercheval came a half hour

10:05:08AM 23  later, he was no longer responsive.

10:05:15AM 24       And so we believe that the evidence, taken as a

10:05:19AM 25  whole, will show that Mr. Varney executed a dying

10:05:22AM 1    declaration, he was holding on to life to get it done, he

10:05:26AM 2    died the very next day, and he was competent when he did

10:05:30AM 3    so.  Thank you so much.

10:05:31AM 4           THE COURT:  Thank you.

10:05:33AM 5           MS. JOHNSON:  Your Honor, can I note an objection

10:05:35AM 6    for the record?  Obviously there is no jury here and your

10:05:38AM 7    Honor is quite capable of making evidentiary calls as

10:05:41AM 8    things come up.  But in this case we have exchanged

10:05:45AM 9    deposition designations and objections to all of the

10:05:49AM 10   proposed testimony that plaintiff has offered in this

10:05:53AM 11   case.  The defendants -- numerous defendants, not just

10:05:58AM 12   Foster Wheeler, have objected to a number of the

10:06:01AM 13   statements that were just included in plaintiffs' opening

10:06:04AM 14   statement.  Obviously your Honor has not been given a copy

10:06:07AM 15   of any of the transcripts to make those rulings prior to

10:06:10AM 16   those statements being used in opening statement.

10:06:13AM 17      Also, this declaration, that is still up on the

10:06:16AM 18   screen, of Mr. Schimmel, is a hearsay document.  He is not

10:06:24AM 19   here present in this courtroom.  He will not be called to

10:06:26AM 20   testify at this hearing.  So there is no basis for this

10:06:30AM 21   statement to be admitted in this hearing at all.

10:06:39AM 22          MR. ERAUT:  Excuse me, your Honor.  This is Allen

10:06:42AM 23   Eraut for defendant Warren Pumps.  Incidentally, there are

10:06:44AM 24   multiple defendants that have common interests here that

10:06:48AM 25   may have the same objections.  I assume you don't want us

10:06:49AM 1   all to join in objections made by other defendants.  Is

10:06:52AM 2   the procedure acceptable to the Court that an objection

10:06:56AM 3   made by one defendant will be deemed made by all

10:06:59AM 4   defendants?

10:07:00AM 5        THE COURT:  Yes.  I think it is better that you

10:07:02AM 6   opt out rather than having to opt in every time there is

10:07:05AM 7   an objection --

10:07:08AM 8        MR. ERAUT:  Thank you, your Honor.

10:07:10AM 9        THE COURT:  -- as to opening statement.

10:07:35AM 10       MR. VEGA:  Good morning, your Honor.  Dennis Vega

10:08:21AM 11  for Foster Wheeler.

10:08:24AM 12       At its core, this case is primarily --  The

10:08:32AM 13  declaration is essentially hearsay.  It is an out-of-court

10:08:36AM 14  statement offered for the truth of the matter asserted,

10:08:38AM 15  nothing more.

10:08:40AM 16       In fact, during plaintiffs' counsel's opening he

10:08:44AM 17  actually said he told his wife, he told his daughter, he

10:08:47AM 18  told his doctors.  All of those statements are the same

10:08:50AM 19  statement over and over and over again, and they were not

10:08:53AM 20  said, as the rule requires, a declaration made under the

10:09:04AM 21  belief of impending death.  These statements were made

10:09:08AM 22  numerous times, the same statement, over and over again.

10:09:12AM 23       In fact, plaintiffs' counsel said he was holding on,

10:09:15AM 24  and holding on, and holding on.  That holding on, we

10:09:18AM 25  maintain, breaks that immediacy, the belief that you

10:09:23AM 1     are -- that death is imminent.

10:09:26AM 2          When we are looking at this dying declaration and

10:09:30AM 3     whether in fact it is a dying declaration there are two

10:09:33AM 4     critical time periods that are important.  There is the

10:09:36AM 5     time period between when the incident occurred and when

10:09:39AM 6     the statement is made.  It is usually short, such as when

10:09:44AM 7     it's, you know, "Bob has just shot me."  And the

10:09:47AM 8     rationale --

10:09:48AM 9               THE COURT:  It wasn't Bob.  It was somebody else.

10:09:54AM 10              MR. VEGA:  The rationale being that it is

10:09:57AM 11    spontaneous, it is made without reflection.  In this

10:10:00AM 12    particular instance, we don't have that here.  We are

10:10:04AM 13    recounting things that happened 50 years earlier.

10:10:07AM 14         Additionally, there is the time period between when

10:10:11AM 15    the statement is made and death.  Here, again, as

10:10:15AM 16    plaintiff admitted in his opening, that statement was made

10:10:20AM 17    over many weeks, over many months.  It is the same

10:10:24AM 18    statement over and over again.  It is just blanket

10:10:28AM 19    hearsay.

10:10:28AM 20         Additionally, the rule arises from the common law

10:10:32AM 21    from homicide cases where, you know, there might not be

10:10:35AM 22    any witnesses.  That's not the case here.  We are talking

10:10:37AM 23    about shipyards that employed thousands of people.  They

10:10:44AM 24    actually identified several coworkers in this case.  So

10:10:48AM 25    there is no reason that we need to rely on really a

10:10:53AM 1    plaintiff-fabricated declaration.

10:10:56AM 2         Under Federal Rule of Evidence 804(b)(2) it is

10:11:02AM 3    plaintiffs' burden to prove several factors.  As we will

10:11:06AM 4    go through these factors, you will see that plaintiff

10:11:08AM 5    fails to meet all three of these.

10:11:12AM 6         The statement --  This is not a statement that was

10:11:16AM 7    made by Mr. Varney.  In fact, as we go through this you

10:11:20AM 8    are going to see that this was simply a legal document

10:11:22AM 9    created by his attorney.  It was not believing death was

10:11:27AM 10   imminent.  It was stated several weeks in advance.  He was

10:11:33AM 11   holding on.  We deposed the wife.  The wife said, "He

10:11:37AM 12   wanted to do this for me."  He knew he was -- he knew the

10:11:40AM 13   purpose for this statement, and it was not done under

10:11:43AM 14   impending death.

10:11:44AM 15        And it was not about its cause or circumstances.  The

10:11:49AM 16   instance relayed here is 50 years ago.  I think it was 46

10:11:54AM 17   to 60 years earlier.

10:11:57AM 18        The background of the case, very briefly, Mr. Varney

10:12:00AM 19   worked in the shipyards from '57 to 1972.  Forty-six years

10:12:06AM 20   later, August 17th -- August 2017, he is diagnosed with

10:12:10AM 21   mesothelioma.  The case is filed December of 2017.

10:12:18AM 22        January 16th --  And this is going to be an important

10:12:21AM 23   piece here.  January 16th, plaintiff serves interrogatory

10:12:25AM 24   responses on defendants.

10:12:29AM 25        January 22nd, they file a notice of deposition.  The

10:12:32AM 1    notice of deposition is for February 5th.  Throughout that

10:12:36AM 2    point in time there is no immediate threat of impending

10:12:40AM 3    death.  He knows --  He's alive, he is going to testify.

10:12:44AM 4         On February 1st they reschedule the video to

10:12:50AM 5    February 8th.  The reason given is that he is

10:12:55AM 6    hospitalized, but he is stabilized.  So we know

10:12:58AM 7    February 1st he is at least stable, and they still think

10:13:02AM 8    they are going to produce him for a deposition.

10:13:04AM 9         On February 2nd, and, again, this becomes very

10:13:07AM 10   important -- this is communication from plaintiffs'

10:13:10AM 11   counsel to the defendants -- Mr. Varney is currently on

10:13:14AM 12   morphine, he is unable to speak, so we need to get the

10:13:19AM 13   video done a little sooner.  So they still expect to do

10:13:22AM 14   the video.

10:13:23AM 15        February 7th is when they sign the declaration, and

10:13:26AM 16   then he does pass away the next day.

10:13:28AM 17        Here, we deposed Mrs. Varney.  We asked her,

10:13:38AM 18   question, "On the morning that your husband signed the

10:13:41AM 19   declaration, were you in the hospital room all morning?"

10:13:44AM 20   "That day I returned early because that was going to

10:13:47AM 21   happen, so I needed to be there.  I needed to be there."

10:13:52AM 22   "So you got -- you were at the hospital early, and then

10:13:56AM 23   did you go to work that day?"  "No, I wasn't working.  I

10:13:59AM 24   asked for permission from work.  I wasn't working.  I

10:14:02AM 25   asked for permission."

10:14:04AM 1    In reality, Ms. Varney later testifies she remained

10:14:08AM 2  in the hospital that entire morning.  And they were all

10:14:11AM 3  waiting to sign this document.  Again, waiting to sign the

10:14:15AM 4  document.  So it is not imminent.  They are still waiting.

10:14:19AM 5  They know that he is hanging on.

10:14:20AM 6    "You said when he started he wanted to do this.  What

10:14:26AM 7  do you mean by 'when he started?'"  And Ms. Varney

10:14:30AM 8  responds, "When they told him that he was ill from

10:14:32AM 9  asbestos he started -- he wanted to do something because

10:14:35AM 10 of his illness.  So he knew that if he did that paperwork

10:14:38AM 11 he would help me.  So he wanted me to be okay."

10:14:41AM 12    Herein lies the real reason for the declaration.  And

10:14:47AM 13 we are going to go through it right now.  You are going to

10:14:50AM 14 see that this statement, which is the purported Varney

10:14:53AM 15 declaration, is actually nothing more than just

10:14:57AM 16 plaintiffs' statement -- plaintiffs' counsel.  It is

10:15:01AM 17 completely self-serving.  As we go through it, you are

10:15:03AM 18 going to see that appears to be copied from plaintiffs'

10:15:06AM 19 interrogatory responses.

10:15:09AM 20    So here is the interrogatory responses that were

10:15:12AM 21 served on the defendants earlier in this case, three weeks

10:15:16AM 22 before the signed declaration.  And it is virtually a cut

10:15:22AM 23 and paste job.

10:15:23AM 24    So we have the declaration of Mr. Varney.  In the

10:15:26AM 25 declaration of Mr. Varney he says that he worked as a

10:15:29AM 1    machinist at Puget Sound, and he gives the date.  When we

10:15:34AM 2    look at the interrogatory responses, same information.

10:15:38AM 3         Here, the declaration of Mr. Varney, he says -- he

10:15:42AM 4    says in his declaration that he signs the day before he

10:15:45AM 5    passes that he has knowledge of the facts and

10:15:48AM 6    circumstances set forth below.  But the problem is, three

10:15:51AM 7    weeks earlier, when plaintiffs served their

10:15:56AM 8    interrogatories, which are verified by plaintiff and

10:15:59AM 9    plaintiff's wife, there, he says, "I believe my attorneys

10:16:02AM 10   have information suggesting that I was exposed to

10:16:05AM 11   defendants' asbestos products during my time working as a

10:16:09AM 12   marine machinist."  So three weeks earlier we are getting

10:16:13AM 13   a more accurate version of what happened.  It is his

10:16:17AM 14   attorneys that are giving him this information.

10:16:18AM 15        Next, he says, "During my time at both the shipyards

10:16:23AM 16   I breathed dust from the removal and replacement of

10:16:25AM 17   asbestos-containing gaskets."  In his interrogatories he

10:16:29AM 18   basically says the same thing three weeks earlier, "As a

10:16:33AM 19   marine machinist Mr. Varney was exposed to

10:16:37AM 20   asbestos-containing gaskets and insulation."

10:16:39AM 21        Next, in the declaration, so the day before he passes

10:16:42AM 22   away, he identifies turbines manufactured by General

10:16:46AM 23   Electric and Westinghouse, valves manufactured by --  He

10:16:49AM 24   lists type of equipment and then manufacturer name.

10:16:52AM 25        So let's go to the interrogatories.  What does it say

10:16:54AM 1    there?  The interrogatories, "He was exposed to

10:16:57AM 2    asbestos-containing materials associated with valves

10:17:00AM 3    manufactured by Atwood & Morrill."  And he goes through

10:17:04AM 4    the same -- the exact same items, the same company

10:17:07AM 5    manufacturers.

10:17:14AM 6        Here again, "I never saw a warning about asbestos or

10:17:23AM 7    cancer on a single product from any of these companies."

10:17:29AM 8    That's what's in his declaration.  But three weeks earlier

10:17:32AM 9    it was, based on information his attorneys gave him,

10:17:35AM 10   "Mr. Varney was never warned about the hazards of

10:17:38AM 11   asbestos.  He never saw a warning on any of defendants'

10:17:43AM 12   products about the hazards of asbestos."

10:17:46AM 13       We have this progress note.  This is a progress note

10:17:50AM 14   that, to plaintiffs' counsel's credit, he raised it to

10:17:53AM 15   your attention, because it is a very important entry in

10:17:56AM 16   the doctor's note.  So here we have a note from

10:18:00AM 17   Dr. Kercheval, which is on the day that the declaration is

10:18:03AM 18   presumably signed.  It's at 11:30.  And the interesting

10:18:07AM 19   thing here is that the doctor says that he is now unable

10:18:13AM 20   to provide any information and is nearly obtunded.

10:18:20AM 21       That is an interesting word.  In Taber's Encyclopedic

10:18:28AM 22   Medical Dictionary obtunded means, "Having diminished

10:18:32AM 23   arousal and awareness, often as the result of

10:18:36AM 24   intoxication, metabolic illness, infection, or neurologic

10:18:41AM 25   catastrophe."

10:18:42AM  1   Dr. Kercheval is asked, "What do you mean by

10:18:45AM  2 'obtunded'?"  He gives us his definition.

10:18:48AM  3   So what was Mr. Varney's condition on the 7th?  "He

10:18:51AM  4 had actually -- at that point I make a note that he is --

10:18:54AM  5 was essentially obtunded."  In other words, he was not

10:18:59AM  6 responding to any verbal stimuli.  That's within a half

10:19:03AM  7 hour of him signing the declaration.

10:19:05AM  8   We asked Mrs. Varney, "Do you recall what time of day

10:19:11AM  9 it was on February 7th when you saw your husband sign this

10:19:15AM 10 document?"  She says, "It was in the morning.  I don't

10:19:17AM 11 remember the time, but it was before noon or at noon."  We

10:19:21AM 12 know from the notary, we took his deposition, he says that

10:19:26AM 13 it was signed at 11:00.

10:19:27AM 14   Again, this is Dr. Kercheval.  You were shown a

10:19:35AM 15 picture of another doctor, Dr. Sharma.  But it turns out

10:19:40AM 16 that Dr. Kercheval saw this -- saw Mr. Varney every single

10:19:47AM 17 day, from the day he was admitted in January until the day

10:19:50AM 18 he passed.  He told us he worked 14 days straight.

10:19:54AM 19 Dr. Kercheval was the attending physician.  He was the

10:19:57AM 20 attending physician in charge.

10:19:59AM 21   Dr. Sharma, and to Dr. Sharma's credit, he actually

10:20:04AM 22 tells us that some of the notes that are in the medical

10:20:07AM 23 records -- there is a template.  It is basically as you go

10:20:11AM 24 through you are just pushing the template and it just

10:20:14AM 25 repeats what was on there days before.  When you go

10:20:17AM 1   through the medical records you will see that some of the

10:20:19AM 2   records have that he is on certain medications that he is

10:20:22AM 3   not on.  We know that he is not on the medications, they

10:20:25AM 4   are just entering -- just pushing the button, because we

10:20:29AM 5   actually see the bill later on and we see what they

10:20:32AM 6   charged for.  There are certain entries, like alert and

10:20:36AM 7   oriented times four --  We are going to get to it, but you

10:20:38AM 8   will see that Mr. Varney was nonresponsive for at least

10:20:42AM 9   four days before he signed that declaration.

10:20:45AM 10       Here, Dr. Kercheval is asked, "During the time

10:20:49AM 11  Mr. Varney was at Abrazo West, would you have been -- were

10:20:53AM 12  you considered his primary care doctor?"  "For the

10:20:56AM 13  hospital, yes."

10:20:56AM 14       And here is Dr. Sharma.  "Okay.  If I -- if -- it

10:21:02AM 15  would be typical, in your experience, for the attending

10:21:05AM 16  physician to spend more time with the patient than you as

10:21:08AM 17  a specialist in pulmonology?"  His answer, "We are limited

10:21:12AM 18  to our specialty only.  We focus on our specialty and the

10:21:16AM 19  attending physicians do develop the -- every part of it."

10:21:21AM 20       And here is another note from Dr. Sharma.  This is

10:21:24AM 21  the same day at 8:30 in the morning.  "Neuro:  Follows

10:21:29AM 22  simple commands.  Rapidly declining."  At 8:30 a.m. he is

10:21:34AM 23  rapidly declining.

10:21:35AM 24       Deposition of Dr. Sharma.  "So all that says is he

10:21:38AM 25  could move his eyes up and down, back and forth, correct?"

10:21:43AM 1    "He can.  He can follow the commands."  "On command?"  "On

10:21:47AM 2    command."  "Okay.  In terms of his ability to otherwise

10:21:49AM 3    respond, would you defer to Dr. Kercheval and his

10:21:51AM 4    examination, his findings?"  "Yes, sir."

10:21:54AM 5         Deposition of Dr. Sharma.  "You don't have any

10:21:58AM 6    personal knowledge whether Mr. Varney read and understood

10:22:02AM 7    that declaration that counsel for plaintiffs has shown to

10:22:07AM 8    you today; is that correct?"  "That is correct.  I have no

10:22:10AM 9    knowledge."

10:22:11AM 10        This is email correspondence from Mr. Adams to the

10:22:17AM 11   defendants.  And it says, "Although Mr. Varney" -- and

10:22:21AM 12   this was on February 2nd, "Although Mr. Varney may not be

10:22:25AM 13   able to do it, he is in the hospital, on morphine, and

10:22:30AM 14   unable to speak at this moment, we propose going forward."

10:22:35AM 15   So February 2nd Mr. Varney is unable to speak at all.  And

10:22:38AM 16   that's from plaintiffs' counsel.

10:22:40AM 17        All of the material assertions in the declaration are

10:22:47AM 18   taken from the interrogatory responses that were served

10:22:49AM 19   three weeks earlier.  When they were interrogatory

10:22:53AM 20   responses they were based on counsel's knowledge, not

10:22:56AM 21   Mr. Varney's.

10:22:58AM 22        Declaration of Mrs. Varney.  This is the wife, again.

10:23:05AM 23   Although you heard today in opening that he told his wife,

10:23:10AM 24   he told his daughter, he told the doctors --  Here,

10:23:16AM 25   Mrs. Varney is specifically asked, "Did you ever hear him

10:23:19AM 1  say the word 'insulation'?"  "Insulation?  No."  "Did you

10:23:23AM 2  ever hear insulation -- did you ever hear of insulation?

10:23:26AM 3  Did you ever hear him say the word 'gasket'?"  Answer:

10:23:29AM 4  "Gasket?"  "Gasket."  "No, I don't remember."  "Did you

10:23:31AM 5  ever hear him say the word "packing'?"  "I don't remember.

10:23:35AM 6  No, I don't remember."

10:23:36AM 7       Deposition of Dr. Sharma.  "And so what Mr. Varney is

10:23:41AM 8  telling you in this document that's on the first page --

10:23:45AM 9  first of all, the document from February 6th -- so it's in

10:23:50AM 10  2017, so it is over a year before Mr. Varney passed away?"

10:23:54AM 11  "Yes, sir."  "Okay.  What Mr. Varney is essentially

10:23:57AM 12  telling you in the document is that he was exposed to

10:23:59AM 13  asbestos in the shipyards beginning in 1957, when he was

10:24:03AM 14  18 years old?"  "Yes, sir.  Yes."

10:24:07AM 15       And this is talking about another note from

10:24:09AM 16  Dr. Sharma, again, that he had recounted to his doctors

10:24:13AM 17  months before the signing of this declaration.  There is

10:24:18AM 18  nothing immediate about this declaration.

10:24:20AM 19       Interrogatory responses can in no way be statements

10:24:23AM 20  made under the belief of imminent death.  And that's

10:24:26AM 21  exactly what they are asking you to do here.

10:24:28AM 22       Mr. Varney could not speak for days before his death.

10:24:31AM 23  Any statements purportedly made to counsel were weeks old,

10:24:35AM 24  at best.  They certainly were not on imminent belief of

10:24:39AM 25  death.

10:24:39AM 1      The re-signing of a lawyer-prepared pleading that
10:24:44AM 2  restates allegations drawn from interrogatory responses
10:24:48AM 3  does not make them reliable evidence.  In fact, those
10:24:52AM 4  are -- it's a classic hearsay statement, it is a classic
10:24:55AM 5  self-serving statement.  Those are never allowed to be
10:24:58AM 6  admitted for any purpose, except if we were going to use
10:25:02AM 7  them for impeachment.  Defendants can use them
10:25:05AM 8  affirmatively.  Plaintiffs can't use them affirmatively.
10:25:09AM 9      The critical factual assertions IDing specific
10:25:13AM 10  companies and materials, identifications of asbestos
10:25:16AM 11  origins, those are not based on Mr. Varney's personal
10:25:19AM 12  knowledge.  Federal Rule --  This is based on Federal
10:25:23AM 13  Rule 602, that is classic hearsay within hearsay.
10:25:26AM 14      The cause and the circumstance of death.  Again,
10:25:33AM 15  "Barry just shot me."  Yes, that is talking about the
10:25:36AM 16  cause of death.  But if you tell somebody, "I am dying of
10:25:40AM 17  mesothelioma," that is not relaying the cause or the
10:25:45AM 18  circumstances.  That is giving a diagnosis.  That doesn't
10:25:48AM 19  have any of the telltale assurances of reliability that we
10:25:52AM 20  look to when a court is determining whether a dying
10:25:55AM 21  declaration is going to be admitted.
10:25:58AM 22      Essentially plaintiffs' counsel typed out the factual
10:26:08AM 23  allegations of the liability claims against all of the
10:26:11AM 24  defendants, had Mr. Varney sign it on his deathbed, and
10:26:15AM 25  then is asking this court to ratify those claims as

10:26:18AM 1    factually reliable and true.

10:26:19AM 2         We talked about capacity.  I am wrapping up here.  We

10:26:27AM 3    have an email, again, from Mr. Adams.  And this is the day

10:26:34AM 4    of the signing of the declaration.  So here:  "Dear

10:26:40AM 5    counsel, unfortunately, Don is just too sick to go forward

10:26:44AM 6    with his deposition tomorrow."  So he is too sick to go

10:26:48AM 7    forward with the deposition, but he is not too sick to

10:26:50AM 8    sign a document.  "He is in tremendous pain, can hardly

10:26:54AM 9    breathe, and is barely hanging on to life.  His death is

10:26:59AM 10   imminent."

10:27:01AM 11        Let's take a look at that word "imminent," because,

10:27:03AM 12   of course, it is derived from the statute itself.  But,

10:27:06AM 13   remarkably, all of the declarations that plaintiff uses to

10:27:09AM 14   support --  You know, he always has --  You know, he's got

10:27:12AM 15   the priest using the word "imminent."  He's got the notary

10:27:16AM 16   using the word "imminent."  He has Dr. Kercheval using the

10:27:19AM 17   word "imminent."  Everybody is using the word "imminent."

10:27:22AM 18        Here, the declaration of Dr. Kercheval, talking

10:27:27AM 19   about --  Again, this goes to Mr. Varney's competency at

10:27:32AM 20   the time of the signing.  "The treatment options for

10:27:34AM 21   mesothelioma are palliative, not curative.  The best

10:27:37AM 22   result we can hope for is to prolong the patient's

10:27:40AM 23   survival, while minimizing cancer-related symptoms.

10:27:43AM 24   Mesothelioma is a progressive cancer in which patients

10:27:46AM 25   often experience increasing levels of pain and greater

difficulties with ambulation as the cancer progresses."

Additionally, "Patients' mental faculties often diminish due to the disease process or drugs that are administered."

At the end --  So here Dr. Kercheval is being asked questions.  At the end of Page -- Paragraph 5, it states, "Additionally, patients' mental faculties often diminish due to the disease process or drugs that are administered, including drugs to manage pain."  "Are you talking about patients generally there or are you talking about Mr. Varney?"  Answer:  "I don't know the exact reference at this point.  Both would be true, in that in my notes, you know, I certainly made reference to his decrease in cognition."  Again, that is the day he signs the declaration.

"Okay.  It indicates that Mr. Varney began morphine on the 27th" -- and we are talking 27th of January here -- "and received it, it looks like, through the 8th, except for the 30th and 31st of January, and the 2nd and 3rd of February.  Correct?"  "That's what I see."

Here are some of the medications.  He is on a litany of medications.  I can't even pronounce the first one. Cetirizine, an antihistamine.  Drowsiness and tiredness are the side effects.

Methocarbamol, a muscle relaxant.  The known side

10:29:18AM 1    effects -- and this is per the Physicians' Desk

10:29:21AM 2    Reference -- confusion, drowsiness, dizziness, blurred

10:29:25AM 3    vision.  That was administered twice on the morning that

10:29:27AM 4    Mr. Varney signed that declaration.

10:29:29AM 5         Morphine, an opioid.  What are the side effects?

10:29:33AM 6    Confusion, delirium, drowsiness, hallucinations, blurred

10:29:38AM 7    vision.  Again, he is on several medications.  Blurred

10:29:43AM 8    vision is a side effect.  He is handed a document to sign.

10:29:48AM 9    The morphine was administered three times that morning.

10:29:51AM 10        A note from Dr. Kercheval.  And this is from -- this

10:30:02AM 11   is two -- just two days before he signs the declaration.

10:30:05AM 12   And already we are seeing signs.  "Patient continues to

10:30:10AM 13   decline since admission."  And it says, "SIG decline,"

10:30:14AM 14   which during the deposition he said is significant

10:30:16AM 15   decline, "with very poor prognosis.  Have had discussions

10:30:21AM 16   with family, but patient is unable to significantly

10:30:26AM 17   contribute to the discussion."

10:30:28AM 18        Again, Dr. Kercheval discussing his February 5th --

10:30:36AM 19   two days before he signs the declaration -- medical

10:30:38AM 20   examination.  Again, he tells us, "He just wasn't

10:30:43AM 21   cognitively able to contribute to that discussion?"

10:30:49AM 22   "Yes."

10:30:50AM 23        Dr. Kercheval, again, when we are discussing the

10:30:54AM 24   February 7th examination.  "When you say that he's being

10:31:00AM 25   nonresponsive, what in your mind does that mean in terms

10:31:03AM 1   of his condition?"  "So at that point for this patient, my

10:31:07AM 2   feeling would be that he had -- was deteriorating to the

10:31:09AM 3   point where he wasn't able to respond any longer."

10:31:14AM 4        "When you say he is being nonresponsive, what does

10:31:17AM 5   that mean?  Does he recognize people who are in the room?"

10:31:22AM 6   "Typically, I would say that -- if I'm saying he's

10:31:25AM 7   nonresponsive, that would be me going in to evaluate him,

10:31:30AM 8   and as part of doing the physical, calling his name,

10:31:32AM 9   getting him to respond, whether that be opening his eyes

10:31:35AM 10  or answer or grasp my hand, any one of those."

10:31:40AM 11       Ms. Varney.  This is his wife discussing the signing.

10:31:46AM 12  "I was even surprised.  It was a surprise for me because

10:31:50AM 13  at that moment he was lucid.  He was good at that moment.

10:31:53AM 14  I think he was waiting.  I don't know.  He would always

10:31:56AM 15  tell me, 'Gloria' --  He would always worry about me.  And

10:31:59AM 16  I believe in God.  I think God allowed him to sign it,

10:32:01AM 17  because I can't explain how he was able to do it.  He

10:32:04AM 18  signed."

10:32:05AM 19       What that tells you is even she recognized --  This

10:32:09AM 20  is not a well man sitting there.  Somehow he was able to

10:32:12AM 21  sign despite all the dizziness, the drowsiness, the

10:32:17AM 22  blurred vision.

10:32:18AM 23       "And Dr. Kercheval told us when" --  This is the

10:32:24AM 24  deposition of Ms. Varney.  "And Dr. Kercheval told us when

10:32:28AM 25  he was there your husband wasn't talking anymore.  Do you

10:32:31AM 1  remember that?"  Ms. Varney:  "My husband couldn't talk,

10:32:35AM 2  but during that time he was awake.  He was awake, but he

10:32:38AM 3  didn't talk.  But at that moment, I don't understand, but

10:32:40AM 4  he was awake."

10:32:43AM 5       "Was there any conversation that happened during this

10:32:47AM 6  time when the priest and the notary were present in the

10:32:50AM 7  hospital room when your husband signed this declaration?"

10:32:54AM 8  Ms. Varney answers:  "No, everyone was quiet.  The priest

10:32:58AM 9  was to his side.  The notary was in front, watching.  I

10:33:01AM 10  was next to my husband.  The lawyer was there.  We were

10:33:05AM 11  just looking at him.  I was the one that was next to him,

10:33:08AM 12  but we were just there, watching.  The notary was watching

10:33:12AM 13  everything.  But no one talked."  No one talked.  "He just

10:33:17AM 14  looked at me when they gave him the paper and he held the

10:33:20AM 15  paper and then he signed.  He signed and then he laid

10:33:24AM 16  backwards."

10:33:25AM 17       So the evidence has shown he is unable to testify,

10:33:31AM 18  because that's why they stopped his deposition and they

10:33:33AM 19  cancelled the deposition.  He could not speak and had not

10:33:36AM 20  spoken for at least several days.  He was unable to

10:33:39AM 21  provide any information.  He is heavily medicated.

10:33:42AM 22  Mrs. Varney was shocked that he could even sit and look at

10:33:46AM 23  the declaration.  But we know he is on a hospital bed.

10:33:49AM 24  But we will get to the hospital bed later.  He is not

10:33:52AM 25  capable of providing detailed descriptions of equipment,

10:33:56AM 1    work practices, and the chemical composition of the

10:33:59AM 2    materials.  We know he is not able to provide that,

10:34:01AM 3    because if he was able to provide that, they would have

10:34:04AM 4    scheduled the deposition.

10:34:07AM 5            THE COURT:  Counsel, you are making a closing

10:34:09AM 6    argument here and taking more time than I anticipated

10:34:14AM 7    would be necessary for opening statement.

10:34:17AM 8            MR. VEGA:  I will wrap this up.  You are going to

10:34:23AM 9    see there is no printer.  We don't know anything about how

10:34:26AM 10   this declaration was created.  In fact, when we tried to

10:34:29AM 11   get information about how the declaration was created, and

10:34:32AM 12   I'm sure we are going to hear about it on the stand, there

10:34:35AM 13   was a claim of attorney-client work privilege, and also

10:34:39AM 14   attorney-client privilege.  Again, our position is all of

10:34:45AM 15   that is waived, and it must be waived, and it was waived

10:34:48AM 16   the moment they produced it.

10:34:49AM 17       I will go through this very quickly and just get to

10:34:55AM 18   the end.  There was no laptop.  Again, I am just

10:35:23AM 19   recounting what I have already gone through.  I don't want

10:35:26AM 20   to belabor it.

10:35:27AM 21       Here, I think one of the important things for the

10:35:30AM 22   Court to determine, when we are going to decide whether

10:35:34AM 23   this is a dying declaration or not, is just the

10:35:38AM 24   spontaneity of it, does it give us the reliance of

10:35:42AM 25   truthfulness?  And this whole scene --  And we are going

10:35:49AM 1    to go through it in detail.  This whole scene that is

10:35:52AM 2    orchestrated -- and the orchestration, your Honor -- and

10:35:55AM 3    the level of -- just the theatrical production of calling

10:36:00AM 4    a priest --  Literally they call a priest to the hospital

10:36:04AM 5    on February 6th to witness the signing.  "But you know

10:36:08AM 6    what, he can't sign it today.  Priest, come back

10:36:13AM 7    tomorrow."  And now the priest comes back tomorrow.  The

10:36:15AM 8    next day the priest is there.  They call a notary.  They

10:36:18AM 9    have a notary there.  They have everyone there.  It is

10:36:21AM 10   completely staged.

10:36:24AM 11       We have interrogatory responses from January 16th.

10:36:29AM 12   The priest shows up 2/6.  There is no notary on 2/6, so

10:36:34AM 13   they have to send him back.  The priest comes back again,

10:36:37AM 14   and it is a complete do over.

10:36:41AM 15       In the end, this declaration is not admissible in

10:36:44AM 16   this case for plaintiffs to defeat summary judgment.  It

10:36:48AM 17   cannot be relied upon by their experts.  This is just

10:36:52AM 18   another way of spinning an attorney declaration.  This is

10:36:57AM 19   simply an affidavit.  Thank you, your Honor.

10:37:03AM 20          THE COURT:  I don't know about order here, but

10:37:06AM 21   you jumped up so I guess you're next.  I indicated in the

10:37:13AM 22   procedural order that we would -- if there was any

10:37:18AM 23   question about it, that you follow the order you appear in

10:37:22AM 24   the file.  If you're next and nobody complains, that's

10:37:28AM 25   fine with me.

10:37:31AM 1     MS. WEGLARZ:  Unless somebody wants to stand up

10:37:33AM 2  first.

10:37:33AM 3     Your Honor, I just want to be brief about this, and

10:37:36AM 4  put the focus on a different part of your Honor's order.

10:37:43AM 5  Let me set this up first.

10:38:07AM 6     Your Honor, I would like to focus --

10:38:18AM 7     THE COURT:  Give me your name again, please?

10:38:21AM 8     MS. WEGLARZ:  Clare Weglarz on behalf of John

10:38:26AM 9  Crane, Inc.

10:38:28AM 10    I want to focus on what is the basis for the dying

10:38:34AM 11 declaration exception to the hearsay rule.  This is, as

10:38:38AM 12 your Honor knows, a rule that is based on common law.  It

10:38:43AM 13 goes back decades, centuries, 1700s.

10:38:47AM 14    The traditional theory is that no one would dare face

10:38:52AM 15 the wrath of God with a lie on your lips.  Therefore, what

10:38:56AM 16 I am going to focus on right now is the crucial element of

10:39:00AM 17 the awareness by the speaker when that statement is first

10:39:07AM 18 spoken.

10:39:10AM 19    I will start with a 1933 Supreme Court case that we

10:39:14AM 20 all sort of learned in law school, when we are talking

10:39:17AM 21 about the dying declaration.  I know it is a long time for

10:39:20AM 22 most of us to remember law school.  But *Shepard versus*

10:39:24AM 23 *United States* talks about a woman who is poisoned with a

10:39:27AM 24 lethal does of arsenic, and she lingered in agony for

10:39:31AM 25 weeks.  During her lingering she uttered the statement,

10:39:36AM  1    "Dr. Shepard," who is her husband, "poisoned me."  Justice

10:39:43AM  2    Cardozo did not find this to be a dying declaration,

10:39:48AM  3    because, he said, even though she had been lingering in

10:39:51AM  4    this long death, when she said this statement for the

10:39:55AM  5    first time she did not speak as one who was actually dying

10:40:01AM  6    at the time.

10:40:02AM  7         And I think the important quote that's taken out of

10:40:05AM  8    this case, again, what I am going to focus on right now,

10:40:09AM  9    is, "To make a dying declaration the declarant must have

10:40:14AM 10    spoken without hope of recovery and in the shadow of

10:40:17AM 11    impending death.  The patient must have spoken with the

10:40:21AM 12    consciousness of a swift and certain doom."

10:40:25AM 13         So what we have here is the dying declaration of

10:40:31AM 14    Mr. Varney.  As counsel before me pointed out, it does

10:40:36AM 15    contain statements that had already been made for purposes

10:40:40AM 16    of this litigation.  They had already been spoken before

10:40:45AM 17    the date this declaration was actually signed by

10:40:49AM 18    Mr. Varney.  Some of these statements were made at least

10:40:54AM 19    as early as December 20th, 2017, because they are

10:40:58AM 20    contained in the complaint that started this lawsuit.

10:41:01AM 21         Some of these statements were made as early as

10:41:05AM 22    February 6th, 2017, when Mr. Varney had been seen by his

10:41:13AM 23    pulmonologist, Dr. Sharma.  Dr. Sharma notes and told us

10:41:18AM 24    in his deposition that, even a year before, Mr. Varney had

10:41:23AM 25    been telling him about these exposures to asbestos that he

10:41:26AM 1   had at these shipyards.  That's a year before.  That's,

10:41:32AM 2   let's see, six months before he is even diagnosed with

10:41:35AM 3   mesothelioma.  He is not diagnosed with mesothelioma until

10:41:38AM 4   August of 2018 (sic).

10:41:41AM 5        What we do know from the facts of this case, when

10:41:46AM 6   death finally does appear imminent, at least in the eyes

10:41:50AM 7   of the physician, and when he is telling the family this,

10:41:53AM 8   that is not until February 6th, 2018, a year after these

10:41:58AM 9   statements had been first spoken by Mr. Varney.

10:42:02AM 10       I had mentioned before that these are litigation

10:42:05AM 11  statements.  I am not going to go through it all right

10:42:07AM 12  now.  I will save it for closing argument.  But I do want

10:42:10AM 13  to point out that this declaration does contain legal

10:42:20AM 14  language.  Paragraph 1, this is the legal language of the

10:42:25AM 15  actual statute.  This cannot be coming from Mr. Varney.

10:42:28AM 16  He is not a lawyer.  This is not his own statements.

10:42:33AM 17       Paragraphs 2 through 7, which is the remainder of the

10:42:37AM 18  declaration, mirrors language that is observed in the

10:42:41AM 19  complaint and in the interrogatory responses.  And, again,

10:42:47AM 20  in closing argument I will show the Court how these

10:42:49AM 21  actually mirror each other.

10:42:52AM 22       As we go through this evidentiary hearing today, I

10:42:55AM 23  think this is what the evidence is going to show:  I think

10:42:57AM 24  it is going to show that Dr. Sharma is being told by

10:43:03AM 25  Mr. Varney -- these same exposure statements, a year

10:43:05AM 1     before this declaration is even signed in the hospital.

10:43:11AM 2          Mr. Varney is diagnosed in August of 2017.  Sometime

10:43:16AM 3     between August and December counsel is retained.  I assume

10:43:21AM 4     when counsel is retained Mr. Varney is telling his counsel

10:43:24AM 5     about his exposures to mesothelioma.  Those exposures then

10:43:27AM 6     are put into the complaint.

10:43:30AM 7          Mr. Varney goes into the hospital January 26, 2018.

10:43:35AM 8     That's his last hospital stay.  Mr. Kercheval --

10:43:40AM 9     Dr. Kercheval told us at his deposition that when he went

10:43:43AM 10    into the hospital there was the expectation that

10:43:47AM 11    Mr. Varney was going to leave the hospital.

10:43:49AM 12         On February 2nd, the plaintiffs actually even set a

10:43:56AM 13    deposition for Mr. Varney.  This is when he is in the

10:43:59AM 14    hospital.  There is calendaring a deposition for a few

10:44:03AM 15    days away, five, six days away.  You don't calendar a

10:44:07AM 16    deposition for someone who is on death's doorstep, that is

10:44:12AM 17    going to be a swift -- a swift fate right there.

10:44:15AM 18         On February 6th, this is when Mr. Varney's doctor,

10:44:22AM 19    Dr. Kercheval --  He is the person at the hospital who is

10:44:24AM 20    taking care of him.  This is when finally Dr. Kercheval

10:44:28AM 21    says, this is when I realized he only has three to five

10:44:32AM 22    days to live.  I assume that this is knowledge imparted to

10:44:35AM 23    the family.

10:44:36AM 24         Before that date, just two days before, on

10:44:39AM 25    February 4th, they were preparing for Mr. Varney to leave

10:44:43AM 1   the hospital, to go into hospice, and to even get a

10:44:47AM 2   feeding tube.  Mr. Varney agreed to a feeding tube.

10:44:50AM 3   Again, these are not things a person does if they believe

10:44:53AM 4   that death is going to be swift and at that moment, like

10:44:56AM 5   the old case law tells us we are supposed to look at these

10:45:01AM 6   situations and circumstances under.

10:45:04AM 7         Mr. Varney dies on February 8th.  We have the

10:45:09AM 8   declaration now, the day before he dies.

10:45:12AM 9         The only thing I want to say about the actual signing

10:45:15AM 10   of the declaration, because I think counsel covered a lot

10:45:18AM 11   of it, is that we don't even know if Mr. Varney on the

10:45:23AM 12   deathbed actually read the declaration.

10:45:25AM 13         On Friday, two or three days ago, we had the

10:45:28AM 14   opportunity to depose the notary public, who acknowledged

10:45:35AM 15   the declaration.  And I don't think your Honor -- I'm sure

10:45:38AM 16   you have not had the pleasure of reading that -- portions

10:45:41AM 17   of that deposition.  We will provide it to you.  My only

10:45:45AM 18   point with that is that it was only an acknowledgment.

10:45:49AM 19   Mr. Parris, the notary public, told us an acknowledgment

10:45:55AM 20   is merely saying the identity of the signer is who he is.

10:45:59AM 21   There is no requirement that a person read the actual

10:46:02AM 22   document before that signature is acknowledged.  I think

10:46:08AM 23   that is a problem, because we don't know if he read it at

10:46:11AM 24   all.  We just don't know.

10:46:13AM 25         And, again, the statements in this declaration, what

10:46:17AM 1   the evidence is going to show today, is those statements

10:46:20AM 2   were spoken not for the first time on February 7th.  They

10:46:24AM 3   were spoken in interrogatory responses on January 11th, a

10:46:28AM 4   month before.  They were spoken in the complaint two

10:46:31AM 5   months before.

10:46:33AM 6        Maria, his wife, at her deposition, she told us that

10:46:40AM 7   she had conversations with Mr. Varney about the exposures

10:46:45AM 8   and -- what's in the declaration three to four months

10:46:49AM 9   before he died.

10:46:51AM 10       At another point in her deposition she said that she

10:46:53AM 11  had conversations with Mr. Varney about his asbestos

10:46:59AM 12  exposures at the shipyards even before he was diagnosed.

10:47:04AM 13       And, again, Dr. Sharma, they had extensive

10:47:07AM 14  conversations about the exact same statements that are

10:47:12AM 15  made in that declaration a year later.

10:47:15AM 16       I think the crucial line that we need to be aware of

10:47:20AM 17  in this hearing today is to the right of that red line,

10:47:25AM 18  what statements were made for the first time when death

10:47:28AM 19  became imminent.  I think it becomes imminent, based on

10:47:32AM 20  the evidence that we have in this record, around

10:47:36AM 21  February 6th.  I think that's being conservative.  It

10:47:39AM 22  could have been a little bit later.  We know it is not

10:47:41AM 23  February 2nd, because this is when they are trying to plan

10:47:44AM 24  the deposition.

10:47:45AM 25       We know it is not February 4th, because, again, this

10:47:49AM 1   is when Dr. Kercheval is trying to get him out of the

10:47:52AM 2   hospital, and he is agreeing to the feeding tube and doing

10:47:56AM 3   measures that you don't do to a person that is about to

10:48:00AM 4   die right then.

10:48:02AM 5        It's close to February 6th.  This is when

10:48:08AM 6   Dr. Kercheval thinks there are three to five days to live.

10:48:12AM 7   I don't know if that means --  It is hard with the case

10:48:15AM 8   law knowing exactly what "imminent" is.  Three to five

10:48:18AM 9   days, I think, conservatively, that could be seen as

10:48:21AM 10  imminent.

10:48:23AM 11       We know on February 7th --  That is the only time in

10:48:27AM 12  the record we actually have a declaration of someone

10:48:30AM 13  saying death is imminent, on February 7th.  But, again, I

10:48:34AM 14  will be conservative.

10:48:36AM 15       And so, again, on the timeline --  I think what we

10:48:39AM 16  need to be focused on today, under that earlier

10:48:43AM 17  jurisprudence, the 1930s, the 1700s kind of cases where

10:48:48AM 18  this rule comes from, is when statements are made for the

10:48:51AM 19  first time when death becomes imminent.

10:48:56AM 20       Thank you, your Honor.  I appreciate your time today.

10:49:01AM 21            THE COURT:  It is just about time for a break.

10:49:03AM 22  Anyone else want to make an opening statement?  Okay.  We

10:49:12AM 23  will proceed with the evidence after a short break.  We

10:49:14AM 24  will reconvene at 11:00 by the courtroom clock.

11:00:22AM 25       (Recessed.)

11:02:41AM 1         THE COURT:  You may call your first witness.

11:02:43AM 2         MR. ADAMS:  Thank you, your Honor.  The

11:02:45AM 3 plaintiffs call as their first witness Dr. Ramit Sharma.

11:02:50AM 4 Your Honor, this is a video.  It is sort of a longer

11:02:53AM 5 video.  It is an hour and 19 minutes.

11:02:57AM 6         THE COURT:  Really?

11:02:59AM 7         MR. ADAMS:  Yes.  We only have an hour and a half

11:03:01AM 8 of video, total.  We have two videos, a live witness, a

11:03:05AM 9 read, and two declarations.  It is both sides'

11:03:12AM 10 designations -- video, so it is not as if they are going

11:03:16AM 11 to have to play the same video in their case.  We are

11:03:19AM 12 going to play the whole thing now.  But it is a longer

11:03:21AM 13 video.

11:03:22AM 14         MS. JOHNSON:  Your Honor, Malika Johnson.  My

11:03:26AM 15 concern is, as I noted earlier, that we have --

11:03:29AM 16         THE COURT:  Speak into the mic, please.

11:03:32AM 17         MS. JOHNSON:  Plaintiffs served their

11:03:35AM 18 designations on all of the defendants.  The defendants

11:03:37AM 19 have each countered and objected to portions of

11:03:40AM 20 plaintiffs' proposed designations.

11:03:43AM 21     Your Honor has not seen those transcripts, because

11:03:45AM 22 plaintiff did not file them with the Court.  Your Honor

11:03:49AM 23 has not had the opportunity to rule on any of the proposed

11:03:52AM 24 objections.

11:03:54AM 25     What I would request, in the event that your Honor is

11:03:58AM  1    prepared to let them proceed with a witness that they have

11:04:00AM  2    not been able to show that they could not get here to

11:04:03AM  3    testify live today, then I would request that your Honor

11:04:07AM  4    be given the transcript with all of the highlights for

11:04:11AM  5    each proposed parties' designations, counters, and

11:04:16AM  6    objections, and rulings be made prior to this video being

11:04:20AM  7    played.

11:04:21AM  8            THE COURT:  Are there a lot of objections?

11:04:23AM  9            MR. ADAMS:  They have objected to every single

11:04:25AM 10    word in every single deposition.  Your Honor, my

11:04:28AM 11    suggestion would be that we start with the video, we get

11:04:31AM 12    going on the hearing, and if they have real objections to

11:04:34AM 13    make during the video, they can stand up, we can pause it,

11:04:38AM 14    and you can make a ruling as though the witness is on the

11:04:40AM 15    stand.

11:04:40AM 16            MS. WEGLARZ:  Alternatively, we can just give you

11:04:42AM 17    the transcript.

11:04:43AM 18            THE COURT:  I can read a lot faster than I can

11:04:46AM 19    watch a video.

11:04:48AM 20            MR. ADAMS:  We have the transcripts marked and

11:04:50AM 21    ready to go.

11:04:51AM 22            THE COURT:  I would prefer to proceed that way,

11:04:54AM 23    and then I can mark my objections -- rulings on objections

11:04:59AM 24    as I go.

11:05:01AM 25            MR. ADAMS:  Great.  No problem.  May I approach,

11:05:09AM 1    your Honor?

11:05:09AM 2            THE COURT:  I will --

11:05:11AM 3            MS. JOHNSON:  I don't believe we have been given

11:05:13AM 4    a copy of that, your Honor.

11:05:17AM 5            MS. WEGLARZ:  We haven't seen --

11:05:19AM 6            MS. JOHNSON:  We haven't been given a copy.  We

11:05:24AM 7    have not been given a copy of what has just been handed to

11:05:28AM 8    you.

11:05:29AM 9            THE COURT:  I don't know what this is, so I don't

11:05:32AM 10   know if you have a copy or not.

11:05:34AM 11           MR. ADAMS:  Your Honor --

11:05:42AM 12           MS. WEGLARZ:  We just took a break, but this is

11:05:45AM 13   something we could deal with in about 15 minutes, to make

11:05:48AM 14   sure everything is in here, and then just give it to you,

11:05:51AM 15   and you can look at it later.

11:05:53AM 16           MR. ADAMS:  Your Honor, these are all of the

11:05:56AM 17   objections from all of the defendants marked on a

11:05:59AM 18   transcript for all of the depositions in this case.

11:06:03AM 19       We received --  I am trying not to wade into the

11:06:08AM 20   lawyers' fighting about what actually happened, but we

11:06:10AM 21   received objections late last night from many, many

11:06:15AM 22   defendants.  We stayed up all night marking the

11:06:18AM 23   transcripts, doing all of the work, and they are ready to

11:06:21AM 24   go.  And so we would like to proceed with this hearing.

11:06:27AM 25   We have given them a copy, and we are ready to go.

11:06:33AM 1          MR. CRAIG:  Your Honor, Kevin Craig.  I don't

11:06:35AM 2    believe Local Rule 32(e) has been followed here.  We did

11:06:38AM 3    not receive the transcripts from plaintiff with their

11:06:42AM 4    testimony highlighted until Friday afternoon.  The first

11:06:46AM 5    batch came in at 1:15, and there was a follow up at 4:15.

11:06:51AM 6    That was the first time we had gotten the transcripts that

11:06:54AM 7    are required under Rule 32(e).

11:06:57AM 8          We worked over the weekend, we got them to them

11:07:01AM 9    yesterday.  I have not seen the final markup that is

11:07:07AM 10   supposed to have everything in it, including all of the

11:07:09AM 11   objections.  We would object to the use of these

11:07:13AM 12   deposition transcripts.

11:07:16AM 13          MR. ADAMS:  Your Honor, we had three and a half

11:07:18AM 14   weeks' notice of this hearing.  We took three depositions

11:07:20AM 15   and got declarations and talked to every witness.  We did

11:07:24AM 16   everything.  We subpoenaed all the witnesses, we took all

11:07:27AM 17   the depositions, we got all the declarations.  They did

11:07:31AM 18   nothing.  We sent them what we could designate as quick as

11:07:34AM 19   we could.  They returned it to us.  All of them returned

11:07:36AM 20   it separately without a single document being marked.  We

11:07:40AM 21   collated all of that into one document as fast as we

11:07:44AM 22   could, even for depositions taken last Friday.  And we are

11:07:48AM 23   ready to proceed.

11:07:49AM 24          They are not waiving anything.  The Court has all of

11:07:52AM 25   the objections.  They can make any objections they want as

11:07:55AM 1    the video is played.  We would like to proceed with this

11:07:58AM 2    hearing.

11:07:59AM 3           MS. JOHNSON:  Your Honor, as your Honor knows, it

11:08:02AM 4    is plaintiffs' burden.  We don't have a burden here at

11:08:04AM 5    this evidentiary hearing today.  While they may have

11:08:08AM 6    noticed depositions, they have failed time and again to

11:08:12AM 7    comply with the local rules.  What has been handed to you

11:08:17AM 8    was simultaneously handed to us for the first time today.

11:08:23AM 9           MS. MacKENZIE:  Your Honor, this is Nicole

11:08:25AM 10   MacKenzie on behalf of Parker-Hannifin.  I wanted to add,

11:08:29AM 11   in addition to what Ms. Johnson said, not only is it

11:08:32AM 12   plaintiffs' burden, it's -- an evidentiary hearing was

11:08:36AM 13   ordered, and I think it was clear from the Court's order

11:08:39AM 14   that it was anticipated -- the Court was anticipating

11:08:43AM 15   hearing from live witnesses, not deposition testimony,

11:08:48AM 16   much of which had already been presented in the written

11:08:52AM 17   submissions.

11:08:54AM 18      As the written submissions indicate, some of the

11:08:57AM 19   questions that were asked were objected to and refused --

11:09:02AM 20   plaintiffs' counsel refused to allow the witness to

11:09:05AM 21   respond on the basis of attorney-client privilege.  The

11:09:08AM 22   whole point of having this evidentiary hearing was to

11:09:12AM 23   allow the Court to inquire, and also to rule on those

11:09:17AM 24   kinds of objections, and to order the witnesses to answer,

11:09:20AM 25   if necessary.

11:09:22AM 1    So we would actually object to the use of deposition

11:09:26AM 2 testimony at all, particularly given that, as counsel

11:09:30AM 3 noted, we have known about this hearing for three and a

11:09:34AM 4 half weeks, and they could have -- if they intended to

11:09:37AM 5 proceed on deposition testimony they could have sought

11:09:40AM 6 leave of the Court, and they could have set up a procedure

11:09:43AM 7 for having those submissions exchanged and objected to,

11:09:48AM 8 and everything submitted to the Court prior to the hearing

11:09:51AM 9 so that the Court could rule on those.  That has not

11:09:54AM 10 happened.  And for that reason we think that none of those

11:10:00AM 11 designations should be allowed.

11:10:30AM 12    MS. JOHNSON:  Your Honor, it is my understanding

11:10:32AM 13 that the copy of what has been given to you does not even

11:10:35AM 14 have any of the defendants' objections, in terms of the

11:10:38AM 15 basis of the objection.

11:13:32AM 16    THE COURT:  Who is Mr. Harris who was conducting

11:13:35AM 17 this examination?

11:13:38AM 18    MR. ADAMS:  I'm sorry, your Honor?

11:13:40AM 19    MS. JOHNSON:  Mr. Harris is not present in the

11:13:42AM 20 courtroom.

11:13:42AM 21    THE COURT:  Is he part of your team?

11:13:45AM 22    MS. JOHNSON:  He is with Williams Kastner.

11:13:50AM 23    THE COURT:  One at a time.  And speak into the

11:13:53AM 24 mic.

11:13:53AM 25    MS. JOHNSON:  He is with Williams Kastner, with

11:13:57AM 1    their office.

11:13:57AM 2         THE COURT:  He is a defense lawyer?

11:14:00AM 3         MS. JOHNSON:  He is.

11:14:34AM 4         THE COURT:  Well, a quick look at this tells me

11:14:36AM 5    that there is a great deal in here that is not really

11:14:40AM 6    relevant to the issues that we have to decide.  I take it,

11:15:38AM 7    from a quick look at this, that objections were made after

11:15:43AM 8    the transcript was prepared rather than on the face of the

11:15:49AM 9    deposition; is that correct?

11:15:53AM 10        MR. ADAMS:  Correct.  There are a few objections

11:15:56AM 11   actually in the transcript made at the time of the

11:15:58AM 12   deposition, but very few.  Almost all of the objections

11:16:04AM 13   were not made at the deposition, which I believe is a

11:16:08AM 14   waiver, at least to the form of the question.

11:16:17AM 15        MS. JOHNSON:  And, your Honor, all objections,

11:16:20AM 16   aside from form, were reserved.

11:16:26AM 17        THE COURT:  I am thinking in terms of how hard it

11:16:29AM 18   is to rule on objections.

11:16:39AM 19      You know, I anticipated five or six witnesses, and

11:16:43AM 20   that we would be halfway through them by now.  There is

11:16:50AM 21   too much stuff in this deposition that is not relevant to

11:16:55AM 22   the key issues in this case.  The key issues are what

11:17:01AM 23   happened at the time this document was signed.

11:17:09AM 24      There is a lot of evidence already in the record

11:17:12AM 25   about Mr. Varney's physical condition at the time.  You

11:17:30AM 1   know, I don't want to go through this.  This is more than

11:17:33AM 2   you need to show.  I would be interested in the doctor's

11:17:41AM 3   opinion, and in what happened just on the days leading up

11:17:48AM 4   to this signing.

11:17:52AM 5        But this goes, of course, as usual, into the doctor's

11:17:55AM 6   history and background, and a bunch of stuff that I really

11:18:00AM 7   don't care a lot about for purposes of this hearing.  So

11:18:06AM 8   you are giving me a document that seems to me, while some

11:18:12AM 9   of it is relevant, a great deal is not relevant for this

11:18:17AM 10  hearing.

11:18:22AM 11       I would suggest you want to try again, and go ahead

11:18:32AM 12  with another witness.

11:18:39AM 13            MR. ADAMS:  Your Honor, I understand.  We have

11:18:44AM 14  five or six witnesses.  This is by far the longest

11:18:49AM 15  witness.  In my opinion it is also by far the most

11:18:52AM 16  important witness for our case.  I thought this would go a

11:18:57AM 17  lot quicker, as well.  I understand that concern.

11:19:04AM 18       For example, for the notary, I think the video is --

11:19:16AM 19  it's shorter.  We have declarations for the priest that we

11:19:20AM 20  intend to just publish and read into the record.  That's a

11:19:24AM 21  five-minute thing.  We can do that now.

11:19:28AM 22            THE COURT:  You say a declaration.  Not subject

11:19:32AM 23  to cross-examination?

11:19:34AM 24            MR. ADAMS:  He is not subject to

11:19:36AM 25  cross-examination at the hearing.  He was available for

11:19:41AM 1    cross-examination.  He was subpoenaed, but he has not been

11:19:44AM 2    deposed.  But certainly for purposes of deciding a summary

11:19:47AM 3    judgment motion, a declaration would be admissible.

11:19:54AM 4    That's why we have used declarations for some of the

11:19:58AM 5    witnesses and video depos for some of the others.

11:20:05AM 6         MS. WEGLARZ:  Your Honor, John Crane would object

11:20:07AM 7    to the admission of the declaration, especially in this

11:20:10AM 8    particular hearing where a declaration is at issue.

11:20:14AM 9         MS. JOHNSON:  I would just note that I don't

11:20:16AM 10    believe he was ever subpoenaed.  As I noted previously,

11:20:22AM 11    the defense does not have a burden here.  We had no burden

11:20:26AM 12    to bring him here today and produce him as a live witness.

11:20:30AM 13    If plaintiff intended to use his testimony, then it was

11:20:34AM 14    their obligation to put him on the stand and make him

11:20:37AM 15    subject to cross-examination rather than offering the

11:20:40AM 16    Court yet another hearsay document without exception.

11:20:48AM 17         MR. CRAIG:  Your Honor, the issue here today is

11:20:50AM 18    the evidentiary hearing on the admissibility of evidence

11:20:53AM 19    on summary judgment.  This isn't the summary judgment

11:20:57AM 20    hearing.

11:20:57AM 21         THE COURT:  Well, it's for both the summary

11:21:01AM 22    judgments pending and for trial.  I think that was clear

11:21:10AM 23    in the orders I issued.  You know, things may be

11:21:16AM 24    admissible for one thing and not for another.

11:21:28AM 25         MR. ADAMS:  Your Honor, one solution potentially

11:21:30AM 1    is we can skip ahead to Page 17 of Dr. Sharma's

11:21:35AM 2    deposition.  That skips who he is, his qualifications,

11:21:38AM 3    some of the background about him, if the Court does not

11:21:42AM 4    need that evidence.  It gets right into the medical

11:21:44AM 5    records and his opinions for February 7th, 2018.

11:21:50AM 6         THE COURT:  Well, that's what you need to do, but

11:21:53AM 7    I don't think we should do it without advance notice of

11:21:56AM 8    what pages you are going to submit and so forth.

11:22:01AM 9         I mean, I am just here to work and to do this.  I

11:22:11AM 10   don't want to do a bunch of extra stuff that just isn't

11:22:17AM 11   necessary to these narrow issues.

11:22:21AM 12        Let me suggest that you resubmit this first

11:22:27AM 13   deposition.  I will read it rather than have it played.

11:22:35AM 14   But you should notify the defendants of what portions of

11:22:38AM 15   the deposition you think should be read so they can make

11:22:42AM 16   objections here in court if they have objections to what

11:22:50AM 17   the pared down version is.  My gosh, you knock 17 pages

11:22:58AM 18   off just like that.  I think there is a lot more that are

11:23:02AM 19   not necessary to your position.

11:23:04AM 20        Let's go with the next witness.

11:23:13AM 21        MR. ADAMS:  We have the testimony of the notary.

11:23:20AM 22   That is Stephan J. Parris.  That is also a video, however.

11:23:26AM 23        THE COURT:  All right.

11:23:26AM 24        MS. JOHNSON:  Your Honor, Malika Johnson.  It is

11:23:31AM 25   the same exact issue, they are proposing to play a video

11:23:37AM 1   for this Court, and we have not seen the portions that

11:23:40AM 2   they intend to play, nor have we had the opportunity for

11:23:45AM 3   your Honor to rule on the objections that we specifically

11:23:48AM 4   gave to counsel.

11:23:51AM 5          He asked for the objections yesterday by noon.  They

11:23:55AM 6   took the notary deposition on Friday.  Counsel sent us

11:23:59AM 7   their designations on Saturday, in the afternoon.  They

11:24:03AM 8   asked for the defendants to provide them with counters and

11:24:08AM 9   objections yesterday prior to noon.  We did that.  We

11:24:12AM 10  provided it to them, I believe it was like 11:30,

11:24:19AM 11  something like that.  Nonetheless, they made no move to

11:24:22AM 12  file that with this Court so your Honor would have a copy

11:24:24AM 13  of that and have the opportunity to rule on all these

11:24:27AM 14  issues prior to them contemporaneously trying to play them

11:24:31AM 15  in the hearing.

11:24:33AM 16          THE COURT:  How long is this deposition?

11:24:35AM 17          MR. ADAMS:  This deposition, I think, is 40

11:24:39AM 18  minutes.  The vast, vast majority of it is defense

11:24:47AM 19  designations, not plaintiffs'.  I think my examination of

11:24:52AM 20  the witness was maybe 15 pages total.  Quite short.

11:25:03AM 21          There were a number of statements just made that

11:25:06AM 22  simply aren't true, but I really have no interest in

11:25:10AM 23  saying whose fault it is.  I am simply trying to present

11:25:14AM 24  the evidence to the Court.

11:25:18AM 25          I am not sure what else to do, your Honor.  We did

11:25:21AM 1   our best.  We took the depositions as fast as we could, we

11:25:26AM 2   cut the video as fast as we could, and we sent them what

11:25:29AM 3   we were going to play as fast as we could.  We are here

11:25:33AM 4   having done a tremendous amount of work in a short amount

11:25:35AM 5   of time trying to get this information to the Court.

11:25:37AM 6   There is no jury here, so if they have an objection they

11:25:41AM 7   can stand up and make it, and the Court can rule.  I'm

11:25:44AM 8   sorry, your Honor.  I wish --

11:25:46AM 9          THE COURT:  I understand.  Are there objections

11:25:52AM 10  to the body of the information in the deposition, or is it

11:25:59AM 11  to things like leading questions and so forth?

11:26:04AM 12         MS. JOHNSON:  I would say that there's objections

11:26:08AM 13  as to the form of the questions asked as well as the

11:26:12AM 14  responses, because the questions are seeking information

11:26:15AM 15  that the witness does not have personal knowledge of.

11:26:23AM 16  They are repetitive questions over and over seeking the

11:26:25AM 17  same sorts of answers.

11:26:27AM 18     The counter-designations that have been marked in

11:26:29AM 19  this transcript are when defendants did have the

11:26:34AM 20  opportunity to really inquire as to the witness' memory of

11:26:39AM 21  the events, of which he has none.

11:26:44AM 22         THE COURT:  Go ahead with the deposition and make

11:26:47AM 23  objections as you wish.  If objections are made, stop the

11:26:57AM 24  tape.

25         (At this time the deposition of Stephan Parris was

1   played.)

11:27:50AM 2                        DIRECT EXAMINATION

11:27:50AM 3   By Mr. Adams:

11:27:51AM 4   Q.   Good morning, Mr. Parris.

11:27:52AM 5   A.   Good morning.

11:27:53AM 6   Q.   My name is Ben Adams.  I am one of the lawyers who

11:27:56AM 7   represent the family in this lawsuit of someone named

11:27:59AM 8   Donald Varney.  Okay?

11:28:00AM 9   A.   Yes.

11:28:01AM 10  Q.   Can you tell us your full name for the record?

11:28:05AM 11  A.   Steven Julius Parris.

11:28:08AM 12  Q.   Will you spell your full name for us?

11:28:10AM 13  A.   S-T-E-P-H-A-N, J-U-L-I-U-S, P-A-R-R-I-S.

11:28:19AM 14  Q.   Appreciate that.  I want to ask you a few questions

11:28:24AM 15  about your background, just a few.  How old are you?

11:28:26AM 16  A.   Sixty-six years of age.

11:28:31AM 17  Q.   What is your date of birth?

11:28:32AM 18  A.   12/2/1952.

11:28:35AM 19  Q.   Are you married?

11:28:35AM 20  A.   Yes, I am.

11:28:36AM 21  Q.   Do you have any children?

11:28:37AM 22  A.   I have two adult children.

11:28:41AM 23  Q.   I understand that you are a notary?

11:28:42AM 24  A.   I am.

11:28:43AM 25  Q.   Do you have another profession?

| | | |
|---|---|---|
| 11:28:44AM | 1 | **A.  I do.** |
| 11:28:45AM | 2 | **Q.  What is that?** |
| 11:28:45AM | 3 | **A.  I am an IT person for a bank.** |
| 11:28:52AM | 4 | **Q.  How long have you been a notary?** |
| 11:28:55AM | 5 | **A.  It will be two years come September.** |
| 11:28:59AM | 6 | **Q.  Can you tell us, roughly, when you first became a** |
| 11:29:04AM | 7 | **notary?** |
| 11:29:05AM | 8 | **A.  September 25th, 2017.** |
| 11:29:08AM | 9 | **Q.  Can you give us a little bit of a background on the** |
| 11:29:11AM | 10 | **process that you went through to become a notary?** |
| 11:29:15AM | 11 | **A.  Well, you go to the Secretary of State of Arizona,** |
| 11:29:21AM | 12 | **and you fill out a request to become a notary, and you pay** |
| 11:29:28AM | 13 | **a fee, and you submit that request to the state, and you** |
| 11:29:33AM | 14 | **mail them the check.  They do a background check, and then** |
| 11:29:38AM | 15 | **they either approve or deny your request to be a notary.** |
| 11:29:42AM | 16 | **If you're approved, you then get a certificate, which** |
| 11:29:45AM | 17 | **I have.  And you also must be bonded.  So you go to a** |
| 11:29:51AM | 18 | **bonding company and you pay them a fee and then you become** |
| 11:29:54AM | 19 | **bonded.** |
| 11:29:56AM | 20 | **And they also have a class that you attend so you** |
| 11:30:01AM | 21 | **know the rules of the game.** |
| 11:30:02AM | 22 | **Q.  And if I understand your testimony, the state of** |
| 11:30:07AM | 23 | **Arizona is the entity that you apply to to become a** |
| 11:30:12AM | 24 | **notary?** |
| 11:30:12AM | 25 | **A.  The Secretary of State's office, correct.** |

```
11:30:14AM  1    Q.   Do you remember how long the process took to get
11:30:22AM  2    notarized -- or to get your notary?  Is it a license or a
11:30:26AM  3    commission?
11:30:26AM  4    A.   It's a certificate.  You become an agent of the
11:30:30AM  5    state.
11:30:30AM  6    Q.   How long did that process take?
11:30:32AM  7    A.   I would say two to three weeks.
11:30:34AM  8    Q.   And since September of 2017, have you always had your
11:30:43AM  9    notary certificate?
11:30:44AM 10    A.   Yes.
11:30:44AM 11    Q.   Has it ever been suspended?
11:30:47AM 12    A.   Never.
11:30:48AM 13    Q.   Has it ever been revoked?
11:30:50AM 14    A.   Never.
11:30:50AM 15    Q.   Have you ever had any kind of discipline of any kind
11:30:53AM 16    with respect to your notary certificate?
11:30:55AM 17    A.   None whatsoever.
11:30:57AM 18    Q.   Have you ever been subpoenaed?
11:30:59AM 19    A.   Never.
11:31:00AM 20    Q.   Other than this case?
11:31:02AM 21    A.   Never.
11:31:02AM 22    Q.   Have you ever refused to notarize something?
11:31:06AM 23    A.   Yes.
11:31:10AM 24    Q.   Okay.  Without getting into too much detail, why
11:31:15AM 25    would you refuse to notarize something?
```

Barry L. Fanning, RMR, CRR - Official Court Reporter
(253) 882-3833 Barry_Fanning@WAWD.uscourts.gov
1717 Pacific Ave - Tacoma, WA 98402

11:31:17AM 1    A.   Lack of proper identification.

11:31:19AM 2    Q.   And so would it be a true statement that you don't

11:31:27AM 3    just notarize everything anyone asks you to.

11:31:32AM 4          MS. JOHNSON:   Objection.   Leading.

11:31:34AM 5    Mr. Adams:

11:31:35AM 6    Q.   A few questions about the purpose of getting a

11:31:37AM 7    document notarized.   Do you have some understanding?

11:31:40AM 8          MR. VEGA:   Excuse me.   Are you going to stop so

11:31:42AM 9    we can get a ruling?

11:31:50AM 10         THE COURT:   I'm sorry.   I missed what the

11:31:52AM 11   objection is to here.

11:31:55AM 12         MS. JOHNSON:   The objection was when he -- when

11:32:02AM 13   the question was, "And so it would be a true statement

11:32:05AM 14   that you don't just notarize everything anyone asks to

11:32:09AM 15   you?"   The objection is leading and argumentative.

11:32:18AM 16         MR. CRAIG:   Also relevance and unfairly

11:32:20AM 17   prejudicial.

11:32:22AM 18         THE COURT:   The question was leading in form and

11:32:25AM 19   not appropriate.   On the other hand, it is harmless, and

11:32:28AM 20   the answer may stand.   Let's go.

11:32:32AM 21   By Mr. Adams:

11:32:33AM 22   Q.   Based on some of the classes -- I think you said you

11:32:36AM 23   took a class -- or your experience, or your knowledge as a

11:32:38AM 24   notary about why people get documents notarized?

11:32:43AM 25   A.   In lieu of appearing in person, identification needs

11:32:48AM 1  to be certified that the person who is signing that

11:32:51AM 2  document is in fact that person.

11:32:54AM 3  Q.  Do you have any understanding about why people get

11:32:59AM 4  documents notarized?

11:33:02AM 5  A.  Other than what I just said, no, I do not.

11:33:05AM 6  Q.  What, if anything, if you know, does a notary seal on

11:33:11AM 7  a document indicate about the trustworthiness of the

11:33:18AM 8  document?  What, if anything, does a notary seal on a

11:33:22AM 9  document indicate about the trustworthiness of the

11:33:25AM 10  document?

11:33:26AM 11  A.  It does not speak to the trustworthiness of the

11:33:29AM 12  document.  The seal only speaks to proper identification

11:33:34AM 13  of the signer.

11:33:36AM 14  Q.  Would you notarize a document if the signer was

11:33:45AM 15  incapacitated?

11:33:46AM 16  A.  Never.  Would not, cannot.

11:33:49AM 17  Q.  Why not?

11:33:50AM 18  A.  Because it is a matter of lucidity.  If a person is

11:33:53AM 19  not lucid, then they obviously do not know what they are

11:33:57AM 20  doing, what they are signing.  So I cannot and will not

11:34:01AM 21  and have not.

11:34:01AM 22  Q.  If a person was unconscious -- would you notarize a

11:34:07AM 23  document if they were out cold?

11:34:12AM 24  A.  I don't know how that would be possible.

11:34:14AM 25  Q.  Right.

11:34:15AM 1  **A.**  So, no.

11:34:16AM 2  **Q.**  If a person was unable to respond to you, would you

11:34:26AM 3  notarize a document?

11:34:27AM 4  **A.**  Absolutely not.

11:34:28AM 5  **Q.**  Why not?

11:34:29AM 6  **A.**  Because if they are unable to respond, I don't know

11:34:32AM 7  if they are lucid or not.

11:34:34AM 8  **Q.**  I am going to attach as Exhibit No. 2 a declaration

11:34:39AM 9  of Donald Varney, dated February 7th, 2018.  And I will

11:34:47AM 10  hand that to the witness.

11:34:54AM 11  **A.**  That is my stamp.  That is my signature.

11:34:58AM 12  **Q.**  On the second page of that document there is a notary

11:35:02AM 13  stamp, correct?

11:35:03AM 14  **A.**  Correct.

11:35:04AM 15  **Q.**  Whose -- and you just told me, but I have to ask a

11:35:07AM 16  question, whose notary seal is that?

11:35:13AM 17  **A.**  Mine.

11:35:14AM 18  **Q.**  Can you tell us whether or not this is a document

11:35:19AM 19  that you notarized on February 7th, 2018?

11:35:22AM 20  **A.**  It absolutely is.

11:35:24AM 21  **Q.**  And so you would not have added your notary seal to

11:35:34AM 22  this document if the individual --  Strike that.

11:35:39AM 23  Who is the individual who signed the document?

11:35:42AM 24  **A.**  Donald Varney.

11:35:44AM 25  **Q.**  And based on your prior testimony, you would not have

11:35:49AM  1   added your seal to this document if Mr. Varney was

11:35:55AM  2   incapacitated, unable to respond, or unconscious, correct?

11:36:00AM  3           MS. JOHNSON:  Objection.  Leading.

11:36:02AM  4   By Mr. Adams:

11:36:02AM  5   Q.  Do you have any specific --

11:36:06AM  6           THE COURT:  Who is questioning the witness?

           7           MR. ADAMS:  (Raising hand.)

11:36:13AM  8           THE COURT:  The objection is sustained.  Leading

11:36:20AM  9   question.

11:36:21AM 10   By Mr. Adams:

11:36:22AM 11   Q.  -- memory of Mr. Varney?

11:36:23AM 12   A.  I do not.

11:36:24AM 13   Q.  Do you have any idea how many documents you have

11:36:34AM 14   notarized since --

11:36:35AM 15   A.  Since Mr. Varney?

11:36:37AM 16   Q.  Yeah.

11:36:38AM 17   A.  I would say probably 400, 450.

11:36:42AM 18   Q.  Can you tell us, based on your own specific memory,

11:36:49AM 19   Mr. Varney's condition on February 7th, 2018?

11:36:53AM 20   A.  Unfortunately, I cannot.  I have no memory whatsoever

11:36:58AM 21   of Mr. Varney.

11:36:59AM 22   Q.  I want you to assume that we have either obtained

11:37:03AM 23   declarations or deposed the other individuals in --

11:37:09AM 24           MS. JOHNSON:  Objection.  Calls for hearsay.

11:37:13AM 25   Speculation.  Foundation.

11:37:18AM  1           MR. CRAIG:  Improper hypothetical.  Assumes

11:37:21AM  2  facts.  Relevance.  Unduly prejudicial.

11:37:24AM  3           THE COURT:  I didn't hear the whole question.

11:37:26AM  4           MS. JOHNSON:  The whole question was:  "Okay.  I

11:37:29AM  5  want you to assume that we have either obtained

11:37:32AM  6  declarations or deposed the other individuals in the room

11:37:35AM  7  when Mr. Varney signed this document."

11:37:44AM  8           THE COURT:  I think that is a reasonable

11:37:46AM  9  assumption.  What's the next question?

11:37:50AM 10           MS. JOHNSON:  "And those individuals testified."

11:37:54AM 11  And then it goes on to state hearsay and stuff that

11:38:01AM 12  Mr. Parris would never know because he doesn't have any

11:38:04AM 13  recollection of what happened in the room.

11:38:07AM 14           MR. ADAMS:  The actual question, your Honor:  "Do

11:38:10AM 15  you have any information to dispute that?"  And the

11:38:12AM 16  witness says, "No."  That's where it's going.

11:38:15AM 17           THE COURT:  Well, the objection is overruled.

11:38:20AM 18  By Mr. Adams:

11:38:23AM 19  Q.  -- when Mr. Varney signed this document.  Okay?

11:38:25AM 20  A.  Um-hum.  Yes.

11:38:26AM 21  Q.  And those individuals testified that Mr. Varney sat

11:38:29AM 22  up in bed, opened his eyes, held the document, appeared to

11:38:33AM 23  read the document, appeared to understand the document,

11:38:37AM 24  and then signed it himself.  Are you with me?

11:38:41AM 25  A.  Yes.

11:38:41AM 1   Q.   Do you have any information today to dispute that?

11:38:43AM 2   A.   I do not.

11:38:44AM 3   Q.   The fact that your notary symbol is on the document,

11:38:50AM 4   is that consistent or inconsistent with the facts I have

11:38:52AM 5   just asked you to assume?

11:38:53AM 6   A.   It is consistent.

11:38:55AM 7   Q.   Why is it consistent?

11:38:56AM 8   A.   Because I don't notarize people who aren't lucid and

11:38:59AM 9   don't understand what they are doing.

11:39:02AM 10  Q.   Those are all my questions.  I'm sorry.  I forgot one

11:39:05AM 11  thing.

11:39:05AM 12       You have brought your book with you.  What is that?

11:39:08AM 13  A.   That's my official notary journal.

11:39:13AM 14  Q.   Is there an entry in that journal for the date, time,

11:39:17AM 15  and location where you notarized this declaration of Don

11:39:21AM 16  Varney's?

11:39:22AM 17  A.   Yes, there is.

11:39:23AM 18  Q.   What time did you notarize it?

11:39:25AM 19  A.   11:00 a.m.

11:39:27AM 20  Q.   And so based on the fact that your notary seal is on

11:39:30AM 21  the document and it was done at 11:00 a.m., what, if

11:39:35AM 22  anything, do you know about the lucidity of Mr. Varney on

11:39:38AM 23  that date?

11:39:39AM 24  A.   Mr. Varney --

11:39:41AM 25            MR. CRAIG:  Objection.  That is an improper

11:39:43AM 1    hypothetical, assumes facts, leading, foundation,

11:39:46AM 2    speculation, argumentative, irrelevant, and unduly

11:39:50AM 3    prejudicial.

11:39:52AM 4            MR. ADAMS:  There is no hypothetical, your Honor.

11:39:54AM 5    I asked him, based on the testimony he just gave that his

11:39:57AM 6    notary symbol was on it and it is 11:00 a.m., what does he

11:40:03AM 7    know from his pattern or practice whether Mr. Varney was

11:40:05AM 8    lucid at that time.

11:40:07AM 9            MR. CRAIG:  That also assumes the part that he

11:40:09AM 10   made representations about what other people would say.

11:40:11AM 11           THE COURT:  I'm sorry.  Louder.

11:40:12AM 12           MR. CRAIG:  It was also based on the

11:40:14AM 13   representations that counsel had made to the witness about

11:40:16AM 14   what other people would say.

11:40:24AM 15           THE COURT:  I think this is a self-answering

11:40:27AM 16   question.  But the objection is sustained.

11:41:07AM 17           THE WITNESS:  -- was lucid, otherwise the notary

11:41:09AM 18   would not have occurred.

11:41:11AM 19   By Mr. Adams:

11:41:11AM 20   Q.  Can you tell us whether or not Mr. Varney was lucid

11:41:14AM 21   at 11:00 a.m. on February 7th, 2018 --

11:41:18AM 22           MS. JOHNSON:  Your Honor --

11:41:19AM 23           MR. CRAIG:  Same objections, your Honor.

11:41:20AM 24           THE COURT:  Well, the objection is sustained.

11:41:27AM 25           THE WITNESS:  I do not have a memory of

11:41:29AM 1    Mr. Varney.  However, I --

11:41:39AM 2               MR. ADAMS:  Your Honor, he answers about his

11:41:40AM 3    pattern and practice and experience.

11:41:43AM 4               THE COURT:  Yeah, he already testified to that.

11:41:46AM 5               MR. ADAMS:  Okay.  Understood.

11:42:03AM 6                         CROSS-EXAMINATION

11:42:03AM 7    By Ms. Weglarz:

11:42:04AM 8    Q.   Prior to notarizing Exhibit 2 in a hospital, had you

11:42:09AM 9    ever notarized any documents in a hospital before?

11:42:11AM 10   A.   Yes, I have.

11:42:12AM 11   Q.   What kind of documents?

11:42:14AM 12   A.   Power of attorneys, usually.

11:42:16AM 13   Q.   Have you ever notarized a document like this type of

11:42:20AM 14   declaration that talks about facts?

11:42:23AM 15   A.   No, I have not.  That was the first declaration I

11:42:26AM 16   have ever done.

11:42:28AM 17   Q.   Have you ever done a declaration like this since you

11:42:34AM 18   notarized this declaration?

11:42:36AM 19   A.   I would say no, I have not.

11:42:38AM 20   Q.   So this type of declaration that you notarized, which

11:42:41AM 21   is Exhibit 2, is the only time you have notarized a

11:42:46AM 22   document like this; is that correct?

11:42:47AM 23   A.   To the best of my memory.

11:42:49AM 24   Q.   Do you recall when you were --  Well, actually, who

11:42:57AM 25   asked you to notarize Exhibit 2?

11:43:00AM 1    A.   Mr. Adams.

11:43:01AM 2    Q.   And when were you contacted by Mr. Adams to do the

11:43:10AM 3    notarial act?

11:43:11AM 4    A.   The morning --

11:43:13AM 5    Q.   What time did this notarial act take place?

11:43:18AM 6    A.   At 11:00 a.m.

11:43:20AM 7    Q.   And that is indicated in your book, correct?

11:43:22AM 8    A.   Correct.

11:43:23AM 9    Q.   How much earlier were you contacted by Mr. Adams?

11:43:28AM 10   A.   Memory serves me, several hours prior.

11:43:33AM 11   Q.   Have you spoken to Mr. Adams since February 7th?

11:43:37AM 12   A.   Today, the first time since.

11:43:40AM 13   Q.   When Mr. Adams asked you to do this notarial act,

11:43:54AM 14   what exactly did he -- did he tell you what he wanted you

11:43:56AM 15   to do on the phone?

11:43:57AM 16   A.   Yes.  He told me he wanted me to perform a notary.

11:44:00AM 17   Q.   And there are different notarial acts, as I

11:44:04AM 18   understand it; is that right?

11:44:05AM 19   A.   True.

11:44:05AM 20   Q.   So it could be an acknowledgment or a jurat?

11:44:10AM 21   A.   Correct.

11:44:10AM 22   Q.   What other kinds of notarial acts are there?

11:44:15AM 23   A.   Those are the two.

11:44:16AM 24   Q.   What type of notarial act is this or was this?

11:44:20AM 25   A.   This would be an acknowledgment.

11:44:29AM 1   Q.   Did anyone specifically tell you that the notarial

11:44:33AM 2   act they wanted you to perform was an acknowledgment, or

11:44:36AM 3   is that something you determined on your own?

11:44:38AM 4   A.   I determined that.

11:44:39AM 5   Q.   And as I understand what an acknowledgment is, it is

11:44:48AM 6   basically you are verifying that the signature is genuine?

11:44:52AM 7   A.   Correct.

11:44:53AM 8   Q.   Does it verify anything other than that fact?

11:44:58AM 9   A.   It does not.

11:45:00AM 10  Q.   I am going to mark as Exhibit 4, just portions of the

11:45:09AM 11  Arizona Notary Public Reference Manual.  I will give you a

11:45:15AM 12  copy.  This one in particular is dated August 2018.  Are

11:45:19AM 13  you familiar with this particular publication?

11:45:21AM 14  A.   I am not.

11:45:22AM 15  Q.   Have you seen a publication similar to this that is

11:45:30AM 16  dated prior to August 2018?

11:45:32AM 17  A.   I believe I did, yes.

11:45:34AM 18  Q.   And if you go to the second page, there is a

11:45:43AM 19  checklist, twelve steps to a proper notarization.  Are

11:45:49AM 20  these in fact the steps that a notary is required to go

11:45:54AM 21  through before a document is notarized?  Take your time.

11:46:03AM 22  There is no rush.

11:46:04AM 23  A.   That's correct.

11:46:05AM 24  Q.   Let me ask you a few questions about items on this

11:46:08AM 25  checklist.  The second step states, "Does a signer

11:46:14AM 1   comprehend the underlying transaction on the document?"

11:46:18AM 2   My question to you is, do you know if Mr. Varney in fact

11:46:25AM 3   comprehended the underlying transaction on the document?

11:46:29AM 4   A.   As I don't have any memory of it, it is very

11:46:35AM 5   difficult for me to answer that question.

11:46:40AM 6   Q.   So it would be fair to say -- if I asked you a

11:46:43AM 7   question like, "Did Mr. Varney read the document?" is that

11:46:47AM 8   a question that you wouldn't be able to answer because you

11:46:49AM 9   don't have a memory?

11:46:50AM 10  A.   Correct.

11:46:51AM 11  Q.   So let's just make it a little bit clean for the

11:47:00AM 12  record.  Did Mr. Varney read the declaration that we have

11:47:06AM 13  identified as Exhibit 2 before he signed it?

11:47:09AM 14  A.   I don't remember that.

11:47:11AM 15  Q.   You mentioned that you felt that Mr. Varney was

11:47:18AM 16  lucid.  And my question to you is, how did you determine

11:47:20AM 17  that Mr. Varney was in fact lucid?

11:47:24AM 18  A.   I specifically didn't say that.  I said that the

11:47:31AM 19  document would not have been notarized had he not been

11:47:35AM 20  lucid.  Now, my practice is to engage in conversation and

11:47:44AM 21  to ask why we are present.  That's my practice.  And I

11:47:49AM 22  gauge from the response that I get the lucidity of the

11:47:53AM 23  person.

11:47:54AM 24  Q.   Did you have a conversation with Mr. Varney?

11:47:56AM 25  A.   I can't answer that question.

11:47:58AM 1    Q.   You don't remember?

11:47:59AM 2    A.   I do not remember.

11:48:00AM 3    Q.   Do you remember who else was in the room when

11:48:06AM 4    Mr. Varney signed the document?

11:48:08AM 5    A.   I do not recall.

11:48:10AM 6    Q.   Do you know who drafted this document?

11:48:14AM 7    A.   I do not.   I would assume that it was Mr. Adams, but

11:48:19AM 8    I would not swear to that.

11:48:20AM 9    Q.   Did you have any conversations with Mr. Adams about

11:48:24AM 10   how this document was created?

11:48:26AM 11   A.   I don't believe we did.   We might have, but if we did

11:48:31AM 12   I do not recall.

11:48:32AM 13   Q.   Do you know when this document was created?   I am

11:48:37AM 14   referring to Exhibit 2.

11:48:38AM 15   A.   I do not.

16                          CROSS-EXAMINATION

11:48:39AM 17   By Mr. Harris:

11:48:39AM 18   Q.   Were you paid to go to the hospital to notarize

11:48:43AM 19   Mr. Varney's signature?

11:48:44AM 20   A.   Absolutely.

11:48:46AM 21   Q.   When you go to notarize a signature, how much are

11:48:50AM 22   you -- what is your fee?

11:48:53AM 23   A.   Wow.   That is kind of a personal question.   It

11:49:01AM 24   depends on how much time I feel would be allocated to that

11:49:09AM 25   session.   Some are quick; they are cheaper.   Some are more

11:49:15AM 1    lengthy; they are more expensive.  Some have time

11:49:20AM 2    considerations.  Hospitals, the doctors tend to pop in and

11:49:25AM 3    pop out.  So the fee schedule is based on those scenarios.

11:49:30AM 4    Q.   Is this a fee schedule that you set or is there a fee

11:49:34AM 5    schedule set by the state of Arizona?

11:49:36AM 6    A.   It is set by me.  The state of Arizona only allows

11:49:40AM 7    you to charge $10 for the actual signing, the signature.

11:49:44AM 8    The rest is determined by me, travel, time, things of that

11:49:48AM 9    nature.

11:49:48AM 10   Q.   When you were contacted by Mr. Adams to go to the

11:49:54AM 11   hospital to sign, do you know what your quoted fee was for

11:49:58AM 12   this signature?

11:49:59AM 13   A.    I believe it was $125, but I am only guessing.  I did

11:50:05AM 14   not check my records on that.

11:50:06AM 15   Q.   When you -- were you paid eventually to go to the

11:50:13AM 16   hospital to notarize the document we have marked as

11:50:15AM 17   Exhibit 2?

11:50:15AM 18   A.   Yes.

11:50:16AM 19   Q.   Who paid you?

11:50:17AM 20   A.   Ben did.

11:50:18AM 21   Q.   Mr. Adams?

11:50:19AM 22   A.   Yes.  Sorry.  Mr. Adams.

11:50:22AM 23   Q.   That's okay.  How did he pay you?

11:50:24AM 24   A.   The only reason I remember Mr. Adams is because of

11:50:29AM 25   the payment method.  It was a bit peculiar, because to my

11:50:36AM 1   memory he paid me with a $100 bill, and I billed him $25,

11:50:42AM 2   which I recall receiving a check from his law firm for the

11:50:47AM 3   other $25.  Had that not occurred, I probably would not

11:50:52AM 4   have remembered Mr. Adams.  Although, I will say that an

11:50:55AM 5   attorney being present is odd.  I kind of remember that

11:50:59AM 6   part of it.  For the most part, no, I wouldn't have

11:51:01AM 7   remembered him.

11:51:02AM 8   Q.   Have you had any conversations with anyone about

11:51:04AM 9   additional compensation, other than those checks, for

11:51:07AM 10  being here today?

11:51:08AM 11  A.   No.  Is that a possibility?

            12                    CROSS-EXAMINATION

11:51:13AM 13  By Ms. SERKO:

11:51:13AM 14  Q.   One more thing you said was that you thought it was

11:51:15AM 15  odd that attorneys were present at the time when you

11:51:19AM 16  notarized what we have attached as Exhibit 2.  What do you

11:51:23AM 17  mean it is odd that attorneys were present when you do the

11:51:28AM 18  notarial act?

11:51:29AM 19  A.   Because of all the notaries I have done, I don't

11:51:32AM 20  think I remember I had one where an attorney was present.

11:51:34AM 21  Q.   So this is the only one where an attorney was

11:51:36AM 22  present?

11:51:37AM 23  A.   To the best of my knowledge, correct.

11:51:40AM 24                    CROSS-EXAMINATION

11:51:40AM 25  By Mr. Carlton:

11:51:41AM 1    Q.   My name is Mark Carlton.  I only have a few

11:51:45AM 2    questions.   The first question I have for you is, you

11:51:47AM 3    mentioned that you talked to Mr. Adams today, is that

11:51:50AM 4    correct, before your deposition?

11:51:52AM 5    A.   Correct.

11:51:54AM 6    Q.   Was that in person or via phone?

11:51:56AM 7    A.   Person.

11:51:58AM 8    Q.   And what time did you start meeting with Mr. Adams

11:52:02AM 9    this morning?

11:52:03AM 10   A.   Five til --  What time is it?

11:52:11AM 11         MR. ADAMS:  We started at 11:00.

11:52:17AM 12         THE WITNESS:  Five til 11:00.  Sorry.

11:52:18AM 13   By Mr. Carlton:

11:52:18AM 14   Q.   Did you talk to him for about five minutes?

11:52:21AM 15   A.   A little less.  We took some time to walk up here, so

11:52:25AM 16   a little less than five.

11:52:27AM 17   Q.   Did you meet Mr. Adams outside the building

11:52:29AM 18   somewhere?

11:52:29AM 19   A.   I did.

11:52:30AM 20   Q.   What did you talk about with Mr. Adams during your

11:52:34AM 21   walk up to the deposition that you are sitting in now?

11:52:38AM 22   A.   Well, Mr. Adams apologized to me for not contacting

11:52:43AM 23   me, because I had not spoken to him during this whole

11:52:47AM 24   process.  And I received tons of phone calls.  And I have

11:52:54AM 25   been subpoenaed twice.  And I just thought it was a bit

11:52:57AM 1    odd that I had not heard from Mr. Adams.  He apologized

11:52:59AM 2    for not making contact.  And he tried to calm me down,

11:53:06AM 3    because I was a bit nervous.  He told me that I wasn't in

11:53:09AM 4    trouble.  Basically that was the conversation.

11:53:13AM 5    Q.  Did he tell you or suggest to you any of the

11:53:19AM 6    questions that might be asked of you this morning?

11:53:23AM 7    A.  He told me that my identity would be asked about and

11:53:29AM 8    my credentials for the state of Arizona.  He did tell me

11:53:32AM 9    that, that those would be the type of questions that I

11:53:34AM 10   would be getting.

11:53:35AM 11   Q.  Did Mr. Adams use the word "lucid" at any time during

11:53:41AM 12   your conversation?

11:53:42AM 13   A.  He absolutely did not.

11:53:43AM 14   Q.  What is your definition of the word "lucid"?

11:53:49AM 15   A.  Self-awareness, awareness of one's surroundings,

11:53:55AM 16   awareness of other people present, understanding --

11:54:02AM 17   Q.  I'm sorry.  You were breaking up there.

11:54:03AM 18   A.  I'm sorry.  I said self-awareness, understanding of

11:54:08AM 19   one's surroundings, and understanding of who is present,

11:54:13AM 20   an understanding of, I guess, the general purpose of why

11:54:17AM 21   we are all together at that time.

11:54:20AM 22   Q.  So you mentioned in response to questions earlier

11:54:24AM 23   that you typically have a conversation with the witness

11:54:31AM 24   prior to the signing.  Is that the only what I will call

11:54:36AM 25   test to determine whether or not the witness is lucid by

11:54:41AM 1    your definition?

11:54:42AM 2    A.   Yes.

11:54:43AM 3    Q.   Do you perform or are you trained to perform any kind

11:54:47AM 4    of examination of the witness to determine whether they

11:54:50AM 5    are lucid?

11:54:51AM 6    A.   Not being a doctor, no, I wouldn't know what to do.

11:55:01AM 7    I have no clue as to what to do, other than, as I stated,

11:55:05AM 8    what my understanding of what lucidity is.

11:55:08AM 9    Q.   I'm sorry.  It sounds like we're breaking up again.

11:55:11AM 10   A.   I said, as I am not a doctor, even though someone

11:55:16AM 11   thought I was, I would have no idea as to what one would

11:55:21AM 12   do to assess lucidity, clinically speaking.  So I can only

11:55:29AM 13   do so in a general sense, which is what I stated.

11:55:33AM 14                    RECROSS-EXAMINATION

11:55:35AM 15   By Mr. Carlton:

11:55:36AM 16   Q.   Mr. Parris, Mr. Carlton again.  What I gathered from

11:55:40AM 17   what I heard from your last answer was that -- your

11:55:41AM 18   reference to being a doctor, was that because there was an

11:55:44AM 19   error on one of the subpoenas you received?

11:55:47AM 20   A.   Yes, that's correct.

11:55:48AM 21   Q.   Just for the record, you are not a medical doctor; is

11:55:52AM 22   that correct?

11:55:52AM 23   A.   I am not.

11:55:55AM 24   Q.   Do you have any type of medical training of any kind?

11:55:59AM 25   A.   I do not.

11:56:00AM 1   Q.   Have you ever worked in like a nursing facility where

11:56:07AM 2   you would become familiar with elderly patients?

11:56:11AM 3   A.   I have not.

11:56:12AM 4   Q.   I will represent to you that Mrs. Varney was present

11:56:23AM 5   at the time of the signing that you notarized for

11:56:27AM 6   Mr. Varney.  Is it fair to say you don't recall that?

11:56:29AM 7   A.   I do not.

11:56:30AM 8   Q.   I will also represent to you that she testified that

11:56:34AM 9   Mr. Varney did not speak at all during this signing

11:56:40AM 10  ceremony on February 7th.  Okay?

11:56:44AM 11  A.   Okay.

11:56:45AM 12  Q.   Assuming that is true, what else in your practice do

11:56:52AM 13  you do, if anything, to verify the lucidity of a witness?

11:56:58AM 14  A.   I already stated what I do, what my practice is.

11:57:04AM 15  Q.   So if the evidence turns out to be that Mr. Varney

11:57:08AM 16  did not speak in your presence, would it be fair to say

11:57:12AM 17  that you did not follow your practice in determining

11:57:16AM 18  whether or not he was lucid?

11:57:17AM 19  A.   Again, I don't have any memory of this event

11:57:23AM 20  whatsoever, other than as I stated earlier about meeting

11:57:27AM 21  Mr. Adams.  So I do not remember.

11:57:31AM 22  Q.   And so it sounds like you would defer to Maria

11:57:36AM 23  Varney's recollection of the conversations or lack thereof

11:57:40AM 24  over your own?

11:57:41AM 25  A.   I would not defer anything when I don't have a memory

11:57:45AM 1   of the situation.

11:57:46AM 2   Q.  Would you defer to somebody that does claim to have a

11:57:50AM 3   memory?

11:57:50AM 4   A.  I would not defer to anyone of a conversation or

11:57:55AM 5   event that I don't have any memory of.  I would not defer.

11:58:01AM 6   Q.  Are you aware that there is a hearing on Monday

11:58:05AM 7   before a federal judge regarding this particular

11:58:09AM 8   declaration, Exhibit 2?

11:58:10AM 9   A.  I am not.

11:58:12AM 10  Q.  Is it fair to say then that you have not been asked

11:58:16AM 11  to attend that hearing by Mr. Adams or anyone else?

11:58:20AM 12  A.  That is correct.

11:58:22AM 13  Q.  Is it your practice when attending a signing ceremony

11:58:30AM 14  like this -- I know you mentioned it often involves car

11:58:33AM 15  titles, not asbestos litigation.  But do you as part of

11:58:37AM 16  your conversation ask any questions about the contents of

11:58:41AM 17  the documents that are being signed?

11:58:43AM 18  A.  I do not.

11:58:44AM 19  Q.  Is it your practice to ask anyone else, such as the

11:58:50AM 20  person who arranges the signing session, about their

11:58:54AM 21  understanding of the document?

11:58:57AM 22  A.  It is not.

11:59:01AM 23                    RECROSS-EXAMINATION

11:59:01AM 24  By Ms. Serko:

11:59:02AM 25  Q.  My first question is, do you recall when or what time

11:59:06AM 1    you arrived at the hospital on February 7th?

11:59:09AM 2    A.   I would say approximately 10:30.

11:59:14AM 3    Q.   So you said that he signed at around 11:00; is that

11:59:20AM 4    correct?

11:59:20AM 5    A.   That's correct.

11:59:21AM 6    Q.   So between 10:30 and 11:00, what were you doing?

11:59:28AM 7    A.   Waiting to get in to see Mr. Varney.  I spent some

11:59:35AM 8    time --

11:59:37AM 9    Q.   Where were you waiting?

11:59:38AM 10   A.   I spent most of the time looking for the room, and

11:59:40AM 11   then I remember that Mr. Adams came out to meet me and

11:59:46AM 12   took me to the room.  He told me that it would be soon,

11:59:52AM 13   and he went back into the room.  That's my memory.

11:59:57AM 14   Q.   Do you recall -- do you recall anything else that

12:00:01PM 15   Mr. Adams said during that time?

12:00:02PM 16   A.   No.  I am embarrassed to say, but I don't have any

12:00:09PM 17   memory of being in the room whatsoever.  I am embarrassed

12:00:12PM 18   to say that, but I don't.

12:00:15PM 19   Q.   Do you recall whether or not Mr. Adams paid you

12:00:18PM 20   before or after the signing?

12:00:21PM 21   A.   It would have been after.

12:00:29PM 22   Q.   Did Mr. Adams hand you the document that was

12:00:33PM 23   notarized?

12:00:35PM 24   A.   Yes, he did.  I believe, yeah.  He would have had to

12:00:44PM 25   have given it to me for me to at least scan it to see if

```
12:00:48PM  1   witnesses were required, which is what I am usually
12:00:52PM  2   looking for.
12:00:53PM  3   Q.   When are witnesses required?
12:00:55PM  4   A.   When?  Was that your question?
12:00:59PM  5   Q.   Yes.  Yes.
12:01:01PM  6   A.   This is a declaration, okay, which I have never seen
12:01:06PM  7   before.  I don't even know what a declaration is.  I
12:01:10PM  8   usually do power of attorneys in hospitals, and they
12:01:16PM  9   always require witnesses.
12:01:24PM 10   Q.   From looking at the document, what did you determine
12:01:29PM 11   about whether it required witnesses or not?
12:01:31PM 12   A.   They were not required.
12:01:33PM 13   Q.   This may have been asked, but do you recall whether
12:01:41PM 14   or not there were witnesses or other people present in the
12:01:45PM 15   room, other than yourself, Mr. Adams, and Mr. Varney?
12:01:49PM 16   A.   No, I don't.  I am being told today that there were
12:01:53PM 17   other peoples in the room, but, again, I have no memory of
12:01:57PM 18   this event whatsoever.  So, as I said before, I couldn't
12:02:02PM 19   defer to what someone else says, and I can't attest that
12:02:05PM 20   there were other people in the room at the time, because I
12:02:13PM 21   don't recall.
12:02:13PM 22   Q.   Are you aware of the medications Mr. Varney was on at
12:02:18PM 23   the time?
12:02:18PM 24   A.   Excuse me?
12:02:20PM 25   Q.   Are you aware of the medications Mr. Varney was on at
```

| | |
|---|---|
| 12:02:24PM 1 | the time? |
| 12:02:24PM 2 | A.   No.   I have no knowledge of medications whatsoever. |
| 12:02:28PM 3 | Q.   Do you recall what hand he signed the document with? |
| 12:02:33PM 4 | A.   I do not recall. |
| 12:02:36PM 5 | Q.   Do you recall whether he was wearing glasses? |
| 12:02:41PM 6 | THE COURT:   Cut it off. |
| 12:02:44PM 7 | MR. ADAMS:   It's stopped. |
| 12:02:45PM 8 | THE COURT:   It is noon.   How much more time on |
| 12:02:49PM 9 | this dep? |
| 12:02:54PM 10 | MR. ADAMS:   Twelve minutes, your Honor. |
| 12:02:56PM 11 | THE COURT:   Okay.   We will pick it up at 1:30. |
| 01:32:54PM 12 | (Lunch recess.) |
| 01:37:11PM 13 | THE COURT:   Let's continue with the deposition. |
| 01:37:22PM 14 | THE WITNESS:   I do not recall. |
| 01:37:27PM 15 | By Ms. Serko: |
| 01:37:28PM 16 | Q.   Sir, you mentioned in your prior testimony different |
| 01:37:34PM 17 | types of notarization, an acknowledgment and oath or |
| 01:37:39PM 18 | affirmation.   Can you explain the difference between |
| 01:37:41PM 19 | those? |
| 01:37:42PM 20 | A.   An acknowledgment is verifying the identity of the |
| 01:37:46PM 21 | person.   What was the other two, again, that you said? |
| 01:37:55PM 22 | Q.   Oath or affirmation. |
| 01:37:58PM 23 | A.   An oath is where you would give -- ask for a sworn |
| 01:38:03PM 24 | statement, ask for it in the affirmative.   And the other |
| 01:38:11PM 25 | one was affirmation?   Is that what you said? |

01:38:16PM 1    Q.   That's my understanding, oath or affirmation.

01:38:20PM 2    A.   I don't know what that one is.

01:38:23PM 3    Q.   And in this instance you qualified this signing of

01:38:27PM 4    Mr. Varney as an acknowledgment, correct?

01:38:30PM 5    A.   Correct.

01:38:30PM 6    Q.   Do you recall actually seeing Mr. Varney's

01:38:38PM 7    identification?

01:38:38PM 8    A.   Yes.  Well, no, I don't recall that I -- seeing it,

01:38:45PM 9    but because it is recorded in my book, I saw it.  Because

01:38:50PM 10   everything in my book occurs -- as far as identification

01:38:53PM 11   is concerned, is transferred from the driver's license.

01:38:59PM 12   Q.   But you have no independent memory of seeing his

01:39:03PM 13   driver's license?

01:39:04PM 14   A.   I do not.

01:39:05PM 15   Q.   Do you recall who gave you his driver's license, if

01:39:12PM 16   that's what occurred?

01:39:13PM 17   A.   I do not.

01:39:17PM 18   Q.   You wouldn't have seen a computer printer in the

01:39:26PM 19   room; is that correct?

01:39:26PM 20   A.   I'm sorry?  Would you say that again?

01:39:30PM 21   Q.   Sure.  You did not see a computer printer in the room

01:39:33PM 22   with Mr. Varney; is that correct?

01:39:35PM 23   A.   No.  Again, I can't state as to what happened in the

01:39:41PM 24   room or what equipment was in the room or what peoples

01:39:45PM 25   were in the room, because I don't have any memory of it.

01:39:49PM 1   I would say it's odd to see a computer printer in a

01:39:53PM 2   hospital room, but I don't recall if there was one,

01:39:55PM 3   because I don't remember.

01:39:56PM 4   Q.   Sir, you said that you met with Mr. Adams this

01:40:02PM 5   morning, correct?

01:40:04PM 6   A.   Correct.

01:40:04PM 7   Q.   And you mentioned that he made a comment along the

01:40:12PM 8   lines of, "You're not in trouble."  Do you know why he

01:40:15PM 9   said that?

01:40:15PM 10  A.   Because I think it was obvious that I was nervous and

01:40:23PM 11  apprehensive about this scenario, because I had received

01:40:29PM 12  so many phone calls from so many different attorneys

01:40:34PM 13  asking me so many questions about an event that I don't

01:40:39PM 14  recall.  Because I do so many notaries, I can't possibly

01:40:46PM 15  recall all of them.  It's not possible.

01:40:51PM 16      And then I would also say that this happened more

01:40:54PM 17  than a year ago.  Okay?  Perhaps if it was two months ago

01:41:00PM 18  I would have a better memory, but it was a long time ago.

01:41:04PM 19  So I don't have any memory of it.

01:41:07PM 20  Q.   And how was it that you and Mr. Adams arranged to

01:41:12PM 21  meet prior to the deposition today?  Was it a phone call?

01:41:14PM 22  A.   We did not arrange anything.  I drove here, and he

01:41:22PM 23  called me, and he came down and met me.  It was

01:41:30PM 24  coincidence because I had just --

01:41:33PM 25  Q.   Had you --

01:41:34PM  1    **A.   -- I had just parked.  I had just put the car in park**

01:41:37PM  2    **and the phone rang.**

01:41:39PM  3    **Q.   And that phone call from Mr. Adams today, just as you**

01:41:44PM  4    **parked, that was the first time you had spoken to him**

01:41:46PM  5    **since February 7th?**

01:41:48PM  6    **A.   That is correct.**

01:41:49PM  7    **Q.   And was anything discussed on the phone, other than**

01:41:53PM  8    **that you had just arrived and would meet downstairs,**

01:41:58PM  9    **apparently?**

01:41:58PM 10    **A.   Other than his apologies for not reaching out to me**

01:42:03PM 11    **sooner.  That was it.**

01:42:06PM 12    **Q.   Okay.  Sir, just in general, are there other signers**

01:42:17PM 13    **or notarizations you have done that you do have memory of,**

01:42:21PM 14    **or do you generally not recall instances of notarizing**

01:42:25PM 15    **documents?**

01:42:26PM 16    **A.   To be honest with you, I try to forget as quickly as**

01:42:31PM 17    **I do it.  I do way too many notaries to try to retain in**

01:42:37PM 18    **my mind those events.  I do way too many.**

           19                         **REDIRECT EXAMINATION**

           20    **By Mr. Adams:**

01:42:43PM 21    **Q.   Mr. Parris, I have a few follow-up questions for you**

01:42:47PM 22    **quickly, and then, hopefully, we will get you out of here.**

01:42:50PM 23    **You were asked some questions about myself, Mr. Adams,**

01:42:53PM 24    **paying you $100 in cash at the hospital, and then I think**

01:42:58PM 25    **my law firm sending you a $25 check after that.  Do you**

01:43:02PM 1    recall that testimony?

01:43:02PM 2    A.   I do.

01:43:03PM 3    Q.   Did I pay you anything more than what you have billed

01:43:12PM 4    for the work?

01:43:13PM 5    A.   You did not.

01:43:14PM 6    Q.   Did I bribe you in any way?

01:43:16PM 7    A.   You did not.

01:43:17PM 8    Q.   Did I say, "If I give you a bunch of money, will you

01:43:21PM 9    to sign this document, even though Mr. Varney is not

01:43:26PM 10   lucid"?

01:43:30PM 11          MS. JOHNSON:   Objection.   It's argumentative and

01:43:32PM 12   it's leading.   It is an improper question.

01:43:33PM 13          THE COURT:   I'm sorry.   Is somebody talking?

01:43:35PM 14          MS. JOHNSON:   I said objection, it's leading and

01:43:38PM 15   argumentative.

01:43:41PM 16          MR. ADAMS:   There was no objection at the

01:43:43PM 17   deposition, your Honor, just for the record.

01:43:46PM 18          THE COURT:   It is a harmless leading question.

01:43:49PM 19   Overruled.

01:43:52PM 20          THE WITNESS:   I did not, I would not.

01:43:56PM 21   By Mr. Adams:

01:43:57PM 22   Q.   Yeah.   If I had done that, if a lawyer came to you

01:43:59PM 23   and tried to bribe you, would you accept it?

01:44:02PM 24   A.   I would not accept it.

01:44:03PM 25   Q.   You have been paid by other lawyers to be here today,

01:44:05PM 1    correct?

01:44:06PM 2    A.   Yes, I believe I have been.

01:44:08PM 3    Q.   You mentioned that you had received, I think, a $43

01:44:11PM 4    check and 45 cents, and a $56 check, correct?

01:44:16PM 5    A.   Correct.

01:44:16PM 6    Q.   Those came from lawyers that were not me, correct?

01:44:19PM 7    A.   Correct.

01:44:19PM 8    Q.   Have you changed your testimony today because other

01:44:23PM 9    lawyers wrote you checks?

01:44:25PM 10   A.   I have not.

01:44:25PM 11   Q.   Have you said anything untrue today because other

01:44:28PM 12   lawyers wrote you checks?

01:44:29PM 13   A.   I have not.

01:44:30PM 14   Q.   Would you do that?

01:44:31PM 15   A.   I resent the statement, because there is no reason

01:44:35PM 16   for me to do anything like that, you know.  We are talking

01:44:40PM 17   minuscule amounts of money here.  If we were talking

01:44:47PM 18   billions of dollars, millions of dollars, I might consider

01:44:49PM 19   it.  I wouldn't do it, but I might consider it.  For the

01:44:51PM 20   amount of money we are talking about, it is not worth it

01:44:54PM 21   to me.

01:44:54PM 22   Q.   How many times have you notarized documents, if you

01:44:57PM 23   had to estimate, since you became a notary?

01:44:59PM 24   A.   How many have I notarized since I became a notary?

01:45:04PM 25   Q.   Yeah.

01:45:05PM 1   A.   Five hundred and seventy-seven, I believe it has

01:45:08PM 2   been.

01:45:08PM 3   Q.   You have made a lot more than $100, right?

01:45:10PM 4   A.   I have.

01:45:11PM 5   Q.   Would you risk your entire notary license for $100?

01:45:14PM 6   A.   No.

01:45:15PM 7   Q.   You were asked some other questions about the fact

01:45:19PM 8   that there was an attorney present when you notarized

01:45:22PM 9   Mr. Varney's declaration.  Do you remember that?

01:45:24PM 10  A.   Right.

01:45:24PM 11  Q.   That was me?

01:45:25PM 12  A.   I'm pretty sure.

01:45:28PM 13  Q.   Did I use any lawyer tricks on you to get you sign

01:45:34PM 14  the document?

01:45:36PM 15  A.   Whoa.  No, you did not.

01:45:40PM 16  Q.   Did I twist your arm, or try to convince you, or do

01:45:45PM 17  any lawyer-like things to try to get you to do something

01:45:48PM 18  that you didn't believe was true and accurate?

01:45:53PM 19  A.   You did not.

01:45:55PM 20  Q.   You were asked some questions about what your pattern

01:46:01PM 21  and practice is with respect to engaging in conversation

01:46:07PM 22  with individuals when they are going to sign something

01:46:10PM 23  that you are notarizing.

01:46:12PM 24  A.   Correct.

01:46:12PM 25  Q.   Can you tell us whether or not that is something that

01:46:21PM  1    you do every single time you notarize a document?

01:46:24PM  2    A.   I do not.

01:46:25PM  3    Q.   Can you tell us whether you at least determine that

01:46:32PM  4    someone is lucid and with it every time they (sic)

01:46:35PM  5    notarize a document?

01:46:36PM  6    A.   Absolutely.

01:46:37PM  7    Q.   Do you need to be a licensed medical doctor to do

01:46:40PM  8    that?

01:46:41PM  9    A.   I do not.

01:46:43PM 10    Q.   You were asked some questions about the specific type

01:46:47PM 11    of declaration document that you notarized in this case.

01:46:51PM 12    Do you remember that?

01:46:51PM 13    A.   I do.

01:46:51PM 14    Q.   And I think your testimony was you hadn't seen a

01:46:57PM 15    declaration before that you notarized?

01:47:00PM 16    A.   Correct.

01:47:00PM 17    Q.   Have you gone to hospitals before to notarize

01:47:04PM 18    documents?

01:47:05PM 19    A.   I have.

01:47:05PM 20    Q.   How common is that?

01:47:07PM 21    A.   Very.

01:47:07PM 22    Q.   Is there anything unusual about you going to a

01:47:12PM 23    hospital and notarizing a document?

01:47:14PM 24    A.   Absolutely not.

01:47:15PM 25    Q.   You were asked some questions about a twelve-step

01:47:20PM 1    Arizona notary public reference manual.  Do you recall

01:47:23PM 2    that?

01:47:24PM 3    A.   I do.

01:47:24PM 4    Q.   We have marked that document as Exhibit 4 to the

01:47:27PM 5    deposition, and it has twelve steps that a notary

01:47:31PM 6    generally follows when getting a document notarized?

01:47:33PM 7    A.   Correct.

01:47:34PM 8    Q.   Is it your pattern and practice to follow those

01:47:37PM 9    twelve steps?

01:47:38PM 10   A.   Absolutely.

01:47:38PM 11   Q.   Can you tell us whether or not it is your pattern and

01:47:41PM 12   practice to have an individual read a document and

01:47:50PM 13   comprehend a document before signing it and placing your

01:47:54PM 14   notary seal on the document?

01:47:55PM 15            MS. JOHNSON:   Objection.

01:47:57PM 16            THE WITNESS:   That has never happened.  It is not

01:47:59PM 17   common.

01:47:59PM 18   By Mr. Adams:

01:47:59PM 19   Q.   I'm sorry.  Say that again.

01:48:00PM 20   A.   I said the signer reading the document has never

01:48:07PM 21   occurred ever in my signings, at the event.  They scan it

01:48:14PM 22   and they sign it.

01:48:16PM 23   Q.   You were asked some questions by a number of lawyers

01:48:19PM 24   in the room and on the phone.  Have any of those questions

01:48:22PM 25   changed your testimony, that you would not have notarized

01:48:26PM 1  this document if Mr. Varney was unable to respond in any

01:48:33PM 2  way?

01:48:33PM 3  A.   That is correct, nothing would have changed or will

01:48:37PM 4  change.

5                          CROSS-EXAMINATION

6  By Ms. Weglarz:

01:48:39PM 7  Q.   Is it a requirement that the person actually read a

01:48:41PM 8  document before you acknowledge the signature as in you

01:48:48PM 9  did --

01:48:49PM 10  A.   In my presence?

01:48:50PM 11  Q.   -- with a notarial act?  Yes.

01:48:51PM 12  A.   Absolutely not.

01:48:52PM 13  Q.   Before you, as a notary public, are allowed to

01:48:56PM 14  acknowledge a signature on a document, like you did here,

01:48:59PM 15  is it a requirement --

01:49:01PM 16  A.   It is not.

01:49:01PM 17  Q.   -- that the person have read the document?

01:49:03PM 18  A.   It is not.

19                       FURTHER RECROSS-EXAMINATION

20  By Mr. Harris:

01:49:06PM 21  Q.   I believe you testified a moment ago in response to

01:49:09PM 22  Mr. Adams that you do not always talk to a witness to

01:49:12PM 23  confirm whether they are lucid.  Did I understand that

01:49:15PM 24  correctly?

01:49:18PM 25  A.   There is always brief conversations, not lengthy,

01:49:27PM 1    "hi," things of that nature.

01:49:33PM 2    Q.   When you referred earlier to conversations, do you

01:49:37PM 3    consider one word, such as "hi," to constitute a

01:49:42PM 4    conversation?

01:49:43PM 5    A.   If I get a response, yes.

01:49:48PM 6    Q.   That's all you are looking for, is a response?

01:49:50PM 7    A.   I didn't say that.

01:49:55PM 8    Q.   What else are you looking for then, beyond just a

01:49:58PM 9    simple response, like "hi"?

01:50:01PM 10   A.   Lucidity, awareness.

01:50:08PM 11                    FURTHER RECROSS-EXAMINATION

01:50:08PM 12   By Ms. Weglarz:

01:50:10PM 13   Q.   Mr. Parris, did Mr. Adams on February 7th tell you

01:50:14PM 14   Mr. Varney was dying?

01:50:15PM 15   A.   He did not.

01:50:17PM 16   Q.   Did you have any other information as to what his

01:50:21PM 17   condition was or prognosis?

01:50:24PM 18   A.   I did not.

01:50:29PM 19           MS. WEGLARZ:   Thank you.

01:50:32PM 20           MR. ADAMS:   Anyone else on the phone?   All right.

01:50:35PM 21   I don't have any more questions.   Your deposition is

01:50:37PM 22   complete.   Thank you very much, sir.

01:50:39PM 23           THE WITNESS:   Are we off the record?

01:50:42PM 24           MR. ADAMS:   That completes the deposition of

01:50:44PM 25   Mr. Parris, your Honor.

01:50:44PM  1          THE COURT:  I'm sorry.  Let me ask a couple of

01:50:47PM  2  questions.  I didn't get his last name.

01:50:52PM  3          MR. ADAMS:  Parris, P, as in Peter, A-R-R-I-S.

01:50:59PM  4  It's like Paris, France, but with an extra R.

01:51:05PM  5          THE COURT:  Speaking of Paris, I don't know if

01:51:08PM  6  you heard about it, but the Notre Dame cathedral is on

01:51:13PM  7  fire, and apparently pretty bad.

01:51:17PM  8      There was one other thing:  He testified as to when

01:51:21PM  9  he got his certificate, and I didn't make a note of it.

01:51:24PM 10          MR. ADAMS:  It was September of 2017.

01:51:30PM 11          THE COURT:  Okay.  Now, there were a lot of

01:51:43PM 12  objections before we started.  I think they got resolved.

01:51:52PM 13  Are there any objections to Mr. Parris' deposition that

01:51:56PM 14  didn't get resolved that should be resolved?

01:52:05PM 15      There were a lot of leading questions in there.  I

01:52:09PM 16  guess you probably know I have been at this a little

01:52:18PM 17  while.  The kind of leading questions that you objected to

01:52:22PM 18  at the last, trying to bolster the witness' testimony,

01:52:29PM 19  don't help much, what the questioner thinks he's doing.

01:52:36PM 20      Anyway, who's your next witness?

01:52:39PM 21          MR. ADAMS:  Your Honor, we have spent the lunch

01:52:41PM 22  hour withdrawing about eight pages of Dr. Sharma's

01:52:46PM 23  testimony.  We would like to read that at this time.  And

01:52:53PM 24  Mr. Horn will be Dr. Sharma on the stand, and I will

01:52:57PM 25  question the witness.  I think that will go much faster

01:52:59PM 1  than the video dep, where we are kind of shuffling through

01:53:04PM 2  papers and trying to --

01:53:04PM 3          THE COURT:  It would be faster if I read it

01:53:07PM 4  myself on my own time.

01:53:09PM 5          MR. ADAMS:  That is another option.

01:53:11PM 6          MR. VEGA:  Your Honor, if I may, there really

01:53:13PM 7  seems to be a lack of communication between plaintiff and

01:53:16PM 8  the defendants, because this is the first time I am

01:53:18PM 9  hearing that they did any redactions.  We had an hour and

01:53:23PM 10  a half.  At any point in time they could have come to us

01:53:25PM 11  to tell us what those redactions were so that we can

01:53:29PM 12  communicate.

01:53:29PM 13          THE COURT:  We are talking due process.  They are

01:53:32PM 14  entitled to know what you are going to offer.

01:53:34PM 15          MR. ADAMS:  Your Honor, if I had touched a single

01:53:37PM 16  designation they had made, or had co-designated in, or

01:53:42PM 17  have done anything to -- but object to and try to exclude,

01:53:45PM 18  I certainly would have brought it up.  I am not trying

01:53:48PM 19  to --  I only withdrew our designations.  I wouldn't touch

01:53:52PM 20  theirs, and I would never do that.  I am trying to

01:53:54PM 21  streamline things.

01:53:55PM 22          THE COURT:  Streamlining is great, but they have

01:53:57PM 23  a right to know what you are going to offer.

01:54:01PM 24          MR. VEGA:  That still doesn't address whether

01:54:03PM 25  they streamlined the things that we found objectionable or

01:54:06PM 1  not, or if those are still part of the record.  That's the

01:54:09PM 2  lack of communication that we are having at this point.

01:54:14PM 3       MR. ADAMS:  We withdrew our own designations that

01:54:16PM 4  they objected to and wanted excluded.

01:54:21PM 5       MR. VEGA:  Did you withdraw it --

01:54:22PM 6       MR. ADAMS:  Excuse me, counsel.  Don't address

01:54:25PM 7  me.  We withdrew our own designations that they objected

01:54:28PM 8  to and wanted excluded.  We can put them back and they can

01:54:31PM 9  object.  Your Honor, I am over here trying to get this in

01:54:34PM 10  the quickest, easiest way possible.  That's all I am

01:54:36PM 11  trying to do.

01:54:38PM 12       MR. VEGA:  Your Honor, that misses the point.

01:54:40PM 13       THE COURT:  I understand.  What I am telling you

01:54:42PM 14  is that due process requires that they understand, or

01:54:45PM 15  know, or have a chance to object to what you're going to

01:54:48PM 16  offer.  Provide that to them in some form somehow.  This

01:54:55PM 17  is still here, incidentally, that you handed up earlier.

01:55:01PM 18       MR. ADAMS:  Okay.  We cannot --  Okay.  Do you

01:55:09PM 19  want us to --  Your Honor, does the Court want to read the

01:55:14PM 20  transcript on its own time, and we won't --

01:55:17PM 21       THE COURT:  That is the fastest way.  I can do

01:55:20PM 22  that tonight while I'm enjoying my time off at home.

01:55:29PM 23  That's the easiest way to do it, the fastest way.

01:55:35PM 24       MR. ADAMS:  All right.

01:55:44PM 25       MR. VEGA:  Your Honor, will we still have an

01:55:46PM 1     opportunity to see what plaintiffs' counsel is

01:55:49PM 2     proposing --

01:55:50PM 3              THE COURT:  That's what I just told them.

01:55:54PM 4              MR. ADAMS:  We will skip the withdrawals.  They

01:55:56PM 5     have seen it.

01:55:57PM 6              THE COURT:  Pardon?

01:55:58PM 7              MR. ADAMS:  We won't withdraw anything.  We will

01:56:00PM 8     keep it as it is, if that's easier.

01:56:03PM 9              THE COURT:  I don't know what you're talking

01:56:05PM 10    about now.  You're going to offer Dr. Sharma's deposition?

01:56:14PM 11             MR. ADAMS:  Right.

01:56:14PM 12             THE COURT:  What I'm telling you is they have a

01:56:17PM 13    right to know what you're going to offer before you submit

01:56:19PM 14    it.  Make arrangements to give them that information.

01:56:26PM 15             MR. ADAMS:  Okay.  No problem.

01:56:28PM 16             MR. CRAIG:  Your Honor, I do have concern that

01:56:32PM 17    the -- what they're going to hand you does not include the

01:56:35PM 18    objections that we noted in the transcript and provided to

01:56:40PM 19    them.

01:56:45PM 20             THE COURT:  I could have read the whole thing by

01:56:47PM 21    now and been done.

01:56:50PM 22             MR. CRAIG:  Normally Rule 32 has a procedure that

01:56:55PM 23    accomplishes all this, that wasn't done here.

01:57:00PM 24             THE COURT:  I am trying to get to the bottom line

01:57:05PM 25    efficiently here, and hassling over this stuff delays it.

01:57:13PM 1   If you know what they are going to offer, then you can

01:57:16PM 2   object before it is submitted.  That's the next step in

01:57:22PM 3   Dr. Sharma's deposition.

01:57:27PM 4        All right.  What's next?

01:57:30PM 5        MR. ADAMS:  We would like to publish the

01:57:35PM 6   declaration of Father Eric Schimmel and read it into the

01:57:40PM 7   record.

01:57:40PM 8        THE COURT:  All right.  I would point out that

01:57:47PM 9   the declaration is not available for trial, so this would

01:57:50PM 10  be a subject of the motion on summary judgment only.

01:57:54PM 11       MR. ADAMS:  All right.  Plaintiffs call as their

01:57:58PM 12  next witness Father Eric Schimmel.

01:58:09PM 13       MS. WEGLARZ:  Your Honor, the defendants as a

01:58:10PM 14  whole object to this declaration on the basis of hearsay,

01:58:15PM 15  for which there is no exception, and therefore it is

01:58:15PM 16  inadmissible.

01:58:16PM 17       THE COURT:  I am having a hard time understanding

01:58:18PM 18  you.  Be seated, and you can pull that over, hopefully,

01:58:22PM 19  and you won't have to break your back.

01:58:25PM 20       MS. WEGLARZ:  The defendants object to Father

01:58:31PM 21  Schimmel's declaration on the basis of hearsay, for which

01:58:33PM 22  there is no exception, and therefore it is inadmissible.

01:58:37PM 23       THE COURT:  It may be admissible for summary

01:58:41PM 24  judgment purposes.  Let's see what he has to say, if

01:58:46PM 25  that's all we have is his declaration.

01:59:03PM 1      MR. ADAMS:  The declaration of Father Eric

01:59:06PM 2  Schimmel, CSC.  "I, Father Eric Schimmel, CSC, declare as

01:59:13PM 3  follows:  I am not a named party to this action.  Nor have

01:59:15PM 4  I been offered any reward, payment, promise, or inducement

01:59:19PM 5  for the execution of this declaration.  I have not been

01:59:22PM 6  threatened or pressured in any way to provide the

01:59:24PM 7  information in this declaration, which I do so knowingly

01:59:27PM 8  and voluntarily.  I have personal knowledge of the facts

01:59:31PM 9  in this declaration from my own personal observation and

01:59:33PM 10  experience.  I could competently testify to them, if asked

01:59:38PM 11  to.

01:59:38PM 12      I am an ordained Catholic priest of the Congregation

01:59:44PM 13  of Holy Cross.  At the time I met Mr. Varney, I was

01:59:47PM 14  working at the parochial vicar at Saint John Vianney Roman

01:59:52PM 15  Catholic Parish in Goodyear, Arizona.  That is in the

01:59:56PM 16  diocese of Phoenix.

01:59:57PM 17      Before joining the Saint John Vianney Parish, I

02:00:00PM 18  worked in Hispanic outreach at King's College in

02:00:05PM 19  Wilkes-Barre, Pennsylvania for three years.  Before that I

02:00:08PM 20  was the director of Andre House of Hospitality, a ministry

02:00:13PM 21  to the homeless and poor populations of Phoenix, Arizona,

02:00:16PM 22  providing dinner service, hospitality services,

02:00:20PM 23  transitional housing, and prayer.  At the time of the

02:00:23PM 24  incident below, I lived in Goodyear, Arizona.

02:00:26PM 25      On February 6th, 2018, Maria Gloria Varney contacted

02:00:32PM 1    Saint John Vianney and requested that a priest come to

02:00:36PM 2    administer the last rites and holy communion to her

02:00:40PM 3    husband, Donald Varney, whose death from mesothelioma was

02:00:52PM 4    imminent.

02:00:53PM 5        That same evening, I traveled to Abrazo West Hospital

02:00:56PM 6    in Goodyear, Arizona.  I met with Don Varney, who was very

02:01:01PM 7    ill and in tremendous pain.  Don was very emaciated,

02:01:04PM 8    struggled to breathe, and appeared close to death.

02:01:07PM 9        I gave Mr. Varney the sacrament of anointing of the

02:01:12PM 10   sick with the special prayers for the last rites.  The

02:01:15PM 11   last rites in Roman Catholicism are the last prayers and

02:01:20PM 12   ministrations given to an individual of the faith shortly

02:01:23PM 13   before death.

02:01:24PM 14       I had also anticipated witnessing Mr. Varney sign a

02:01:27PM 15   declaration that evening.  As he was not in a position to

02:01:31PM 16   sign, being well after 7:00 p.m., and the people who would

02:01:35PM 17   be needed to witness the signing of the document were not

02:01:37PM 18   there, I was asked to come back the next day, during the

02:01:40PM 19   day.

02:01:40PM 20       On February 7th, 2018, I again went to Mr. Varney's

02:01:47PM 21   room at Abrazo West Hospital to witness Mr. Varney sign a

02:01:50PM 22   document.  I returned to Abrazo West Hospital and was

02:01:54PM 23   present when Mr. Varney signed the document, which I

02:01:57PM 24   believe is attached as Exhibit A.  Mr. Varney was handed

02:02:01PM 25   the attached document and a pen.  Although he was very

02:02:05PM  1   sick, I was impressed that he sat up to sign the document,

02:02:08PM  2   rather than stay lying in the bed and make a scribble

02:02:12PM  3   signature lying down that I have seen other patients make

02:02:15PM  4   when in hospital.  He opened his eyes, held the document,

02:02:19PM  5   responded positively that he knew" --

            6          MR. CRAIG:  Objection.

02:02:21PM  7          MR. ADAMS:  -- "what he was signing."

02:02:23PM  8          MR. CRAIG:  Objection.  This is speculation.

02:02:26PM  9   Lacks foundation.

02:02:27PM 10          THE COURT:  Pardon?

02:02:28PM 11          MR. CRAIG:  I am objecting because this is

02:02:30PM 12   speculation and lacks foundation.

02:02:32PM 13          THE COURT:  Overruled.

02:02:34PM 14          MR. CRAIG:  This portion of it.

02:02:36PM 15          MR. ADAMS:  "He opened his eyes, held the

02:02:38PM 16   document, responded positively that he knew what he was

02:02:40PM 17   signing, and signed it.  He appeared to understand the

02:02:43PM 18   document.  After signing the document Mr. Varney laid back

02:02:48PM 19   down in bed and closed his eyes.

02:02:50PM 20       There were several individuals in the room who

02:02:52PM 21   witnessed Mr. Varney sign the document, including a

02:02:55PM 22   notary, Gloria Varney, Mr. Varney's daughter, and

02:02:59PM 23   Mr. Varney's lawyer.

02:03:00PM 24       I understand that Mr. Varney passed away the

02:03:03PM 25   following day, February 8th, 2018.

02:03:05PM 1        In the middle of March 2019 I was thereafter

02:03:12PM 2    contacted" --

02:03:13PM 3            MR. CRAIG:  Objection, your Honor.  The rest of

02:03:15PM 4    the declaration is not relevant and highly prejudicial.

02:03:27PM 5            MR. ADAMS:  Your Honor, if I can be heard?  I

02:03:29PM 6    will give you a chance to read it.  Sorry.

02:03:31PM 7            THE COURT:  Pardon me?

02:03:34PM 8            MR. ADAMS:  I didn't want to interrupt if the

02:03:36PM 9    Court was reading the last paragraph.

02:03:39PM 10           THE COURT:  Yeah.  The objection is overruled.  I

02:03:44PM 11   understand the objection.  It goes to the weight to be

02:03:47PM 12   attached to this.  You can go ahead.

02:03:49PM 13           MR. ADAMS:  "In the middle of March 2019 I was

02:03:54PM 14   thereafter contacted by someone from a law firm who asked

02:03:56PM 15   me a large number of questions.  The person initially

02:03:59PM 16   presented himself as seeking testimony about what I

02:04:02PM 17   remembered about the incident above.

02:04:04PM 18       As the conversation drew on, I was hesitant to say

02:04:08PM 19   more than what I confidently remembered.  The questions

02:04:11PM 20   started to become more pointed, and I felt like they were

02:04:14PM 21   digging for information beyond what I could comfortably

02:04:17PM 22   testify to under oath.  The nature of the questions made

02:04:20PM 23   it appear to me that this person was searching for ways to

02:04:23PM 24   discredit Mr. Varney.

02:04:26PM 25       I became frustrated by the prolonged questioning.

02:04:31PM 1   Some of the questions seeming to fish for information.  I

02:04:38PM 2   asked who he represented, and the person said he

02:04:40PM 3   represented the firm Mr. Varney's family was suing, or

02:04:43PM 4   something along those lines.  I said that I did not know

02:04:46PM 5   he represented a specific side in the case and that

02:04:49PM 6   information would have been good to know.  I felt it would

02:04:53PM 7   have given me context to know why the questions could

02:04:55PM 8   start with something along the lines of, 'Wait, how about

02:04:59PM 9   this?  Do you recall?' rather than just let my initial

02:05:05PM 10  testimony stand for itself.

02:05:06PM 11       He said that he had identified himself at the outset

02:05:08PM 12  of the conversation and always does so.  I said that I had

02:05:11PM 13  already testified to all that I remember and spent longer

02:05:14PM 14  on the phone than I had time for and ended the

02:05:18PM 15  conversation.

02:05:18PM 16       I was disturbed that the person questioned in ways

02:05:22PM 17  that seemed to be looking for the smallest possible way to

02:05:24PM 18  discredit someone, even while I was persistent in my

02:05:28PM 19  answers to only testify to as much as I could confidently

02:05:31PM 20  remember.

02:05:31PM 21       I had a voicemail from this person who called,

02:05:34PM 22  leading me to call back.  I have recorded that voicemail.

02:05:38PM 23  It, the voicemail, does identify the person by name and

02:05:41PM 24  firm, but no reference was ever made about who he

02:05:43PM 25  represents.

02:05:45PM 1       My reaction to the way the person presented himself

02:05:47PM 2  was that it felt disingenuous to claim to always clearly

02:05:52PM 3  identify oneself while only identifying a law firm, as if

02:05:55PM 4  I was expected to remember who represented Mr. Varney, who

02:05:59PM 5  had passed over a year ago.

02:06:00PM 6      When I stated that I was not aware when Mr. Varney

02:06:03PM 7  passed, he stated in a very matter of fact tone that it

02:06:07PM 8  was the day after he signed the document, with no apparent

02:06:10PM 9  concern for Mr. Varney's demise, nor for the family.

02:06:14PM 10     I declare under the penalty of perjury under the laws

02:06:17PM 11  of the states of Arizona and Washington that the foregoing

02:06:21PM 12  is true and correct."  Dated this 4th day of April 2019,

02:06:25PM 13  at Holly Cross Parish, eastern Massachusetts, Father Eric

02:06:32PM 14  Schimmel, CSC.

02:06:34PM 15     And, your Honor, for the record, Exhibit A to this

02:06:37PM 16  declaration from Father Schimmel is the declaration of

02:06:41PM 17  Donald Varney.

02:06:50PM 18       THE COURT:  Well, that last paragraph is a good

02:06:52PM 19  reminder to lawyers how to investigate things fairly.

02:06:57PM 20     All right.  Next witness.

02:06:59PM 21       MR. ADAMS:  Your Honor, plaintiffs call as their

02:07:01PM 22  next witness Dawn Brown.

02:07:12PM 23       THE COURT:  Ms. Brown, if you would raise your

02:07:15PM 24  right hand to be sworn.

02:07:17PM 25            DAWN BROWN,

02:07:23PM 1        having been sworn under oath, testified as follows:

02:07:23PM 2             THE COURT:  Be seated.

02:07:24PM 3                       DIRECT EXAMINATION

02:07:27PM 4   By Mr. Adams:

02:07:35PM 5   Q.   Good morning, Ms. Brown.

02:07:36PM 6   A.   Good morning.

02:07:37PM 7   Q.   How did you know Don Varney?

02:07:41PM 8   A.   He is my father.

02:07:44PM 9   Q.   Have you had your deposition taken in this case?

02:07:47PM 10  A.   I'm sorry?  Say that one more time.

02:07:50PM 11  Q.   Have you ever done anything like this in your life?

02:07:54PM 12  A.   No.

02:07:55PM 13  Q.   Were you present when your father, Don Varney,

02:08:00PM 14  passed?

02:08:00PM 15  A.   I was.

02:08:00PM 16  Q.   And were you present on February 7th, 2018, when he

02:08:05PM 17  signed a document?

02:08:06PM 18  A.   Yes, I was.

02:08:06PM 19  Q.   I want to ask you a few questions about that, just a

02:08:12PM 20  couple of questions about your background, so we know who

02:08:14PM 21  you are.  How old are you?

02:08:15PM 22  A.   I am 59.

02:08:17PM 23  Q.   And can you tell us a little bit about sort of your

02:08:22PM 24  background, where you grew up, what you do for a living,

02:08:25PM 25  do you have any children, things like that?

02:08:26PM 1   A.   Sure.   I was born in Bremerton, Washington, here, and

02:08:30PM 2   then we moved to a farm in Arlington, is where I was

02:08:34PM 3   raised.

02:08:35PM 4        And then I went to college in Seattle.   And I got

02:08:42PM 5   married.   I have two grown boys.   One lives in Idaho, and

02:08:46PM 6   one lives in New York.   And I just recently moved from

02:08:50PM 7   Washington to Idaho.   I am a licensed insurance agent.

02:08:54PM 8   Q.   When you were growing up as a child, where did you

02:09:01PM 9   understand that your father worked?

02:09:03PM 10  A.   I knew that he worked in the shipyards.

02:09:06PM 11  Q.   How did you know that?

02:09:07PM 12  A.   Dad told us.   And my mom told us that he worked at

02:09:11PM 13  the shipyard, he worked on the naval ships.   I remember

02:09:17PM 14  feeling proud, because he helped our military because he

02:09:22PM 15  was working on those ships.   I didn't know what he did on

02:09:24PM 16  the ships.   I was young.   You know, so your imagination

02:09:29PM 17  goes.   So I assumed he worked on periscopes when I was a

02:09:33PM 18  little kid.   That's what I thought.

02:09:36PM 19  Q.   Did you have an understanding at any time in your

02:09:41PM 20  life about what your great-grandfather(sic), your father's

02:09:47PM 21  father, did for a living?

02:09:49PM 22  A.   Um-hum.

02:09:50PM 23  Q.   What did he do?

02:09:51PM 24  A.   Grandpa worked for Darigold.   I don't know exactly

02:09:58PM 25  what he did there, but I just knew that he did.   I knew

02:10:03PM 1    that my mom's dad had cows and my dad's dad sold milk.

02:10:12PM 2    And that's what I knew as a young child.

02:10:14PM 3    Q.   I want to fast forward to when you first learned that

02:10:19PM 4    your father had this disease, mesothelioma.  Okay.  Can

02:10:24PM 5    you tell us how you found out about that, just briefly?

02:10:29PM 6    A.   Um-hum.  I kept in contact with dad, because he lived

02:10:34PM 7    in Arizona, on the telephone, and when he was diagnosed.

02:10:39PM 8    He would always tell me when he was going to the doctor

02:10:41PM 9    and what it was for.  And then he told me that he was

02:10:44PM 10   diagnosed in August, I think it was 2017, with

02:10:49PM 11   mesothelioma.

02:10:50PM 12   Q.   Did he ever tell you anything about where he believed

02:10:54PM 13   he had --  Strike that.

02:10:57PM 14        Did he ever tell you about what he understood causes

02:11:00PM 15   mesothelioma?

02:11:01PM 16   A.   Yes.  He knew that it was asbestos caused.

02:11:06PM 17            MR. CRAIG:  Objection.  Hearsay.

02:11:08PM 18            MR. ADAMS:  Your Honor, it just goes to the

02:11:10PM 19   consistency with the declaration.

02:11:11PM 20            THE COURT:  Speak up.

02:11:12PM 21            MR. ADAMS:  It is not offered for the truth of

02:11:14PM 22   the matter asserted, it is offered for its consistency

02:11:17PM 23   with the declaration.

02:11:19PM 24            THE COURT:  She may answer.

02:11:25PM 25   By Mr. Adams:

02:11:26PM  1    Q.   And did he ever communicate to you where he believed

02:11:30PM  2    he was exposed to asbestos?

02:11:31PM  3    A.   Yes.  He was very certain that it came from the

02:11:35PM  4    shipyard.

02:11:36PM  5    Q.   Can you tell us what he told you?

02:11:38PM  6    A.   Um-hum.  Yes.  He said that he worked on, like -- all

02:11:51PM  7    I can think of is like tubes, and that he would have to

02:11:57PM  8    try to repair these, and that sometimes they wouldn't come

02:12:01PM  9    apart and so they would have to use something to try to

02:12:05PM 10    break them -- not joints, but the connections.  And then

02:12:12PM 11    the insides of those pipes -- that's what -- pipes, that

02:12:18PM 12    asbestos would come out.  Actually, he described that it

02:12:23PM 13    just -- with his hands.  He said, "It fell on me.  And I

02:12:25PM 14    was covered in it."  It wasn't just breathing, he was

02:12:29PM 15    physically covered in it.

02:12:30PM 16    Q.   Did he tell you what those connections between the

02:12:35PM 17    pipes were called?

02:12:38PM 18    A.   If he did, I can't remember what word he would have

02:12:45PM 19    said.

02:12:46PM 20    Q.   Did he tell you what kind of tools he used when

02:12:49PM 21    working on these connections between the pipes?

02:12:51PM 22    A.   Um-hum.  What the picture in my head was, was those

02:12:59PM 23    wrench -- if you said the name --  I don't remember.  When

02:13:04PM 24    he was talking to me, that's the picture I had in my head,

02:13:07PM 25    some kind of wrench.

02:13:08PM 1   Q.   When did he tell you this information?   Was it before

02:13:14PM 2   or after he was diagnosed with mesothelioma?

02:13:21PM 3   A.   That was after.

02:13:24PM 4   Q.   Did your father ever tell you anything about whether

02:13:36PM 5   or not he believed there was a cure to his mesothelioma?

02:13:41PM 6   A.   No, no cure, just hope.

02:13:47PM 7   Q.   Did he ever tell you about what he thought was going

02:13:51PM 8   to happen to him?

02:13:52PM 9   A.   Yes.   He knew he was going to die from it.

02:13:59PM 10   Q.   Moving forward to when your father went into the

02:14:10PM 11   hospital.   Are you with me?

02:14:12PM 12   A.   Yeah.

02:14:12PM 13   Q.   Okay.   What was your involvement with your father's

02:14:18PM 14   stay in the hospital, if any?

02:14:20PM 15   A.   I moved to --   I went to visit dad.   I know when he

02:14:27PM 16   was in the hospital.   But I went to visit him the first

02:14:30PM 17   part of December.   And then I ended up staying to take

02:14:35PM 18   care of him.   So while he was in the hospital, I was there

02:14:39PM 19   helping -- being there for his support, and helping Gloria

02:14:44PM 20   with things that needed to be done.

02:14:45PM 21   Q.   How long did you stay?

02:14:46PM 22   A.   I was there two and a half months.

02:14:49PM 23   Q.   Were you -- did you stay until the end?

02:14:56PM 24   A.   I did, um-hum.   I would stay at the house at night.

02:15:01PM 25   Gloria stayed all -- the whole time with dad.   She would

| | | |
|---|---|---|
| 02:15:06PM | 1 | stay at the hospital.  And then in the morning she would |
| 02:15:08PM | 2 | come and pick me up, and then I would go to the hospital |
| 02:15:11PM | 3 | and we would just stay with dad. |
| 02:15:14PM | 4 | Q.  Do you remember when your dad went into the hospital? |
| 02:15:17PM | 5 | A.  Yes. |
| 02:15:17PM | 6 | Q.  When was that, roughly?  I guess I should ask, when |
| 02:15:26PM | 7 | did your father go into the hospital the time when he |
| 02:15:29PM | 8 | never left? |
| 02:15:39PM | 9 | A.  It was towards the end -- I don't know exactly if it |
| 02:15:44PM | 10 | was the end of January or the first part of February.  I |
| 02:15:48PM | 11 | don't remember the exact time. |
| 02:15:49PM | 12 | Q.  Sometime between the end of January and early |
| 02:15:51PM | 13 | February? |
| 02:15:51PM | 14 | A.  Right.  I just don't remember the date. |
| 02:15:54PM | 15 | Q.  And then what did you and Gloria do when your father |
| 02:16:00PM | 16 | was admitted to the hospital at this time -- at that time? |
| 02:16:07PM | 17 | Like, how did you and Gloria spend your days once your |
| 02:16:11PM | 18 | father had been admitted into the hospital? |
| 02:16:13PM | 19 | MR. VEGA:  Objection.  Asked and answered. |
| 02:16:15PM | 20 | THE WITNESS:  Pardon? |
| 02:16:16PM | 21 | MR. VEGA:  Objection.  Asked and answered. |
| 02:16:18PM | 22 | THE COURT:  She may answer. |
| 02:16:20PM | 23 | THE WITNESS:  I can -- |
| 02:16:22PM | 24 | By Mr. Adams: |
| 02:16:22PM | 25 | Q.  Continue. |

02:16:23PM 1    A.   Gloria would sit by dad, and I was working remotely.

02:16:28PM 2    My company let me work remotely.   They were up here in

02:16:33PM 3    Washington.   And then I worked remotely.   So I would be in

02:16:36PM 4    the corner working on my computer, and then Gloria would

02:16:39PM 5    be with dad.   And then we would switch, and she would sit

02:16:42PM 6    on the chair or the couch they had, and then I would come

02:16:46PM 7    sit next to dad.   So it was like someone was always next

02:16:50PM 8    to dad, so he knew that we were there with him.

02:16:56PM 9         And then if my nieces and nephews, or my sons, or my

02:17:00PM 10   sisters had any kind of message for dad, then they would

02:17:03PM 11   call me or text me, and I would tell that to dad, or at

02:17:07PM 12   one time I would put the phone up so he could hear their

02:17:11PM 13   voice, whatever they had to say to him.

02:17:14PM 14   Q.   I want to just get right to the date when he signed

02:17:21PM 15   the declaration, which was February 7th, 2018.   Do you

02:17:25PM 16   remember that?

02:17:25PM 17   A.   Um-hum.   I do.

02:17:27PM 18   Q.   Can you tell us what you remember seeing?   Strike

02:17:32PM 19   that.

02:17:32PM 20        Were you in the room when the declaration was signed?

02:17:35PM 21   A.   I was.

02:17:35PM 22   Q.   Can you tell us what you saw?

02:17:36PM 23   A.   Yes.   Dad was, I thought, asleep on the hospital bed.

02:17:47PM 24   He was laying there with his eyes closed.   And then the

02:17:51PM 25   notary came in, and he looked at dad and had said

02:17:55PM 1   something like, "Well, can he sign this?"  Hearing that,

02:18:00PM 2   dad sat up -- immediately sat up, eyes like wide open, and

02:18:07PM 3   he put his finger out and he said, "I am coherent.  I know

02:18:12PM 4   what I am signing."  And then he had the paper, signed it,

02:18:17PM 5   and gave it back.

02:18:20PM 6   Q.   What did your dad do after he signed the paper?

02:18:28PM 7   A.   I can't -- I have to think if we talked a little bit,

02:18:39PM 8   but I don't remember exactly.  I think dad wanted to get

02:18:46PM 9   some details about what was next, but I can't remember an

02:18:51PM 10  exact conversation.  I just remember that sitting up,

02:18:55PM 11  because it was so abrupt, and it was so clear, and it was

02:18:59PM 12  very, like, matter of fact.

02:19:07PM 13  Q.   Do you remember anything else about whether or not

02:19:09PM 14  there were conversations with anyone else in the room and

02:19:14PM 15  your father?

02:19:16PM 16  A.   During that time?

02:19:17PM 17  Q.   Yes.

02:19:17PM 18  A.   I'm sorry.  I cannot remember.

02:19:24PM 19  Q.   That's okay.  Who was in the room?

02:19:25PM 20  A.   Gloria was there, and I was there, and dad, and you

02:19:31PM 21  were there, the doctor, and the notary was there.  I can't

02:19:39PM 22  remember if the doctor was there or not.  The notary was

02:19:41PM 23  there.

02:19:42PM 24  Q.   Do you remember whether or not --

02:19:43PM 25  A.   Oh, excuse me, Father Schimmel was there.  And

02:19:49PM 1   someone else next to me.

02:19:53PM 2   Q.   Do you remember anyone else being there?

02:19:56PM 3   A.   That's who I remember.   I remember there were a lot

02:20:00PM 4   of people in that room.   But those are who I remember.

02:20:03PM 5   Q.   You mentioned earlier that your father knew there was

02:20:20PM 6   not a cure to his disease?

02:20:23PM 7   A.   Yes.

02:20:23PM 8   Q.   Was there anything else that your father ever

02:20:29PM 9   communicated to you about the fact that he knew he wasn't

02:20:33PM 10  going to survive?

02:20:36PM 11  A.   Yes, there was.

02:20:38PM 12  Q.   Can you tell us what he told you?

02:20:40PM 13  A.   Um-hum.   Dad and Gloria were married in January.   But

02:20:50PM 14  Gloria didn't really recognize that, because it was the

02:20:54PM 15  U.S. wedding.   And they got married a second time in

02:20:58PM 16  February.   It was with her whole family, and with a

02:21:01PM 17  Catholic ceremony, and her whole family was there.   And so

02:21:05PM 18  that was her wedding date.   So they didn't really

02:21:07PM 19  celebrate January.

02:21:09PM 20       But I was there in January.   I said, "Dad, do you

02:21:12PM 21  want me to run and get you an anniversary card for

02:21:17PM 22  Gloria," because he couldn't move off the couch.   And he

02:21:22PM 23  said, "Well, you can go do that.   She won't really

02:21:26PM 24  recognize it, because February is our real anniversary,"

02:21:31PM 25  he said.   "I'm not going to make it there to our real

02:21:35PM 1    anniversary."  So I got that anniversary card.  He signed

02:21:39PM 2    it and gave it to her, because he knew he wasn't going to

02:21:43PM 3    make it to the February real wedding day.

02:21:48PM 4    Q.   When did you have that conversation with him, if you

02:21:50PM 5    remember?

02:21:50PM 6    A.   I do remember.  It was the day of their anniversary,

02:21:56PM 7    because I had thought, "Oh, anniversary, and there is no

02:22:01PM 8    celebration going on," so I raced to the store and got it.

02:22:05PM 9    Q.   Can you remind us what that day was, the U.S.

02:22:08PM 10   anniversary?

02:22:09PM 11   A.   I think January 19th is the U.S., and February 24th

02:22:13PM 12   is the Catholic.

02:22:17PM 13   Q.   A couple more questions.  Going back to February 7th,

02:22:29PM 14   2018, what did your father look like on that day?

02:22:32PM 15   A.   He was a bag of bones.  He was just a skeleton.  When

02:22:45PM 16   I was in the hospital -- when dad was in the hospital and

02:22:49PM 17   I was with him he said, "Promise me you will not take any

02:22:52PM 18   pictures of me.  I don't want anyone seeing me like this."

02:22:57PM 19   He didn't want his friends coming in to see him, because

02:23:00PM 20   he was just bones.

02:23:02PM 21        And it was just like not even skin over him.  It was

02:23:06PM 22   just this thin covering over these bones, and he was

02:23:14PM 23   just -- I just remember when he was asleep, putting my arm

02:23:17PM 24   next to him, and his arms were smaller than my arms.  He

02:23:22PM 25   was just a bone.

02:23:24PM 1      And then whenever the nurses were taking care of him,

02:23:30PM 2   he would always say, "Get her out of here.  Get her out of

02:23:34PM 3   here."  He did not want me seeing how just nothing he was.

02:23:44PM 4   Q.  Was there a time when he stopped saying, "Get her out

02:23:47PM 5   of here"?

02:23:49PM 6   A.  Yes.  That was the day of the -- declaration day.

02:23:58PM 7   After that, that evening when the nurses were in, he

02:24:01PM 8   didn't say, "Get her out of here."  And then, of course,

02:24:05PM 9   the day he passed, that morning, he didn't say anything.

02:24:10PM 10  That's when I saw really how there was these big feet --

02:24:17PM 11  big feet and this little leg.

02:24:22PM 12  Q.  We have heard that he passed away the day after he

02:24:26PM 13  signed the declaration?

02:24:28PM 14  A.  That's right.

02:24:28PM 15  Q.  Do you know, based --  Well, strike that.

02:24:36PM 16      Based on all the time you spent with him, and the

02:24:42PM 17  care, and the time -- the months you spent with him, do

02:24:45PM 18  you know why he held on until February 2018?

02:24:49PM 19  A.  Yes, I believe that he wanted to be here for his

02:25:06PM 20  deposition.  He wanted to see this to the end.  He wanted

02:25:10PM 21  to make sure that --  I don't mean to say the wrong thing.

02:25:25PM 22  He hated what happened to him, and he didn't want it to

02:25:32PM 23  go -- just left.  And so I think, in my opinion, he stayed

02:25:37PM 24  around as long as he could to do his part, to make sure

02:25:45PM 25  that something happened to -- I don't know, that he didn't

02:25:55PM  1   die and nothing happened, because in his words

02:26:01PM  2   mesothelioma killed him.

02:26:08PM  3           MR. ADAMS:  Thanks for answering my questions.

02:26:11PM  4   Those are all my questions, your Honor.

02:26:13PM  5           MS. JOHNSON:  Your Honor, can I just, for the

02:26:15PM  6   record --  Obviously there is no jury here.  Your Honor is

02:26:19PM  7   capable of making the evidentiary calls during the course

02:26:22PM  8   of the testimony, but just to reiterate, the defendants

02:26:27PM  9   would object to the entire line of testimony that called

02:26:31PM 10   for hearsay and speculation, and is without foundation or

02:26:37PM 11   personal knowledge.

02:26:39PM 12           THE COURT:  Just a minute.  Ms. Brown, I am

02:26:46PM 13   curious about what went on at the time of this signing.

02:26:53PM 14   This paper didn't come from nowhere, it came from

02:26:56PM 15   somewhere.  Where did the paper come from, if you

02:26:58PM 16   remember?

02:26:59PM 17           THE WITNESS:  The actual typing up of the paper?

02:27:11PM 18           THE COURT:  No.  You are in this hotel room --

02:27:15PM 19   Hotel?  -- in this hospital room, and somebody produced

02:27:23PM 20   the paper to be signed.  Do you recall who produced it or

02:27:28PM 21   where it came from?

02:27:34PM 22           THE WITNESS:  You're right, it didn't just

02:27:47PM 23   appear.  It must have come --

02:27:49PM 24           THE COURT:  If you don't remember, that's okay.

02:27:54PM 25           THE WITNESS:  I guess --  I know it was there.

02:28:01PM 1          THE COURT:  I am just testing your recall here

02:28:05PM 2   about what went on.

02:28:07PM 3          THE WITNESS:  Right.

02:28:08PM 4          THE COURT:  Do you recall who handed the paper to

02:28:11PM 5   your dad?

02:28:12PM 6          THE WITNESS:  My mind is racing to think of how

02:28:16PM 7   all of that happened.  It probably came from Ben.  I don't

02:28:24PM 8   know how else he would have gotten it.

02:28:26PM 9          THE COURT:  Do you recall what Mr. Adams said to

02:28:37PM 10  your dad at that point?

02:28:38PM 11         THE WITNESS:  You know, I don't.  I don't.  It

02:28:42PM 12  was very startling the way that dad just bolted up like

02:28:47PM 13  that, with his eyes.  I am really still focused on that.

02:28:52PM 14  I don't really remember anything transpiring.  I remember

02:28:56PM 15  dad signed it.

02:28:57PM 16         THE COURT:  Do you remember how many pages were

02:28:59PM 17  in it?

02:29:00PM 18         THE WITNESS:  Oh, no, sir, I don't.

02:29:03PM 19         THE COURT:  Did your dad have something to write

02:29:05PM 20  on there when he sat up?

02:29:11PM 21         THE WITNESS:  Like something hard behind the

02:29:16PM 22  piece of paper?

02:29:18PM 23         THE COURT:  Yeah.

02:29:18PM 24         THE WITNESS:  I'm trying to remember.  It seems

02:29:21PM 25  like there must have been something, but I don't recall if

02:29:25PM 1  something was handed to him or if he was just on that

02:29:28PM 2  table that goes over the bed.  I don't remember.

02:29:30PM 3          THE COURT:  Do you remember anything that the

02:29:32PM 4  notary said when he was there?

02:29:35PM 5          THE WITNESS:  The only thing I remember the

02:29:37PM 6  notary saying was, "Well, is he able to sign this?" when

02:29:42PM 7  he walked in.  That's when dad sat up.  And then I don't

02:29:47PM 8  remember really anything after that.  I'm sorry.  But that

02:29:52PM 9  sitting up was -- I don't mean to be disrespectful to my

02:29:54PM 10 dad, that was really freaky, because he was just like

02:29:59PM 11 laying down and eyes closed.  You thought he was asleep,

02:30:02PM 12 but he heard every single thing that was going on, and he

02:30:06PM 13 was up, and he was all of a sudden alert.  He was like

02:30:10PM 14 that for a while.

02:30:11PM 15         THE COURT:  Do you recall anyone telling your dad

02:30:13PM 16 what the document was?

02:30:16PM 17         THE WITNESS:  I'm sure someone did say that, but,

02:30:19PM 18 again --  You know, I feel embarrassed I didn't pay

02:30:23PM 19 attention to these sorts of details.  I'm sure someone

02:30:26PM 20 told him what it was.  He knew what he was signing.  He

02:30:29PM 21 knew why that notary was there.  And he knew that he was

02:30:34PM 22 trying to get, you know, for lack of a better term,

02:30:41PM 23 justice for what he had gone through.  He knew that's what

02:30:44PM 24 he was signing.  He knew that was his statement.  I guess

02:30:48PM 25 that's it, he knew that was his statement that he was

```
02:30:51PM   1   signing.
02:30:53PM   2         THE COURT:  I guess the next question is, how do
02:30:58PM   3   you know that he knew it was his statement?
02:31:00PM   4         THE WITNESS:  Because he was so clear.  It was
02:31:06PM   5   night and day.  He was very clear that that -- he knew
02:31:10PM   6   what he was signing, he knew that it was his statement
02:31:14PM   7   about what had happened to him with that asbestos.
02:31:19PM   8         THE COURT:  Did your dad say anything during this
02:31:24PM   9   process?
02:31:26PM  10         THE WITNESS:  You know, I want to say that I feel
02:31:31PM  11   like afterwards he talked a little bit, but I don't really
02:31:35PM  12   remember anything like that.
02:31:38PM  13         THE COURT:  All right.
02:31:43PM  14                      CROSS-EXAMINATION
02:31:46PM  15   By Ms. Weglarz:
02:31:46PM  16   Q.   Ms. Brown; is that right?
02:31:48PM  17   A.   Yes.
02:31:48PM  18   Q.   I just have a few questions for you.
02:31:51PM  19   A.   Okay.
02:31:51PM  20   Q.   Did your father normally wear glasses?
02:31:56PM  21   A.   Yes.
02:31:57PM  22   Q.   Did he wear glasses to read?
02:31:59PM  23   A.   Probably.
02:32:04PM  24   Q.   Did he have glasses on at the time that he signed
02:32:08PM  25   this document?
```

02:32:09PM 1   A.   I actually think he did, because I think I remember

02:32:14PM 2   that it was odd to me that dad asked for his glasses.

02:32:17PM 3   That's what I remember.

02:32:19PM 4   Q.   So he sat up and asked for glasses?

02:32:22PM 5   A.   When it was time to sign.

02:32:23PM 6   Q.   And you have a financial stake in this case, correct?

02:32:29PM 7   A.   Yes.

02:32:30PM 8   Q.   A percentage of the settlements will go to you,

02:32:35PM 9   correct?

02:32:35PM 10  A.   Yes.

02:32:36PM 11  Q.   You told us that your dad had related to you when he

02:32:40PM 12  first thought that asbestos in the shipyards caused his

02:32:46PM 13  illness?

02:32:47PM 14  A.   Um-hum.

02:32:47PM 15  Q.   Do you remember when you had that conversation, what

02:32:49PM 16  month?

02:32:50PM 17  A.   That would have been in August when he was diagnosed.

02:32:54PM 18  Q.   And he had been having abnormal CTs of his chest

02:33:01PM 19  prior to August, correct?

02:33:02PM 20  A.   I don't know that for sure.  I don't know.

02:33:05PM 21  Q.   You don't know if he was going to the doctor months

02:33:08PM 22  before that?

02:33:09PM 23  A.   I know that he was going to see a doctor.  He went to

02:33:12PM 24  the doctor regularly, but I don't know what for.  I mean,

02:33:16PM 25  I don't know if he had chest x-rays or anything like that.

02:33:19PM 1   Q.   And you were the daughter responsible for finding

02:33:23PM 2   your father's attorneys, correct?

02:33:25PM 3   A.   That's true.

02:33:26PM 4   Q.   How did you find the attorneys?

02:33:28PM 5   A.   Some friends of mine had been involved in an asbestos

02:33:38PM 6   case where this law firm had represented them, and he had

02:33:45PM 7   told me -- this friend had told me that he had been

02:33:49PM 8   deposed, you know, just in conversation, months ago --

02:33:54PM 9   months before.  I don't even know how long.  Before dad

02:33:58PM 10  was even diagnosed.

02:34:00PM 11        And then when I had --  They were actually my

02:34:03PM 12  landlords when I had told them my dad has been diagnosed

02:34:06PM 13  with this.  He said, "That is what I was deposed for."

02:34:12PM 14  And so then he gave me the name.

02:34:14PM 15  Q.   And when did you first call your father's attorneys?

02:34:18PM 16  A.   In December.

02:34:20PM 17  Q.   In December?

02:34:20PM 18  A.   Um-hum.

02:34:22PM 19  Q.   Do you remember what part of December?

02:34:28PM 20  A.   It would have -- I went to visit dad the first part

02:34:32PM 21  of December, so it was probably that early part of

02:34:36PM 22  December, between the 1st and 10th, sometime in there.

02:34:41PM 23  Q.   And when you met with the lawyers --  Actually, let

02:34:44PM 24  me strike that.

02:34:44PM 25        The first time you talked to the lawyers, was it in

02:34:47PM 1    person or on the phone?

02:34:48PM 2    A.   I called them.   I actually called a couple, because

02:34:53PM 3    dad was skeptical about what to do.   And so he said, "Call

02:34:57PM 4    a couple."   And I did.   And then we went with --

02:35:03PM 5    Q.   Did you go with your father to meet the attorneys?

02:35:06PM 6    A.   They came to dad's house.   Dad couldn't really get up

02:35:11PM 7    and move around.

02:35:12PM 8    Q.   And before they took on your case, did they ask your

02:35:18PM 9    dad to tell them about his asbestos exposures?

02:35:21PM 10           MR. ADAMS:   Objection, your Honor.   It lacks

02:35:26PM 11   foundation, as far as "before they took on your case."   It

02:35:29PM 12   calls for a legal conclusion.   And it may seek information

02:35:32PM 13   in violation of the attorney-client privilege.   And I

02:35:37PM 14   don't know if the Court wants to instruct the witness on

02:35:39PM 15   what she can say and can't, or I can.

02:36:04PM 16           THE COURT:   I'm not sure why you even want to go

02:36:06PM 17   into this.

02:36:11PM 18           MS. WEGLARZ:   Let me see if I can ask one more

02:36:13PM 19   question that might clear it up.

02:36:16PM 20   By Ms. Weglarz:

02:36:17PM 21   Q.   When did you actually retain the lawyers?   Do you

02:36:21PM 22   remember what date?

02:36:24PM 23   A.   I don't remember the date, no.

02:36:25PM 24   Q.   I want to ask you about that declaration that your

02:36:31PM 25   dad signed.   Who drafted that declaration?

| | | |
|---|---|---|
| 02:36:36PM | 1 | A.   Who said the words or who -- |
| 02:36:41PM | 2 | THE COURT:  Who wrote it. |
| 02:36:42PM | 3 | THE WITNESS:  -- prepared it up?  The attorneys |
| 02:36:45PM | 4 | did. |
| 02:36:47PM | 5 | By Ms. Weglarz: |
| 02:36:52PM | 6 | Q.   Were you there during any of the time that this |
| 02:36:55PM | 7 | declaration was prepared? |
| 02:36:56PM | 8 | A.   Not that I know of. |
| 02:36:58PM | 9 | Q.   Do you know where the attorneys got the information |
| 02:37:05PM | 10 | to put into the declaration? |
| 02:37:11PM | 11 | MR. ADAMS:  I have to object just to preserve the |
| 02:37:14PM | 12 | privilege.  I think the question can be answered yes or |
| 02:37:16PM | 13 | no.  I have to object, attorney-client privilege, just in |
| 02:37:21PM | 14 | case there is an answer beyond yes or no. |
| 02:37:24PM | 15 | THE COURT:  You can answer the question. |
| 02:37:25PM | 16 | THE WITNESS:  So would you repeat it again, |
| 02:37:27PM | 17 | please? |
| 02:37:28PM | 18 | By Ms. Weglarz: |
| 02:37:29PM | 19 | Q.   Do you know where the information in that declaration |
| 02:37:31PM | 20 | came from? |
| 02:37:31PM | 21 | A.   Yes. |
| 02:37:31PM | 22 | Q.   And where did it come from? |
| 02:37:39PM | 23 | MR. ADAMS:  I think it can be answered without |
| 02:37:42PM | 24 | violating the attorney-client privilege, but I do want to |
| 02:37:45PM | 25 | make my objection just in case the answer discloses a |

```
02:37:48PM  1    confidential communication between lawyer and client.
02:37:52PM  2              THE COURT:  I think that first question is -- the
02:37:56PM  3    preliminary question is how do you know where it came
02:37:59PM  4    from.
02:38:01PM  5              THE WITNESS:  How do I know where the information
02:38:05PM  6    on the declaration came from?
            7    By Ms. Weglarz:
02:38:07PM  8    Q.  Yes.
02:38:08PM  9    A.  Because I know my dad was talking with the attorney
02:38:11PM 10    about it.
02:38:13PM 11    Q.  And how do you know that?
02:38:14PM 12    A.  Sometimes I was asked to leave the room, because it
02:38:21PM 13    was private between them, because it's my dad who filed
02:38:24PM 14    the lawsuit, not me.
02:38:25PM 15    Q.  And when did those conversations take place?
02:38:28PM 16    A.  Like what month?
02:38:31PM 17    Q.  Yes.
02:38:31PM 18    A.  In December.
02:38:32PM 19    Q.  So you were not present for any of those
02:38:39PM 20    conversations, though?
02:38:41PM 21    A.  There was some times when I was -- in the beginning,
02:38:49PM 22    I guess, I was with him.
02:38:52PM 23    Q.  Actually, maybe I should have laid a little bit more
02:38:55PM 24    foundation.  You told us you don't know how many pages are
02:38:58PM 25    in this declaration, correct?
```

02:39:00PM  1   **A.   Um-hum.**

02:39:00PM  2   **Q.   Is that right?**

02:39:01PM  3   **A.   Yes, that's correct.**

02:39:02PM  4   **Q.   Have you ever read the declaration?**

02:39:05PM  5   **A.   I want to say in the hospital room I may have read**

02:39:13PM  6   **that, but I can't remember what it all says.**

02:39:17PM  7   **Q.   Was the first time you saw the declaration in the**

02:39:19PM  8   **hospital room?**

02:39:22PM  9   **A.   Yes.**

02:39:22PM 10   **Q.   So would it be fair to say you don't know how the**

02:39:33PM 11   **declaration was actually put together?**

02:39:35PM 12   **A.   I don't know the specific logistics of it.  I know it**

02:39:40PM 13   **was between dad and his lawyer.**

02:39:42PM 14   **Q.   And do you know when that actual document was**

02:39:45PM 15   **created?**

02:39:45PM 16   **A.   I don't know.**

02:39:46PM 17   **Q.   Do you know where the declaration was created?**

02:39:56PM 18   **A.   I don't.**

02:39:58PM 19   **Q.   Was your father Catholic?**

02:40:13PM 20   **A.   Yes, because of his association with Gloria.  I think**

02:40:18PM 21   **that's the faith that he took on, yes.**

02:40:20PM 22   **Q.   Was he baptized?**

02:40:21PM 23   **A.   That, I don't know.**

02:40:24PM 24   **Q.   When your dad was diagnosed with mesothelioma, was he**

02:40:37PM 25   **concerned about taking care of Maria after he died?**

02:40:40PM 1    A.   Dad's number one concern was always taking care of

02:40:49PM 2    Gloria.  He really felt like something needed to be done

02:40:58PM 3    for what happened to him.

02:41:08PM 4        MS. WEGLARZ:  Thank you.  I will pass the

02:41:10PM 5    witness.

02:41:11PM 6                      CROSS-EXAMINATION

02:41:13PM 7    By Mr. Vega:

02:41:55PM 8    Q.   Good afternoon, Ms. Brown.  I'm sorry we are meeting

02:41:59PM 9    under these circumstances.

02:42:00PM 10   A.   Thank you.

02:42:01PM 11   Q.   You told us that --  First of all, directing your

02:42:08PM 12   attention to the hospital.  And we are talking about

02:42:12PM 13   Abrazo West Hospital, right?

02:42:14PM 14   A.   Yes.

02:42:14PM 15   Q.   What type of bed was your father in?

02:42:18PM 16   A.   I think they just call it a standard hospital bed.

02:42:25PM 17   Q.   And you just motioned with your arm up and down.

02:42:29PM 18   This is the electronic hospital beds that incline and

02:42:32PM 19   recline?

02:42:32PM 20   A.   Um-hum, and can go up and down or forward.

02:42:36PM 21   Q.   During your father's hospital stay, when he was --

02:42:43PM 22   Is that how you would move him upright, through the

02:42:47PM 23   mechanical bed?

02:42:49PM 24   A.   No.  The nurses would --  It was already kind of at

02:42:54PM 25   an incline, but the nurses would actually come in and move

02:42:58PM  1    him, and put pillows under him, and kind of support him

02:43:01PM  2    that way, and move in different ways.   It was more of

02:43:04PM  3    that.   I don't think he was ever flat unless they were

02:43:08PM  4    like changing the sheets, that sort of thing.

02:43:10PM  5    Q.   And I saw, based on the hospital records, that he was

02:43:15PM  6    also being treated for bed sores?

02:43:18PM  7    A.   Yes.

02:43:19PM  8    Q.   And that's because he wasn't able to walk around or

02:43:22PM  9    move around?

02:43:22PM 10    A.   Or move, yeah.

02:43:23PM 11    Q.   When is the last time you saw your father walking on

02:43:28PM 12    his own?

02:43:37PM 13    A.   I think I did not see him walk when he went into the

02:43:44PM 14    hospital the last time.   But any time he would have gotten

02:43:49PM 15    up to go to the restroom, then I was told to get out of

02:43:52PM 16    the room.   So I don't know if he walked to the restroom or

02:43:56PM 17    if he just had a bed pan.   I don't know that.   Me visually

02:44:01PM 18    seeing him walk, the last time was when he went into the

02:44:08PM 19    hospital.   But if he did walk, I wasn't allowed in the

02:44:13PM 20    room then.

02:44:13PM 21    Q.   Just for the record, he entered the hospital, that

02:44:16PM 22    was January 28th?   Does that refresh your recollection as

02:44:19PM 23    to when he went in?

02:44:20PM 24    A.   I knew it was sometime at the end of January, first

02:44:23PM 25    part of February, but I just didn't know the date --

02:44:26PM  1    remember the date.

02:44:27PM  2    Q.   You mentioned that your father said some words as

02:44:40PM  3    soon as he heard the notary.  He said, "I am coherent.   I

02:44:45PM  4    know what I am signing."  Did you hear your father say any

02:44:54PM  5    other words that day?

02:44:55PM  6    A.   I want to say that he still spoke after, but I don't

02:45:01PM  7    know -- I don't remember.  I just remember those, because

02:45:04PM  8    it was just so abrupt.

02:45:07PM  9    Q.   Given that abruptness, when was the last time you had

02:45:16PM 10    heard your father utter any words before he made that

02:45:20PM 11    statement?

02:45:22PM 12    A.   I would like --  Believe me, I have been racking my

02:45:26PM 13    brain to try and remember what his real last words were,

02:45:32PM 14    and I just don't recall.  I can't even tell you if -- how

02:45:37PM 15    many days before, or what it was.  Just my own --  Of

02:45:45PM 16    course, I want it to be, "I love you."  I have been

02:45:47PM 17    racking my brain, but I honestly can't remember.

02:45:50PM 18    Q.   I just want to make sure that you and I are on the

02:45:54PM 19    same page.  I wasn't necessarily asking you for the very

02:45:57PM 20    last words that he said.  I was trying to get the words --

02:46:01PM 21    the last words that he said before he said, "I am

02:46:09PM 22    coherent.  I know what I am signing."

02:46:13PM 23    A.   Um-hum.  You know, I don't know.  Some of his friends

02:46:23PM 24    stopped by the hospital to visit him, but I just can't

02:46:28PM 25    remember what day it was.  Like I said, I have been trying

02:46:31PM 1    to remember; not for this, but just for my own-self.  I

02:46:35PM 2    just cannot remember.  I remember those friends coming in

02:46:38PM 3    and he was talking with them, but I don't remember how

02:46:41PM 4    many days that was before he actually passed.  I just

02:46:45PM 5    cannot remember.

02:46:46PM 6    Q.   Is it fair to say there was at least a day or more

02:46:55PM 7    that he had not spoken up until the time that he said, "I

02:46:58PM 8    am coherent.  I know what I am signing"?

02:47:00PM 9    A.   Um-hum.  These men, some were retired and some were

02:47:09PM 10   working.  I want to say a weekend, the weekend before.  I

02:47:13PM 11   am only guessing.  I don't remember that.  I just don't

02:47:16PM 12   remember.

02:47:16PM 13   Q.   Understanding that you are guessing as to the date.

02:47:19PM 14   But it was when those friends came over, that was the last

02:47:24PM 15   time you heard your father speak before he said the words,

02:47:27PM 16   "I am coherent.  I know what I am signing"?

02:47:30PM 17   A.   Well, I don't want to say that.  I remember that

02:47:33PM 18   conversation.  I remember them being there and dad was

02:47:37PM 19   speaking with them.  But I want to say he still spoke

02:47:40PM 20   after that, but I just don't remember.  I just don't

02:47:44PM 21   remember.

02:47:44PM 22   Q.   When you were in the hospital with your father at

02:47:50PM 23   Abrazo in that last admission, was your mother always

02:47:58PM 24   there when you were there?

02:47:59PM 25   A.   Gloria is my stepmom.

02:48:01PM 1    Q.   Sorry.

02:48:02PM 2    A.   No, that's okay.   There were a few times when she

02:48:06PM 3    would go to the restroom or go get some food, and then I

02:48:12PM 4    would be with dad on my own.   But he wasn't typically by

02:48:16PM 5    himself, unless she was coming to pick me up from the

02:48:19PM 6    house.

02:48:20PM 7    Q.   When is the last time you heard your father have a

02:48:24PM 8    conversation with your mother -- sorry, not with your

02:48:27PM 9    mother, with Gloria Varney?

02:48:29PM 10   A.   Sure.   Um-hum.   I don't know.   You know, she was

02:48:40PM 11   always talking to him, always talking in his ear, always

02:48:43PM 12   rubbing his face and talking to him.   But I just -- I

02:48:48PM 13   honestly cannot remember the last specific day that he

02:48:52PM 14   spoke.   I just cannot remember.

02:48:55PM 15   Q.   You told us that at some point he asked for his

02:49:04PM 16   glasses.   Who handed him his glasses?

02:49:09PM 17   A.    I don't know.   It would have been -- I would say it

02:49:15PM 18   would be Gloria, but I don't know that for 100 percent.   I

02:49:20PM 19   don't know.   Because of the positioning, she was on what

02:49:24PM 20   would have been his left side.   That's where she was

02:49:27PM 21   always at.   She wasn't here.   She would have been the one

02:49:32PM 22   who knew where they were.   She was the one who kept track

02:49:35PM 23   of everything.

02:49:36PM 24   Q.   And what were the precise words that he used to ask

02:49:39PM 25   for his glasses?

02:49:40PM 1   A.   I want to say, "I need my glasses," but, you know, I

02:49:46PM 2   don't know that for sure.

02:49:47PM 3   Q.   And did he say that before he said he was coherent,

02:49:53PM 4   or was that after?

02:49:54PM 5   A.   No.  He was, I thought, asleep before.  So it would

02:49:59PM 6   have been after.

02:50:00PM 7   Q.   And so then are those the last words that he said, "I

02:50:06PM 8   need my glasses," or was it something else that was --

02:50:09PM 9   A.   I don't know.  I can't remember if he spoke anymore,

02:50:15PM 10  if there was any little bit of a conversation afterward,

02:50:18PM 11  after the signing and the notary left.  I just don't

02:50:25PM 12  remember that.

02:50:25PM 13  Q.   When was the last time before the signing that you

02:50:28PM 14  saw your father wearing those glasses?

02:50:32PM 15  A.   The details, I just don't know.  I didn't know to pay

02:50:44PM 16  attention to those things.  I just don't know.

02:50:47PM 17  Q.   Other than the conversation with the -- his friends

02:50:54PM 18  who came to visit him approximately the weekend before he

02:50:58PM 19  passed, do you recall seeing your father speak with

02:51:03PM 20  anybody else?

02:51:06PM 21  A.   Only the nurses or Gloria.  And then Gloria's niece

02:51:14PM 22  and her husband came in.  I don't remember what day they

02:51:20PM 23  showed up.

02:51:22PM 24  Q.   And just --

02:51:27PM 25  A.   I am trying to remember if he spoke with them.

```
02:51:31PM  1    Sorry.

02:51:32PM  2    Q.   Do you know if that was after his friends came?

02:51:36PM  3    A.   It would have been after they came, because Blanca is

02:51:49PM  4    a niece, and she was there when dad passed.  It was

02:51:53PM  5    Blanca, Gloria and I, were with dad when he passed.

02:51:57PM  6    Q.   Can you tell us the names of the friends that came to

02:52:00PM  7    visit your dad?

02:52:02PM  8    A.   Um-hum.  It was Greg --  There were three of them.  I

02:52:28PM  9    believe it was Greg, Mark, and I don't remember the third

02:52:33PM 10    guy's name.

02:52:34PM 11    Q.   Do you remember Greg's last name?

02:52:36PM 12    A.   No.  Greg --  I would have to look.  I don't know.

02:52:45PM 13    Q.   Do you know Mark's last name?

02:52:47PM 14    A.   Yeah, I should know Mark.  I don't remember this

02:52:55PM 15    minute.  Mark's name will come to me, I think.

02:53:03PM 16    Q.   Did your father use a computer?

02:53:12PM 17    A.   Yes.

02:53:13PM 18    Q.   Did you ever see your father using a computer while

02:53:20PM 19    he was admitted at Abrazo?

02:53:23PM 20    A.   No.

02:53:23PM 21    Q.   Did you ever witness a computer -- other than the

02:53:32PM 22    hospital staff computer, did you ever witness a computer

02:53:36PM 23    inside of your father's room?

02:53:38PM 24    A.   My laptop was there, because I worked in the corner.

02:53:42PM 25    Q.   Other than yours, did you ever witness any other
```

02:53:46PM 1    laptop?  I don't know whether you answered.  I thought I

02:53:56PM 2    saw you move your head.

02:53:57PM 3    A.   I wasn't answering.  I was trying to think.  Sorry.

02:54:03PM 4    My laptop was there, but we wouldn't -- I don't know if --

02:54:09PM 5    I don't know if Ben had a computer there.  I had my

02:54:13PM 6    computer there, but there was no other computer.  Gloria

02:54:18PM 7    didn't use the computer.

02:54:20PM 8    Q.   Did you ever observe Mr. Adams -- when you said

02:54:28PM 9    "Ben," you are referring to Mr. Adams?

02:54:30PM 10   A.   (Nodding).

02:54:31PM 11   Q.   I would just need a verbal response.

02:54:33PM 12   A.   Yes.  Sorry.

02:54:35PM 13   Q.   That's okay.  Did you ever observe Mr. Adams on his

02:54:37PM 14   computer, typing?

02:54:42PM 15   A.   Yes.

02:54:43PM 16   Q.   When he was typing, what was happening at that time?

02:54:51PM 17   A.   I just thought he was taking notes for himself, other

02:54:56PM 18   than writing.  I don't know.

02:54:57PM 19   Q.   When was the last time that you saw Mr. Adams typing

02:55:03PM 20   inside of your father's hospital room?

02:55:05PM 21   A.   I'm sorry.  I don't know.  I don't know.

02:55:09PM 22   Q.   On how many occasions did you see Mr. Adams in your

02:55:15PM 23   father's hospital room at Abrazo?

02:55:22PM 24   A.   My goodness.  He was there, of course, for the

02:55:41PM 25   deposition -- not the deposition, the notary.  I can't

02:55:47PM 1   remember if Ben was there when dad passed.  I don't know.

02:56:01PM 2   Q.   My question was not necessarily when, but thank you

02:56:08PM 3   for that.  I was asking on how many days -- how many

02:56:11PM 4   occasions did you see Mr. Adams at the Abrazo Hospital?

02:56:16PM 5   A.   I don't know.  I don't know.

02:56:18PM 6   Q.   Do you know if it was more than once?

02:56:24PM 7   A.   Yes, I am sure it was more than once.

02:56:27PM 8   Q.   And when you say you're sure that it was more than

02:56:35PM 9   once, how do you know that?

02:56:36PM 10  A.   I guess I don't know.  I guess -- I know he was there

02:56:49PM 11  on the day the notary was there.  I can't remember if he

02:56:57PM 12  was there the day that dad actually passed.  I'm sure he

02:57:03PM 13  must have come in before the notary, because that's how I

02:57:07PM 14  knew the notary was coming.  But I don't know how many

02:57:10PM 15  days.

02:57:10PM 16  Q.   When you say "before," are you talking about the same

02:57:14PM 17  day or are you talking about a different day?  You just

02:57:17PM 18  said you knew he was there before.

02:57:20PM 19  A.   Before the notary came?

02:57:22PM 20  Q.   Right.  I am trying to figure out, when you say you

02:57:25PM 21  knew Mr. Adams was there before the notary came, are you

02:57:28PM 22  saying that he was there that morning before the notary

02:57:30PM 23  came?

02:57:30PM 24  A.   Yes.

02:57:31PM 25  Q.   You are not saying he was there the day before the

02:57:33PM 1    notary came?

02:57:34PM 2    A.   Oh, I'm so sorry.  Yes, I believe he was there the

02:57:38PM 3    day before the notary came.

02:57:40PM 4    Q.   So we have two days now.  We have before the notary

02:57:47PM 5    arrived and then the day that the notary arrived.  Any

02:57:50PM 6    other day that you recall Mr. Adams in your father's

02:57:54PM 7    hospital room?

02:57:55PM 8    A.   I don't remember.

02:57:57PM 9    Q.   Were you present in the hospital when the priest

02:58:12PM 10   arrived for the first day, so this would be February 6th?

02:58:20PM 11   A.   Yes.  Yes.

02:58:26PM 12   Q.   Do you recall whether Mr. Adams was in the room --

02:58:30PM 13   A.   Yes.

02:58:31PM 14   Q.   -- at that time?

02:58:33PM 15   A.   Yes, he was.  Yes.

02:58:34PM 16   Q.   And then the priest was told to come back the next

02:58:39PM 17   day?

02:58:39PM 18   A.   Right.

02:58:40PM 19   Q.   And who instructed the priest to come back the next

02:58:44PM 20   day?

02:58:44PM 21   A.   I think Mr. Adams did.

02:58:47PM 22   Q.   Do you recall --  Let me strike that.

02:59:01PM 23        You told us earlier that you saw the declaration the

02:59:09PM 24   day that it was signed; is that right?

02:59:12PM 25   A.   Yes.  Sorry.  Yes.

02:59:15PM 1   Q.   Is that the first time that you saw that declaration?

02:59:19PM 2   A.   Yes, I believe so.

02:59:20PM 3   Q.   So the day it was signed was the first time you saw

02:59:23PM 4   it?

02:59:24PM 5   A.   Yes.

02:59:26PM 6   Q.   Did you --  You said you must have --  I don't want

02:59:31PM 7   to put words in your mouth.  Do you think that you read

02:59:35PM 8   the declaration before your father signed it or after your

02:59:41PM 9   father signed it?

02:59:42PM 10  A.   I think after he signed it, I think.

02:59:44PM 11  Q.   So after he signed it was the first time you read it?

02:59:48PM 12  A.   I think so.

02:59:49PM 13  Q.   Can you go back to -- can you recall what time you

03:00:00PM 14  got to the hospital that day?

03:00:02PM 15  A.   On the signing day?

03:00:05PM 16  Q.   Yes.  February 7th.

03:00:06PM 17  A.   Usually Gloria had me there by 9:00, so it would

03:00:14PM 18  probably have been around 9:00.  It could have been a

03:00:17PM 19  little bit before.  But it was always in that time --

03:00:21PM 20  around that time.

03:00:22PM 21  Q.   And so --  I am just trying to clear this up, because

03:00:29PM 22  when we spoke with Mrs. Gloria Varney she told us that she

03:00:36PM 23  stayed in the hospital that day that the declaration was

03:00:40PM 24  signed.  So do you know how it was that you got to the

03:00:44PM 25  hospital on that day?

03:00:48PM 1  **A.**   The only way I ever got to the hospital was by Gloria

03:00:52PM 2  driving me.   But one day dad's friend Mark drove me to the

03:00:57PM 3  hospital.   But I didn't think it was that signing day.

03:01:02PM 4  **Q.**   Are you aware that on several occasions when we spoke

03:01:07PM 5  with Ms. Gloria Varney she never mentioned that you were

03:01:11PM 6  present at the signing?

03:01:13PM 7  **A.**   I didn't know that, no.

03:01:14PM 8  **Q.**   Are you aware that Mr. Adams responded to discovery,

03:01:20PM 9  and when he gave us the list of who was present at the

03:01:23PM 10 hospital he did not include you as someone who was present

03:01:26PM 11 at the hospital?

03:01:27PM 12 **A.**   When my dad signed the declaration?

03:01:31PM 13 **Q.**   Yes.

03:01:31PM 14 **A.**   But I know I was there.

03:01:40PM 15 **Q.**   So my question, again, is how did you get there that

03:01:48PM 16 day?

03:01:48PM 17 **A.**   I thought Gloria came and picked me up.

03:01:50PM 18 **Q.**   And so what time do you think she came to pick you

03:01:53PM 19 up?

03:01:53PM 20 **A.**   In the morning she would have -- she usually got to

03:01:57PM 21 the house around 7:30, and she got herself ready, and then

03:02:02PM 22 we left and went back to the hospital around 9:00 -- 8:30,

03:02:07PM 23 9:00, somewhere around there.

03:02:08PM 24 **Q.**   When you arrived at the hospital on February 7th at

03:02:11PM 25 8:30 or 9:00, who was present at that time?

03:02:16PM 1    A.   It would have been dad, and then Gloria and I came

03:02:28PM 2    in.

03:02:28PM 3    Q.   At that time Mr. Adams was not in the room?

03:02:35PM 4    A.   I don't know.  I can't remember that.  I don't know.

03:02:51PM 5    Q.   Do you remember the order in which the people began

03:02:59PM 6    arriving on February 7th?

03:03:01PM 7    A.   You mean when Father Schimmel got there and the

03:03:06PM 8    notary?

03:03:07PM 9    Q.   Yes.

03:03:11PM 10   A.   I believe Father Schimmel was there and the notary

03:03:15PM 11   came after that.

03:03:15PM 12   Q.   And where was Mr. Adams in relation to Father

03:03:19PM 13   Schimmel and the notary, Mr. Parris?

03:03:21PM 14   A.   Mr. Adams would have probably been on the left side

03:03:27PM 15   of dad, and Father Schimmel was there, and the notary was

03:03:33PM 16   just like -- came in the door on the right-hand side, and

03:03:36PM 17   was just kind of standing there.

03:03:38PM 18   Q.   Again, I am trying to get the order of how they

03:03:41PM 19   arrived, that's all.  You believe Father Schimmel arrived

03:03:46PM 20   first?

03:03:46PM 21   A.   Well, I guess Ben -- Mr. Adams arrived first, and

03:03:50PM 22   then Mr. -- Father Schimmel, and then the notary was last.

03:03:55PM 23   Q.   And you began your answer with you guess.  If you

03:03:59PM 24   know.

03:03:59PM 25   A.   Because I didn't pay attention to who came in when or

03:04:02PM 1    what time.  My mind is trying to flip back there to

03:04:07PM 2    exactly what happened.  It is also trying to figure out if

03:04:11PM 3    that's the day that --  Now, I know Gloria brought me

03:04:23PM 4    to --  That's bugging me that I can't remember.  I don't

03:04:33PM 5    know the order.  That's what I believe happened, that it

03:04:39PM 6    was first Mr. Adams, then Father Schimmel, and then the

03:04:43PM 7    notary.

03:04:43PM 8    Q.  Was it your intention --  Let me just strike all

03:04:53PM 9    that.

03:04:53PM 10       Putting the declaration aside, you are aware that

03:04:57PM 11   Mr. Adams had scheduled a videotaped deposition of your

03:05:01PM 12   father?  Are you aware?

03:05:02PM 13   A.  Yes.

03:05:03PM 14        THE COURT:  Excuse me, counsel.  The time has

03:05:06PM 15   slipped by me.  We need to take a break.  My court

03:05:11PM 16   reporter will complain.  I will take ten minutes.  A

03:05:17PM 17   quarter after.

03:18:25PM 18       (Recessed.)

03:19:26PM 19        THE COURT:  Okay.  Moving right along.

03:19:34PM 20        MR. VEGA:  May I inquire?

03:19:36PM 21        THE COURT:  Yes.

03:19:37PM 22   By Mr. Vega:

03:19:38PM 23   Q.  Before we broke I was asking you about whether you

03:19:43PM 24   intended to be present during the videotaped deposition of

03:19:49PM 25   your father.

03:19:56PM 1   A.   I didn't know if I could be or not.   I don't know

03:19:58PM 2   that we ever talked about it.   I don't know if I thought I

03:20:02PM 3   would or wouldn't be.

03:20:04PM 4   Q.   Do you recall that the videotaped deposition of your

03:20:09PM 5   father was scheduled for February 7th?

03:20:15PM 6   A.   Yes.

03:20:16PM 7   Q.   And how is it that you remember that?

03:20:20PM 8   A.   Because I thought he was supposed to be videoed, and

03:20:25PM 9   then it was decided he wasn't going to be able to, and so

03:20:28PM 10  the paper declaration was the alternative.

03:20:33PM 11  Q.   Do you recall seeing a videographer in the room the

03:20:41PM 12  day that the declaration was signed?   Not necessarily at

03:20:46PM 13  the time it was signed, but that day that it was signed,

03:20:48PM 14  was there a videographer in the room?

03:20:50PM 15  A.   Not that I know of.

03:20:52PM 16  Q.   Does your cellphone have videotaping capabilities?

03:21:04PM 17  A.   Yes.

03:21:04PM 18  Q.   Did you videotape the signing of that declaration?

03:21:10PM 19  A.   No.

03:21:10PM 20  Q.   Do you know whether Mrs. Gloria Varney -- whether her

03:21:17PM 21  cellphone has videotaping capabilities?

03:21:19PM 22  A.   I don't know if hers does or not.

03:21:22PM 23  Q.   Did you see her videotape the signing?

03:21:26PM 24  A.   No, I didn't.

03:21:28PM 25  Q.   Do you know whether Mr. Adams' cellphone has

03:21:38PM 1    videotaping capabilities?

03:21:40PM 2    A.   I don't know.

03:21:41PM 3    Q.   Did you witness anyone in the room videotape the

03:21:45PM 4    signing of this declaration?

03:21:47PM 5    A.   I don't recall that, no.

03:21:49PM 6    Q.   Before we started talking about the videotaping we

03:21:54PM 7    were talking about the order of the people entering the

03:21:57PM 8    room.  You told us the father got there maybe first, or

03:22:04PM 9    was it Adams?

03:22:05PM 10   A.   Well, I think Ben was there already before the father

03:22:11PM 11   got there.

03:22:12PM 12   Q.   And why wasn't the declaration signed at that point?

03:22:21PM 13   A.   The notary wasn't there.

03:22:22PM 14   Q.   Okay.  And so when we spoke with the notary --  The

03:22:30PM 15   notary told us he was asked to wait outside the room for

03:22:34PM 16   about a half hour.  What was happening inside the room

03:22:40PM 17   with your father during that half hour while the notary

03:22:43PM 18   was waiting outside?

03:22:45PM 19   A.   I thought that was when the nurse was in there with

03:22:49PM 20   dad, giving him -- taking care of whatever needed to

03:22:53PM 21   happen.  I don't know who was in the room.  That's what my

03:22:59PM 22   guess is, what was going on, because I was outside also

03:23:03PM 23   during that time.

03:23:04PM 24   Q.   You were outside --

03:23:06PM 25   A.   The room.

03:23:07PM 1    Q.   -- with the notary?

03:23:08PM 2    A.   Um-hum.  Not right there with him.  He was out there,

03:23:13PM 3    and I said, "Thank you for coming."  And we just kind of

03:23:17PM 4    waited in the hall.

03:23:18PM 5    Q.   How long were you outside the room?

03:23:26PM 6    A.   I couldn't even guess.  I don't know.

03:23:28PM 7    Q.   And was Mr. Adams in the room or was he waiting

03:23:33PM 8    outside with you as well?

03:23:34PM 9    A.   I don't know.

03:23:35PM 10   Q.   Do you know whether you were asked to leave the

03:23:41PM 11   room -- well, you mentioned because the nurse was --

03:23:44PM 12   A.   That's what I thought, was taking care of dad, and I

03:23:48PM 13   just stepped out because I knew I wasn't supposed to be in

03:23:52PM 14   there.

03:24:04PM 15   Q.   When is the first time that you saw the piece of

03:24:11PM 16   paper on that day?

03:24:12PM 17   A.   I think when it was given to dad.

03:24:17PM 18   Q.   And do you remember whether it was taken out of a

03:24:25PM 19   bag, where did it come from?

03:24:26PM 20   A.   I do not know any of those details.

03:24:29PM 21   Q.   Do you know whether Mrs. Gloria Varney participated

03:24:40PM 22   in any way in the drafting of that declaration?

03:24:43PM 23   A.   I do not know that.

03:24:44PM 24   Q.   Have you ever had a conversation with Mrs. Gloria

03:24:48PM 25   Varney about that declaration?

03:24:50PM 1    A.    No.

03:24:51PM 2    Q.    What did you do to prepare to come here today?

03:25:06PM 3    A.    I prayed.

03:25:09PM 4    Q.    Without going into the subject matter at this point,

03:25:19PM 5    did you meet with any -- either Mr. Adams or somebody from

03:25:29PM 6    his office before coming here today?

03:25:31PM 7    A.    Yes.

03:25:31PM 8    Q.    And on how many occasions did you meet with them?

03:25:35PM 9    A.    Just one.

03:25:36PM 10   Q.    And when was that?

03:25:38PM 11   A.    It was last evening.

03:25:40PM 12   Q.    Last evening?

03:25:42PM 13   A.    Um-hum.

03:25:44PM 14   Q.    Prior to meeting with them in person last evening,

03:25:49PM 15   when was the last time that you spoke with anyone from the

03:25:54PM 16   Dean Omar law firm, or any of your father's attorneys?

03:26:14PM 17   A.    It would have been --  Today is Monday.  It would

03:26:17PM 18   have been last week, to let me know I needed to be here.

03:26:20PM 19   Q.    Before last week, when was the last time you spoke

03:26:28PM 20   with anyone from your attorney's -- from your father's law

03:26:36PM 21   firm, the attorneys representing him?

03:26:42PM 22   A.    It has been a while.  I can't give a time.  It has

03:26:49PM 23   been a period of time.

03:26:51PM 24   Q.    You mentioned that when your father made that

03:26:59PM 25   statement of, "I am coherent.  I know what I am doing," in

03:27:04PM 1   your mind that is kind of like the last words you recall

03:27:07PM 2   him saying, correct?

03:27:08PM 3   A.   Truly, yes.

03:27:09PM 4   Q.   And to how many people have you relayed those last

03:27:16PM 5   words that he said?

03:27:18PM 6   A.   To three, my sisters.

03:27:22PM 7   Q.   To your sisters?

03:27:23PM 8   A.   Um-hum.

03:27:25PM 9   Q.   And when did you tell your sisters that those were

03:27:28PM 10  his last words?

03:27:31PM 11  A.   Probably that week that dad passed, because I was

03:27:34PM 12  relaying not his words so much, but just what had

03:27:38PM 13  happened.

03:27:39PM 14  Q.   Did you tell anybody else about those statements?

03:27:43PM 15  A.   I would have told Mr. Adams.

03:27:47PM 16         MR. ADAMS:  Your Honor, I would object, based on

03:27:49PM 17  attorney-client privilege.

03:27:53PM 18         MR. VEGA:  Your Honor --

03:27:55PM 19         THE COURT:  Is this your client?

03:27:57PM 20         MR. ADAMS:  Yes.

03:28:01PM 21         MR. VEGA:  Your Honor, the statement was made

03:28:02PM 22  inside of a hospital room with a priest and a notary.

03:28:08PM 23         THE COURT:  I don't know that.  The objection is

03:28:12PM 24  sustained, and the answer stricken.  You need foundation

03:28:24PM 25  if you can get by that objection.

03:28:27PM 1   **By Mr. Vega:**

03:28:30PM 2   **Q.   You told us that about a week after your father**

03:28:34PM 3   **uttered those words, "I am coherent.  I know what I am**

03:28:38PM 4   **signing," you said that you relayed that to your sisters?**

5   **A.   (Nodding.)**

03:28:43PM 6   **Q.   You are nodding your head up and down.  We need a**

03:28:46PM 7   **verbal response.**

03:28:46PM 8   **A.   Yes.  Yes.**

03:28:48PM 9   **Q.   When is the next time that you said that statement?**

03:28:53PM 10  **A.   Today.**

03:29:00PM 11  **Q.   And I'm not talking about when you said it to me, I**

03:29:05PM 12  **am saying -- or when you said it here in open court.**

03:29:09PM 13  **Before saying it here in open court, since February**

03:29:18PM 14  **of 2018, until before you came into this court, when did**

03:29:20PM 15  **you say that statement to anyone?  When?**

03:29:25PM 16         **MR. ADAMS:   I have to object, your Honor, to the**

03:29:28PM 17  **extent it calls for attorney-client privilege.**

03:29:30PM 18         **THE COURT:   The objection is sustained.**

03:29:36PM 19         **MR. ADAMS:   Thank you.**

03:29:37PM 20  **By Mr. Vega:**

03:29:38PM 21  **Q.   Did you ever tell Ms. Gloria Varney -- did you ever**

03:29:43PM 22  **have a conversation, about those words, being surprised**

03:29:46PM 23  **how your father so vibrantly said those words?  Did you**

03:29:52PM 24  **ever have a conversation with her about that?**

03:29:53PM 25  **A.   Probably not.**

03:29:55PM 1   Q.   Did you ever hear your father talk about the specific

03:30:25PM 2   type of equipment which he believed he worked on or around

03:30:28PM 3   in the Navy, in the shipyards?

03:30:31PM 4   A.   Yes.

03:30:34PM 5   Q.   And when was that?

03:30:36PM 6   A.   It was when I went to visit him in December.

03:30:44PM 7   Q.   And who was present when you were having this

03:30:48PM 8   conversation about the types of equipment?

03:30:50PM 9   A.   It would have been me and dad, and Gloria was

03:30:54PM 10  probably there.

03:30:55PM 11  Q.   As you sit here today, can you tell us what pieces of

03:31:00PM 12  equipment those are?

03:31:01PM 13  A.   I just remember pipes and things that he had to turn.

03:31:15PM 14  Q.   Is it fair to say that you never heard your father

03:31:21PM 15  speak the words that were on that declaration on either

03:31:28PM 16  the day it was signed or the day before?

03:31:35PM 17  A.   You're asking me if I heard my dad like read or make

03:31:39PM 18  the statements that were on his -- the day before or the

03:31:44PM 19  day that he signed?

03:31:46PM 20  Q.   Yes.

03:31:48PM 21  A.   I don't think I did.

03:31:50PM 22  Q.   And you would remember that?

03:31:53PM 23  A.   I am trying to remember so much.  I am trying to be

03:31:58PM 24  as accurate as I can.

03:31:59PM 25  Q.   Just bear with me.  My computer locked me out.  In

03:32:31PM  1    the month of December you had a conversation with

03:32:35PM  2    Mr. Adams; is that correct?

03:32:37PM  3    A.   Yes.

03:32:38PM  4    Q.   And what about in the month of January?

03:32:43PM  5    A.   Sure.  Yes.

03:32:44PM  6    Q.   And about how many conversations did you have with

03:32:48PM  7    Mr. Adams?

03:32:48PM  8    A.   I couldn't even guess.  I don't know.

03:32:51PM  9    Q.   When you would have these conversations with

03:32:53PM 10    Mr. Adams, were they all in person or were some of them on

03:32:57PM 11    the phone?

03:32:57PM 12    A.   Is it okay for me to answer?

03:33:05PM 13           THE COURT:  Ms. Brown is looking for advice from

03:33:08PM 14    me.  I don't know.  Just within the scope of the

03:33:17PM 15    privilege.  The question, it seems to me, is not --

03:33:22PM 16           MR. VEGA:  Content.

03:33:23PM 17           THE COURT:  -- whether anybody was there when she

03:33:27PM 18    talked to Mr. Adams about this situation.  That would

03:33:32PM 19    defeat the privilege.  What's the next question?

03:33:41PM 20    By Mr. Vega:

03:33:42PM 21    Q.   Other than Mr. Adams, did you communicate with anyone

03:33:45PM 22    else from the Dean Omar firm or -- I believe they have

03:33:49PM 23    co-counsel, I don't know how to pronounce the name,

03:33:52PM 24    Couture or something like that?

03:33:54PM 25    A.   Only when they made the initial call and spoke with

03:33:58PM 1    whoever answered the phone.

03:33:59PM 2    Q.   Was that a call that was made to the Couture firm or

03:34:05PM 3    was that to the Dean Omar firm?

03:34:09PM 4    A.   Dean Omar.

03:34:10PM 5    Q.   So there was an initial intake, and then after

03:34:13PM 6    that was when -- all of your communications after that

03:34:15PM 7    were just with one person?

03:34:16PM 8    A.   Yes.

03:34:16PM 9    Q.   Were you ever present when Mr. Adams was speaking

03:34:42PM 10   with your father and there was someone other than your

03:34:46PM 11   mother, Mrs. Gloria Varney, present?

03:34:51PM 12   A.   No.  It would have just been dad, Gloria, Mr. Adams,

03:34:56PM 13   and then if I was there.

03:34:59PM 14   Q.   How much time elapsed on February 7th --  Let me

03:35:11PM 15   just --  Let me strike that and let's start anew.

03:35:17PM 16       You told us that Mr. Parris, the notary, walks into

03:35:25PM 17   the room, and he says, "Is he able to sign?"  Are those

03:35:31PM 18   his words?

03:35:31PM 19   A.   I believe it was really something very close to that,

03:35:34PM 20   if those weren't the exact words, "Is he able to sign?"

03:35:38PM 21   Because dad was just there like he was asleep.

03:35:42PM 22   Q.   And when those words are uttered, when Mr. Parris

03:35:45PM 23   asked the question, is that when the declaration appears?

03:35:50PM 24   A.   No.  That's when dad sat up and said -- said what he

03:35:59PM 25   said, that he was clear and he knew what he was signing.

03:36:03PM 1 And I don't know how long it was before -- you know, I

03:36:07PM 2 don't know if there was more conversation and then dad was

03:36:10PM 3 given that. I don't know. I mean, I don't think he was

03:36:14PM 4 there for a whole long time, the notary.

03:36:16PM 5 Q.   That's what I am trying to zoom in on now. And I

03:36:21PM 6 want to expand that period of time. So when Mr. Parris

03:36:26PM 7 walks in and asks that question, is that when the

03:36:35PM 8 declaration appears?

03:36:39PM 9 A.   Dad responded, and then it would have been shortly

03:36:43PM 10 after that that he was given the declaration.

03:36:45PM 11 Q.   Okay. So Mr. Parris walks in, asks the question,

03:36:50PM 12 your father responds, "I am coherent. I know what I am

03:36:53PM 13 signing," and then at that point the declaration is

03:36:57PM 14 produced?

03:36:57PM 15 A.   I don't know that it was just immediate like that,

03:37:01PM 16 but, yes, shortly after that, or right after that,

03:37:05PM 17 sometime after that is when, yes.

03:37:08PM 18 Q.   And then at what point in relation to the handing him

03:37:14PM 19 the document does your father ask for his glasses?

03:37:20PM 20 A.   I don't know. I think dad had -- he must have had it

03:37:26PM 21 in his hands and then said, "I need my glasses," or,

03:37:29PM 22 "Where are my glasses?" or whatever it was. Probably

03:37:34PM 23 would have been just immediate after that.

03:37:37PM 24 Q.   And then do you have a visual recollection of your

03:37:41PM 25 father reaching for the glasses or did someone put the

03:37:45PM 1    glasses on his face?

03:37:46PM 2    A.   Actually, I am thinking about that, and I don't know

03:37:50PM 3    if they went on him -- if he actually put them on or not.

03:37:54PM 4    I don't know.  I am trying to remember it.  I am trying to

03:37:58PM 5    visualize it, and I don't know if he actually did get his

03:38:03PM 6    glasses or not.

03:38:03PM 7    Q.   But someone handed him the glasses?

03:38:06PM 8    A.   I am trying to remember, but I can't.  I don't know.

03:38:10PM 9    Q.   This was roughly at what time?

03:38:19PM 10   A.   When the notary got there.  It would have been around

03:38:24PM 11   that 11:00.  I don't know if it was a little bit before or

03:38:28PM 12   after.

03:38:30PM 13   Q.   Do you recall whether your father was able to eat

03:38:34PM 14   food at that time?

03:38:36PM 15   A.   No, dad couldn't eat food.

03:38:39PM 16   Q.   He had a tube, right?  And he essentially had been

03:38:44PM 17   laying down, essentially sleeping for the last couple of

03:38:46PM 18   days?

03:38:46PM 19   A.   Right.  But in that recline.  Not flat, but just kind

03:38:50PM 20   of reclined.

03:38:51PM 21   Q.   So the hospital tray, where they sometimes give you

03:38:55PM 22   the food, and it is that rolling cart, there really was no

03:39:01PM 23   reason for using that tray with your father because he

03:39:05PM 24   wasn't on solid foods any longer?

03:39:08PM 25   A.   We still had that tray there, and we had things on

03:39:12PM 1    it.  We had the washcloth, that sort of thing, that little

03:39:15PM 2    plastic cup like -- bowl thing was there.  We had water.

03:39:21PM 3    We were always just kind of washing him off.  You had to

03:39:26PM 4    pat his skin to try to keep it a little bit moist.

03:39:31PM 5    Q.  Did you hear -- while you were in that room, did you

03:39:35PM 6    hear anyone read the declaration to your father?

03:39:45PM 7    A.  I don't remember that.

03:39:47PM 8    Q.  Do you --  And so if you don't remember that, you

03:39:55PM 9    also don't remember to the extent --  So the declaration

03:40:01PM 10   is numbered -- it has numbers --  Do you remember whether

03:40:05PM 11   the declaration is numbered at all?

03:40:06PM 12   A.  That is something I didn't pay attention to.

03:40:10PM 13   Q.  So as you sit here today, you can't tell us that you

03:40:24PM 14   heard someone read off Paragraph 1, and then get some type

03:40:33PM 15   of acknowledgment that your father heard Paragraph 1 and

03:40:39PM 16   believes Paragraph 1 to be accurate and true, correct?

03:40:42PM 17   A.  I don't remember hearing that.

03:40:44PM 18   Q.  And similarly, you didn't hear anyone go through --

03:40:48PM 19   And so if that declaration has seven paragraphs, you

03:40:52PM 20   didn't hear someone go through each of the paragraphs and

03:40:54PM 21   get your father's acknowledgment that that paragraph was

03:40:59PM 22   true and accurate, correct?

03:41:01PM 23   A.  I don't remember that.

03:41:03PM 24   Q.  And that's something you would have remembered,

03:41:07PM 25   correct?

A.   Well, I am having a tough time remembering a lot of things, so I don't know.  It seems like there are things I should remember that I just plain don't.

Q.   And as you sit here right now, what is your best estimate for how long it took from the time your father said, "I am coherent.  I know what I am signing," until he actually signed the declaration?

A.   I think it happened in a reasonable -- a short, reasonable period of time.

Q.   What do you mean by "a short, reasonable period of time"?

A.   I knew you were going to ask me that.  I don't know. We weren't waiting for half an hour for him to sign.  It was like he was given the paper and he signed it.

Q.   Like within five seconds?

A.   No, it wouldn't have been that short, because dad couldn't move that fast.  Was it within 15 minutes? Probably.  Was it longer than that?  I am only guessing. I am throwing 15 minutes out there as a guess.  I just was not paying attention to these sorts of details.

Q.   And you understand that --  You know, you just said 15 minutes, but that would be inconsistent with what everybody else has testified about how long it took your father to sign this document, correct?

          MR. ADAMS:  I am just going to object at this

```
03:42:36PM  1  point, your Honor.  It is argumentative.  It lacks
03:42:39PM  2  foundation.
03:42:39PM  3           THE COURT:  Sustained.
03:42:57PM  4  By Mr. Vega:
03:42:58PM  5  Q.  Do you recall whether --  And I am about to wrap up.
03:43:03PM  6  You mentioned -- I asked you about whether anybody
03:43:05PM  7  videotaped.  Did anybody take any pictures during the day
03:43:09PM  8  of the signing?
03:43:10PM  9  A.  I am unaware if anyone took pictures.
03:43:18PM 10           MR. VEGA:  Thank you, Mrs. Brown.  Those are all
03:43:21PM 11  my questions right now.
03:43:22PM 12           THE COURT:  Other cross, counsel?  Redirect?
03:43:31PM 13           MR. ADAMS:  Yeah.  Your Honor, may we have
03:43:44PM 14  permission to publish an image of the notary, Steven
03:43:49PM 15  Parris?
03:43:50PM 16           THE COURT:  An image of the notary?
03:43:53PM 17           MR. ADAMS:  From the video that was played.
03:43:56PM 18           THE COURT:  Yeah.
03:44:00PM 19                    REDIRECT EXAMINATION
03:44:01PM 20  By Mr. Adams:
03:44:02PM 21  Q.  Ms. Brown, you were asked some questions about
03:44:04PM 22  whether or not you were actually present at the time that
03:44:08PM 23  your father signed this declaration.  Do you remember
03:44:10PM 24  that?
03:44:10PM 25  A.  Yes.
```

03:44:11PM 1   Q.   Have you ever seen this man before?

03:44:12PM 2   A.   Um-hum.  Yes, I have.

03:44:14PM 3   Q.   Where do you recognize him from?

03:44:16PM 4   A.   He was in the hospital hallway, and then in the room

03:44:22PM 5   with dad.

03:44:24PM 6   Q.   And which individual was he in the room with your

03:44:28PM 7   dad?  Did he have a title?

03:44:29PM 8   A.   Yes, he is the notary.  This guy is the notary.

03:44:33PM 9   Q.   Since February 7th, 2018, have you had any

03:44:38PM 10  interaction with a notary?

03:44:42PM 11  A.    I became a licensed notary, but I haven't had any

03:44:46PM 12  interaction with one.

03:44:48PM 13  Q.   Have you seen this person who we have displayed since

03:44:53PM 14  February 7th, 2018?

03:44:54PM 15  A.   No, I have not.

03:44:55PM 16  Q.   You were asked a number of questions about specific

03:45:00PM 17  details of communications you and Gloria had with your

03:45:03PM 18  father during certain time periods.  Do you recall that?

03:45:06PM 19  A.   Um-hum.  Yes.

03:45:07PM 20  Q.   Focusing in on February 7th, 2018, until February 8,

03:45:18PM 21  2018, when your father passed, so the 7th and 8th.  After

03:45:22PM 22  your father signed the declaration.  So that's the time

03:45:25PM 23  period I am going to ask you about, okay?

03:45:28PM 24  A.   Um-hum.

03:45:28PM 25  Q.   Okay.  Was Gloria speaking to your father?

03:45:32PM 1    A.   Yes.  She would talk to him in his ear and rub his

03:45:40PM 2    face.  She continued that until he passed.

03:45:44PM 3            MR. VEGA:  Your Honor, I have an objection.  This

03:45:47PM 4    goes beyond the scope of my cross.  I did not inquire

03:45:51PM 5    about the time period from signing to death.  And that's

03:45:55PM 6    the time period that he is discussing now.

03:45:58PM 7            THE COURT:  Overruled.

03:46:00PM 8    By Mr. Adams:

03:46:03PM 9    Q.   Was there any reaction from your father when Gloria

03:46:06PM 10   spoke to him?

03:46:08PM 11   A.   No.

03:46:10PM 12   Q.   When you spoke --  I'm sorry.  Go ahead.

03:46:16PM 13   A.   No, not that I can remember.

03:46:19PM 14   Q.   Was there a reaction from your father --  Let me take

03:46:27PM 15   a step back.  Sorry.

03:46:28PM 16       Was there a time when your father couldn't respond

03:46:32PM 17   and Gloria was speaking to him, like he didn't say words

03:46:37PM 18   in response?

03:46:38PM 19   A.   Yes.

03:46:39PM 20   Q.   Did he do something else in response to Gloria's

03:46:47PM 21   words?

03:46:47PM 22   A.   Cry.

03:46:48PM 23   Q.   When was that?

03:46:50PM 24   A.   I don't remember the time.  I just know that

03:47:01PM 25   sometimes the tears would come out of his face.  I don't

03:47:03PM 1   know the date, if it was before or after.  I just cannot

03:47:08PM 2   remember.

03:47:09PM 3            MR. ADAMS:  Those are all my questions.  Thank

03:47:11PM 4   you.

03:47:14PM 5                    RECROSS-EXAMINATION

03:47:16PM 6   By Mr. Vega:

03:47:20PM 7   Q.  You were just shown a photo of Mr. Parris, correct?

03:47:25PM 8   A.  Yes.

03:47:25PM 9   Q.  And that's the same image that you saw on the screen

03:47:30PM 10  before we broke for lunch, correct?

03:47:32PM 11  A.  Yes.

03:47:32PM 12  Q.  And that's the same image that you saw right after we

03:47:36PM 13  came back from lunch, correct?

03:47:37PM 14  A.  Yes.

03:47:40PM 15           MR. VEGA:  No further questions.

03:47:42PM 16           THE COURT:  Thank you, Ms. Brown.

03:48:04PM 17           MR. ADAMS:  Your Honor, we don't have any more

03:48:06PM 18  live witnesses for the plaintiffs' case.  We have another

03:48:12PM 19  declaration we would like to read and publish.  Although,

03:48:15PM 20  if the Court simply wants to read it on its own, we are

03:48:19PM 21  amenable to that.

03:48:20PM 22       And we also have -- we also still want to offer the

03:48:27PM 23  deposition testimony of Dr. Sharma, which I understand the

03:48:31PM 24  Court is going to read on its own.

03:48:32PM 25       And we also want to offer the deposition testimony of

03:48:38PM 1    Maria Gloria Varney, which the Court may want to read on

03:48:43PM 2    its own.  I don't know.

03:48:45PM 3        We also want to offer into evidence --  I am treating

03:48:48PM 4    this like a bench trial.

03:48:50PM 5              THE COURT:  That's what it is.

03:48:52PM 6              MR. ADAMS:  I thought so.  We would like to offer

03:48:54PM 7    into evidence the exhibits, which are medical records to

03:49:00PM 8    the deposition of Dr. Sharma.  They are the nursing notes,

03:49:03PM 9    Dr. Sharma's medical records, and some other medical

03:49:07PM 10   records for Don Varney.

03:49:10PM 11             THE COURT:  Mark them.

03:49:12PM 12             MR. ADAMS:  That's all we have.  With that, we

03:49:14PM 13   rest.

03:49:16PM 14             THE COURT:  Here I am.  Mark your exhibits and

03:49:20PM 15   offer them if they are self-identified, however you are

03:49:27PM 16   going to do it.

03:49:28PM 17             MR. ADAMS:  I have a little cheat sheet.  I just

03:49:31PM 18   have to bring it up.  Sorry, your Honor.  I had a cheat

03:51:32PM 19   sheet with an exhibit number for Dr. Sharma's deposition

03:51:38PM 20   corresponding to the trial exhibit number, and I have

03:51:41PM 21   misplaced it.  Can we rest subject to offering that?  As

03:51:46PM 22   soon as I find it --  I'm sorry.  I just had it.

03:51:51PM 23             THE COURT:  Well, there are a number of things

03:51:55PM 24   that are part of your case that I don't have here.

03:52:04PM 25             MR. ADAMS:  We will offer into evidence Exhibit

03:52:06PM  1    No. 1, which is the declaration of Donald Varney.

03:52:09PM  2            THE COURT:  The declaration of whom?

03:52:12PM  3            MR. ADAMS:  Donald Varney.

03:52:17PM  4            MR. VEGA:  Deposition?

03:52:19PM  5            MR. ADAMS:  Declaration.  The declaration of

03:52:22PM  6    Donald Varney as Exhibit No. 1.

03:52:24PM  7            THE COURT:  Have you marked it and handed it to

03:52:26PM  8    the clerk?

03:52:27PM  9            MR. ADAMS:  We exchanged a binder this morning.

03:52:37PM 10            THE COURT:  Your exhibits are in here?

03:52:42PM 11            MR. ADAMS:  Yes.

03:52:44PM 12            THE COURT:  Here you go, Mr. Exhibit Man.

03:52:49PM 13            MR. ADAMS:  We are not offering --

03:52:51PM 14            MR. VEGA:  This is the first time we have seen

03:52:53PM 15    that document.

03:52:54PM 16            MR. ADAMS:  We have exchanged exhibits.  They

03:52:56PM 17    have every single exhibit.

03:52:59PM 18            THE COURT:  You have to take them one at a time

03:53:01PM 19    and tell me what they are.  Number 1 is apparently the

03:53:04PM 20    declaration we are here about.

03:53:06PM 21            MR. ADAMS:  Correct.  We would offer that into

03:53:08PM 22    evidence.

03:53:08PM 23            THE COURT:  Is there any objection to Number 1?

03:53:12PM 24            MS. JOHNSON:  It is hearsay.  There is no

03:53:15PM 25    applicable exception.

03:53:17PM 1          THE COURT:  It may be admitted for purposes of

03:53:20PM 2   this hearing only at this point.

03:53:23PM 3          (Exhibit No. 1 admitted.)

03:53:23PM 4          MR. ADAMS:  We would mark as Exhibit No. 2 the

03:53:27PM 5   declaration of Father Schimmel, and offer that into

03:53:30PM 6   evidence.

03:53:31PM 7          MS. JOHNSON:  Same objection.

03:53:32PM 8          THE COURT:  Any objection to that other than the

03:53:38PM 9   objections already made?

03:53:40PM 10          MS. JOHNSON:  Those already made.

03:53:41PM 11          THE COURT:  It may be admitted, also for this

03:53:44PM 12   hearing only.

03:53:45PM 13          (Exhibit No. 2 admitted.)

03:53:45PM 14          MR. ADAMS:  We would mark and seek to admit the

03:53:47PM 15   declaration of John Kercheval.  That's Exhibit 3.  We

03:53:50PM 16   would offer that into evidence at this time.

03:53:58PM 17          MS. JOHNSON:  The same objection, it is an

03:54:00PM 18   out-of-court statement offered for the truth.

03:54:03PM 19          THE COURT:  I don't hear you.

03:54:04PM 20          MS. JOHNSON:  Same objections.

03:54:08PM 21          THE COURT:  I think it may be admitted for this

03:54:20PM 22   hearing only.

03:54:27PM 23          (Exhibit No. 3 admitted.)

03:54:27PM 24          MR. VEGA:  And just because we don't have that

03:54:29PM 25   here, are you doing -- is the declaration of

03:54:33PM 1    Dr. Kercheval --  I do not have a copy here.  Does that

03:54:37PM 2    contain his medical -- progress notes, as well?

03:54:41PM 3             MS. JOHNSON:  No.

03:54:46PM 4             MR. VEGA:  I am also going to object, just on

03:54:48PM 5    completeness, because I think it should have

03:54:53PM 6    Dr. Kercheval's progress notes, as well, in particular

03:54:57PM 7    where he says that plaintiff is -- that Mr. Varney is

03:55:02PM 8    obtunded.

03:55:03PM 9             MR. ADAMS:  We have no objection to any of the

03:55:05PM 10   medical records coming into evidence.  No objection.

03:55:12PM 11            THE COURT:  He objects, and you don't, and I

03:55:15PM 12   don't know where the stuff is.  You know, like get me the

03:55:19PM 13   stuff and mark it.

03:55:21PM 14            MS. JOHNSON:  I think it is being marked.

03:55:26PM 15            THE COURT:  Pardon?

03:55:30PM 16            THE CLERK:  I have the copy right here.

03:55:32PM 17            THE COURT:  Does that include what counsel asked

03:55:34PM 18   about?  No?  So where are those documents?

03:55:39PM 19            MS. JOHNSON:  We do have copies of those for your

03:55:42PM 20   Honor.

03:55:42PM 21            THE COURT:  I assume if you want them in, then

03:55:44PM 22   you will offer them when it is your turn.

03:55:46PM 23            MS. JOHNSON:  Absolutely.

03:55:47PM 24            THE COURT:  Okay.  The declaration of

03:55:54PM 25   Dr. Kercheval may be admitted for purposes of this hearing

03:55:57PM 1    only.  What else?

03:56:07PM 2            MR. ADAMS:  We are offering Exhibit 12 into

03:56:10PM 3    evidence, which are the exhibits to the deposition of

03:56:13PM 4    Dr. Sharma.  And it's 12-001 to 12-082.

03:56:35PM 5            THE COURT:  Any objection to those documents?

03:56:39PM 6            MS. WEGLARZ:  I would like some clarification.

03:56:41PM 7    Was that a particular exhibit to the deposition?

03:56:44PM 8            MR. ADAMS:  Yes.  It is Exhibits 1 through 8 to

03:56:51PM 9    the deposition.

03:57:03PM 10           MS. WEGLARZ:  My only objection would be there

03:57:05PM 11   are some nursing notes that Dr. Sharma does say are not

03:57:08PM 12   his notes, and he does not vouch for them.  So if they are

03:57:13PM 13   offered for the truth of the matters asserted therein,

03:57:19PM 14   with regards to Mr. Varney's condition, then defendants

03:57:22PM 15   would object to it on that grounds.  If they are offered

03:57:25PM 16   for another purpose --  I don't know what that purpose

03:57:27PM 17   would be.  I guess that's something that plaintiffs would

03:57:33PM 18   have to propose, what the purpose of those nursing records

03:57:39PM 19   are.

03:57:39PM 20           THE COURT:  Those are parts of Exhibit 12?

03:57:43PM 21           MS. WEGLARZ:  I believe it is Exhibit -- that

03:58:14PM 22   would be Exhibit 3.  Of the exhibits that are part of this

03:58:38PM 23   one block of exhibits, it is actually separate individual

03:58:43PM 24   types of documents.

03:58:45PM 25           MR. ADAMS:  Which one do you have the objection

03:58:47PM 1    to?

03:58:49PM 2            MS. WEGLARZ:  We will object to --  Well, first,

03:58:52PM 3    the notice of deposition.  I don't know why that would be

03:58:54PM 4    submitted to your Honor right now.

03:58:56PM 5            MR. ADAMS:  Your Honor, I can --  I hoped we

03:59:00PM 6    wouldn't have to do this, but I will offer just portions

03:59:04PM 7    of Exhibit 12.  And they are Bates numbered.  Maybe that

03:59:09PM 8    will fix this.  Okay?

03:59:13PM 9            THE COURT:  What are you offering here?

03:59:15PM 10           MR. ADAMS:  We are offering Trial Exhibit 12-019

03:59:24PM 11   to 12-027.  I am going to tell you what it is.  Don't

03:59:32PM 12   worry.  That is Exhibit 3 to Dr. Sharma's deposition.

03:59:40PM 13           MS. WEGLARZ:  The defendants object to Exhibit 3

03:59:44PM 14   to the deposition, as these are not Dr. Sharma's notes.

03:59:47PM 15   These are notes of nurses.  In his deposition he says he

03:59:51PM 16   does not vouch for the nurses' notes.  Again, if they are

03:59:57PM 17   offered for the truth of what is asserted in the records,

04:00:00PM 18   defendants object.

04:00:02PM 19           MR. ADAMS:  We deposed the 30(b)(6) witness who

04:00:05PM 20   is responsible for the records at Abrazo West Hospital,

04:00:12PM 21   and they said these are true and correct copies, authentic

04:00:15PM 22   business records for Donald Varney.  So they fall under

04:00:19PM 23   the business records exception to the hearsay rule, and

04:00:20PM 24   they come in for the truth.

04:00:24PM 25           MS. WEGLARZ:  I don't think they do.  So we still

04:00:27PM 1   object that they are hearsay.

04:00:28PM 2        THE COURT:  I think they may be admitted.

03:59:20PM 3      (Exhibit Nos. 12-019 to 12-027 admitted.)

04:00:33PM 4        MR. ADAMS:  We will offer Trial Exhibit 12-028 to

04:00:42PM 5   12-032.  These are additional records from Abrazo West

04:00:50PM 6   campus that were marked as Exhibit 4 to Dr. Sharma's

04:00:55PM 7   deposition.

04:00:58PM 8        MS. WEGLARZ:  Same objection.

04:00:59PM 9        THE COURT:  I think they may be admitted.

04:00:39PM 10      (Exhibit Nos. 12-028 to 12-032 admitted.)

04:01:02PM 11        MR. ADAMS:  We offer Trial Exhibit 12-033 through

04:01:06PM 12   12-059.  Those are additional medical records of Donald

04:01:12PM 13   Varney's, and they were marked as Exhibit 5 to

04:01:16PM 14   Dr. Sharma's deposition.

04:01:19PM 15        MS. WEGLARZ:  No objection.

04:01:20PM 16        THE COURT:  They may be admitted.

04:01:04PM 17      (Exhibit Nos. 12-033 through 12-059 admitted.)

04:01:21PM 18        MR. ADAMS:  We offer Trial Exhibit 12-066 through

04:01:25PM 19   12-074.  Those were additional medical records of Don

04:01:30PM 20   Varney's from Abrazo West Hospital, and they were

04:01:35PM 21   Exhibit 7 to Dr. Sharma's deposition.

04:01:39PM 22        MS. WEGLARZ:  Same objection with regard to the

04:01:42PM 23   nurse's notes.

04:01:42PM 24        THE COURT:  May be admitted.

04:01:23PM 25      (Exhibit Nos. 12-066 through 12-074 admitted.)

04:01:44PM 1     MR. ADAMS:  Your Honor, the last one is 12-075

04:01:48PM 2     through 12-082, which are additional medical records of

04:01:54PM 3     Don Varney's from Abrazo West Hospital, that were marked

04:01:57PM 4     as Exhibit 8 to Dr. Sharma's deposition.

04:02:01PM 5            MS. WEGLARZ:  Same objection.

04:02:03PM 6            THE COURT:  They may also be admitted.

04:01:46PM 7          (Exhibit Nos. 12-075 through 12-082 admitted.)

04:02:06PM 8            MR. ADAMS:  Your Honor, plaintiffs rest.

04:02:13PM 9            THE COURT:  Now, what about the deposition of

04:02:15PM 10    Ms. Varney?

04:02:17PM 11           MR. ADAMS:  We would like to read that, but I

04:02:19PM 12    understand the Court is going to read that --

04:02:22PM 13           THE COURT:  I can read it if I have it.  Where is

04:02:25PM 14    it?

04:02:27PM 15           MR. ADAMS:  It is in that blue binder in front of

04:02:30PM 16    your Honor.  There is a tab that will say, I think,

04:02:38PM 17    Varney.  It says Maria Varney, because that's Gloria's

04:02:41PM 18    official name, but she goes by Gloria.

04:02:47PM 19           THE COURT:  Any objection to Ms. Varney's

04:02:50PM 20    deposition?

04:02:53PM 21           MR. CRAIG:  Your Honor, we have the same issue

04:02:54PM 22    with Ms. Varney's deposition as we did with Dr. Sharma's,

04:02:59PM 23    in that the defendants made objections to particular

04:03:01PM 24    questions on the transcript that we were provided.  The

04:03:06PM 25    version that we were given this morning does not have

04:03:08PM 1    those objections included.  So we would object to the use

04:03:12PM 2    without having the ones indicating our objections.

04:03:20PM 3               MR. ADAMS:  That was an error on our part, your

04:03:23PM 4    Honor.  We indicated --  So that will need to be fixed.

04:03:30PM 5    I'm sorry.  We were working late last night, and we marked

04:03:33PM 6    in red where they objected, but we didn't put the legal

04:03:37PM 7    objection on the transcript.  We put the name of the

04:03:39PM 8    defendant.  That was just a mistake.  I am open to a

04:03:44PM 9    solution if defendants have one.  We can just submit a new

04:03:48PM 10   marked transcript to the Court, you know, tomorrow or

04:03:53PM 11   something.  Or, your Honor, I can stipulate they can have

04:04:02PM 12   every objection they want, and the Court can read it and

04:04:05PM 13   exclude what it wants.  That's fine with me, too.

04:04:15PM 14              THE COURT:  You have 117 pages in this

04:04:20PM 15   deposition.  I can't imagine on the narrow issues

04:04:23PM 16   presented what it takes 117 pages of me to read in order

04:04:29PM 17   to resolve the narrow issues here.  The same thing is true

04:04:33PM 18   of the other deposition we talked about this morning.

04:04:39PM 19       I don't want to trample on anybody's rights here in

04:04:53PM 20   all this, but, man, we are wasting a lot of time with

04:04:56PM 21   this.  It would be easier if you let me read the

04:04:59PM 22   depositions and give them the credibility they deserve.

04:05:25PM 23              MS. JOHNSON:  We have no objection to you reading

04:05:29PM 24   them.

04:05:30PM 25              THE COURT:  Do any of you object to that?

04:05:33PM 1          MR. CRAIG:  Your Honor, I do have copies of the

04:05:35PM 2     objections that I made.  Can I give you those copies?

04:05:43PM 3          THE COURT:  They are somewhere separately than

04:05:46PM 4     the --

04:05:46PM 5          MR. CRAIG:  Yeah.  In compliance with the local

04:05:48PM 6     rule, I noted my objections in the margins.  Those were

04:05:55PM 7     not included in the ones that were done by plaintiffs'

04:06:02PM 8     counsel.

04:06:03PM 9          THE COURT:  Have you got a copy of that?

04:06:07PM 10          MR. CRAIG:  Yes.  If you will give me one second,

04:06:09PM 11     your Honor.

04:06:10PM 12          MR. ADAMS:  Do you want to just write them in the

04:06:12PM 13     transcript he has during a break so it is all on one

04:06:15PM 14     thing?

04:06:15PM 15          MR. CRAIG:  I don't think we will have that

04:06:17PM 16     opportunity.  I sent them to plaintiffs' counsel, so they

04:06:21PM 17     already have copies of them.

04:06:30PM 18          THE COURT:  I guess it is five after 4:00.  I

04:06:33PM 19     usually go to 4:30, but it looks like I've got a longer

04:06:37PM 20     night than that ahead of me.  But surely we are going into

04:06:45PM 21     tomorrow.

04:06:49PM 22      Give me whatever else you want me to read, and I will

04:06:52PM 23     get after it and try to be ready for you tomorrow at 9:30.

04:07:02PM 24     We may have further testimony.  I don't know.  Anybody

04:07:06PM 25     anticipate calling witnesses from the defense side?

04:07:12PM   1          MR. VEGA:  Your Honor, yes, on behalf of Foster

04:07:15PM   2    Wheeler we will be calling Mr. Benjamin Adams.

04:07:23PM   3          THE COURT:  Well, that will be interesting.

04:07:27PM   4    Mr. Adams probably is the only one with a memory of what

04:07:31PM   5    went on here.  Okay.  I will read this stuff.  I will get

04:07:47PM   6    it from Tyler when we break.

04:07:52PM   7          MR. CRAIG:  Your Honor, may I provide you with

04:07:54PM   8    the notation copies?  May I approach?

04:07:56PM   9          THE COURT:  Yeah.  Give them to the clerk.  You

04:08:02PM  10    are on your feet, are you about to say something

04:08:05PM  11    important?

04:08:05PM  12          MS. JOHNSON:  No.  I thought you were going to

04:08:07PM  13    get up.

04:08:07PM  14          THE COURT:  Okay.  I will come back.  Tomorrow

04:08:12PM  15    morning.

            16                    (Proceedings recessed.)

            17

            18

            19

            20

            21

            22

            23

            24

            25

1          **C E R T I F I C A T E**

2

3

4     I, Barry Fanning, Official Court Reporter for the

5  United States District Court, Western District of

6  Washington, certify that the foregoing is a true and

7  correct transcript from the record of proceedings in the

8  above-entitled matter.

9

10

11

12  _____
    /s/ Barry Fanning
13  Barry Fanning, Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25