```
 1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                            IN TACOMA

 3    ------------------------------------------------------------

 4    MARIA VARNEY, Individually    )
      and as Personal               )
 5    Representative for the        )   No. CV18-5105RJB
      Estate of DONALD VARNEY,      )
 6                                  )
              Plaintiffs,           )
 7                                  )
         v.                         )
 8                                  )
      AIR & LIQUID SYSTEMS          )
 9    CORPORATION, et al.,          )
                                    )
10            Defendants.

11
      ------------------------------------------------------------
12
                         EVIDENTIARY HEARING
13
      ------------------------------------------------------------
14

15                         April 16, 2019

16

17          BEFORE THE HONORABLE ROBERT J. BRYAN
              UNITED STATES DISTRICT COURT JUDGE
18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:        Benjamin Adams
                                Ethan A Horn
 3                              DEAN OMAR BRANHAM

 4   For the Defendant Air &
     Liquid Systems:            Kevin Craig
 5                              GORDON REES SCULLY MANSUKHANI

 6   For the Defendant
     Armstrong
 7   International:             Stephanie Ballard
                                PREG O'DONNELL & GILLETT
 8
     For the Defendant
 9   Flowserve US:              Marc Carlton
                                LEWIS BRISBOIS BISGAARD & SMITH
10
     For Defendants Foster
11   Wheeler & CBS:            Alice Serko
                                TANENBAUM KEALE
12
     For the Defendant IMO
13   Industries:               Michael Ricketts
                                GORDON THOMAS HONEYWELL
14
     For Defendants
15   Ingersoll-Rand & Velan
     Valve:                     Kevin Craig
16                              GORDON REES SCULLY MANSUKHANI

17   For the Defendant John
     Crane:                     Claire Weglarz
18                              Daira Waldenberg
                                HAWKINS PARNELL & YOUNG
19
     For the Defendant
20   Parker-Hannifin:           Nicole MacKenzie
                                WILLIAMS KASTNER & GIBBS
21
     For the Defendant
22   Warren Pumps:              Allen Eraut
                                RIZZO MATTINGLY BOSWORTH
23
     For the Defendant
24   Crosby Valves:             Ronald C Gardner
                                GARDNER TRABOLSI & ASSOCIATES
25
```

```
 1

 2   For the Defendant SB
     Decking: (Telephonic)      John Michael Mattingly
 3                              RIZZO MATTINGLY BOSWORTH

     For the Defendant Weir
 4   Valves & Control:          Dana C Kopij
     (Telephonic)               WILLIAMS KASTNER & GIBBS
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings stenographically reported and transcript
           produced with computer-aided technology
```

1

2

3

EXHIBIT INDEX

EXHIBITS ADMITTED                                                    PAGE
  A-1                                                               14
  A-2                                                               14
  A-3 & A-4                                                         15
  A-5                                                               15
  A-6                                                               15
  A-8                                                               16
  A-9                                                               17
  A-10                                                              17
  A-11                                                              18
  A-12                                                              18
  20                                                                19

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

09:33:51AM 1          THE COURT:  Okay.  First let me give you a report

09:34:00AM 2  as to my evening activities.  I read last night the

09:34:11AM 3  deposition of Maria Varney and the deposition of

09:34:19AM 4  Dr. Sharma.  I reviewed and read all of the exhibits that

09:34:35AM 5  were handed to me as admitted, including the declaration

09:34:43AM 6  of Mr. Varney, the declaration of Father Schimmel, the

09:34:52AM 7  declaration of Dr. Kercheval, and exhibits that contained

09:35:05AM 8  hospitalization records and nurses' notes.  I think that's

09:35:11AM 9  everything I was supposed to read.

09:35:17AM 10    I guess, Mr. Adams, the ball is in your court, if

09:35:26AM 11  there is anything further.

09:35:29AM 12          MR. ADAMS:  That was everything we submitted.

09:35:31AM 13  Thank you very much for taking a look at that.  I think we

09:35:34AM 14  are in the defense case now.  The plaintiffs have rested.

09:35:37AM 15          THE COURT:  Okay.  We will turn to the defendants.

09:35:42AM 16  Who's first?

09:35:44AM 17          MR. VEGA:  Your Honor, this is Dennis Vega --

09:35:47AM 18          THE COURT:  Are you first by agreement of all

09:35:49AM 19  concerned or are you just grabbing first?

09:35:52AM 20          MR. VEGA:  I think it is by agreement by all.

09:35:56AM 21  Sorry, your Honor.  Before we begin, since plaintiff has

09:36:01AM 22  rested --

09:36:03AM 23          MR. HORN:  Go ahead.  Once you are done, I can

09:36:06AM 24  speak.

09:36:08AM 25          MR. VEGA:  I'm sorry.  Go ahead.

09:36:10AM 1     MR. HORN:  We are done with our case-in-chief.

09:36:13AM 2 Once you are done, I will add my two cents.

09:36:16AM 3     MR. VEGA:  My colleague, Alice Serko, has an

09:36:19AM 4 application to make before we begin with our

09:36:23AM 5 case-in-chief.

09:36:28AM 6     MS. SERKO:  Your Honor, good morning.  Alice

09:36:31AM 7 Serko on behalf of Foster Wheeler.

09:36:34AM 8   Foster Wheeler respectfully renews the motion to

09:36:37AM 9 exclude the Varney declaration and the Maddox report based

09:36:41AM 10 thereon, and asks for a directed ruling in that regard.

09:36:44AM 11   Plaintiff, as the proponent of hearsay evidence,

09:36:48AM 12 bears the burden of proof at this evidentiary hearing, and

09:36:51AM 13 has failed to sustain that burden.

09:36:53AM 14   As the Court noted in the order setting this hearing,

09:36:57AM 15 the Court was interested in who prepared the document,

09:37:00AM 16 what circumstances it was prepared under, when, where, and

09:37:04AM 17 by whom.  Plaintiff has failed to produce that evidence in

09:37:09AM 18 this case.

09:37:10AM 19   The Court spent the better part of the day -- the

09:37:13AM 20 entire day yesterday, as well as, apparently, your Honor's

09:37:16AM 21 time yesterday evening, reading transcripts all that

09:37:21AM 22 focused on Mr. Varney's competency to sign a document.

09:37:28AM 23 None of the evidence was offered as to who, where, when,

09:37:32AM 24 and how the Varney declaration was prepared.

09:37:35AM 25   So Foster Wheeler respectfully submits they have

09:37:38AM 1    failed to sustain their burden to show that the hearsay

09:37:42AM 2    declaration meets an enumerated exception.  For that, we

09:37:46AM 3    would ask for a directed ruling.  Thank you.

09:37:49AM 4            THE COURT:  Thank you.  I take it you all join in

09:37:52AM 5    that motion?  Any response?

09:37:55AM 6            MR. ADAMS:  Just briefly, your Honor.  We

09:38:04AM 7    presented evidence that Mr. Varney is unavailable, that

09:38:09AM 8    this is a civil case, that when he signed his name to the

09:38:12AM 9    document he made a written statement, the same written

09:38:16AM 10   statement that every person makes when they sign a

09:38:18AM 11   document and they state under penalty of perjury that they

09:38:22AM 12   are adopting the truth of the contents in that document.

09:38:25AM 13       His death was imminent.  That's literally been

09:38:28AM 14   undisputed, except in opening statement when one of the

09:38:32AM 15   lawyers said his death was not imminent.  There hasn't

09:38:35AM 16   been a single bit of evidence to dispute, let alone

09:38:41AM 17   contradict, the undeniable fact that Mr. Varney had lost

09:38:46AM 18   over 55 pounds.  He was skin and bones.

09:38:50AM 19       He told his family members he knew he would never

09:38:53AM 20   leave the hospital.  He knew he would not make the wedding

09:38:56AM 21   anniversary.  He knew his death was imminent.  He had been

09:39:00AM 22   told he had terminal cancer.  He was sitting in a hospital

09:39:03AM 23   bed, and he was skin and bones, gasping for air.  And they

09:39:08AM 24   would present to you, your Honor, that he didn't know he

09:39:12AM 25   was going to die.  That's undisputed.

09:39:14AM  1        The declaration is about the cause and circumstances

09:39:17AM  2   of his death.  Mesothelioma is only caused by asbestos,

09:39:22AM  3   and the declaration is about his exposure to asbestos dust

09:39:27AM  4   that caused his disease.

09:39:28AM  5        So the five elements of ER 804(b)(2), the dying

09:39:33AM  6   declaration exception to the hearsay rule, have been

09:39:37AM  7   satisfied, exactly what this hearing is about.

09:39:46AM  8        The competency issue, there has been ample evidence

09:39:50AM  9   from, I think, eight or nine witnesses at this point that

09:39:58AM 10   Mr. Varney was competent.

09:40:01AM 11        We heard from the notary, who said he would never

09:40:03AM 12   notarize a document if the individual, the signer, was not

09:40:08AM 13   lucid.  He said, "Absolutely not.  I would never notarize

09:40:12AM 14   a document if the signer was not lucid."

09:40:15AM 15        There are two nurses in the medical records, Nurse

09:40:19AM 16   Kracke, Nurse Alexander.  Every single nursing note on

09:40:25AM 17   February 7th, 2018, indicates Mr. Varney was lucid, his

09:40:30AM 18   mental status was coherent, he was with it, he was

09:40:33AM 19   oriented times four.  There is not a single nursing

09:40:37AM 20   note --  The people who spent the most time with

09:40:39AM 21   Mr. Varney on February 7th, 2018, were the nurses.  That

09:40:42AM 22   is undisputed.  Every single nursing note says he was

09:40:45AM 23   coherent and he was mentally lucid.

09:40:50AM 24        We heard from Dr. Sharma, and the medical records

09:40:55AM 25   that Dr. Sharma was shown, which from my perspective is

09:41:00AM 1    the most important piece of evidence in the case, because

09:41:03AM 2    it was prepared long before there was any lawsuit by

09:41:06AM 3    people with no interest in the lawsuit, and Dr. Sharma,

09:41:11AM 4    after reviewing the nursing notes and reviewing his own

09:41:13AM 5    notes, where he said Dr. Varney's neurology was

09:41:19AM 6    appropriate, he was communicating, Dr. Sharma said based

09:41:24AM 7    on all of that I think he was alert and oriented when he

09:41:27AM 8    signed the declaration on February 7th.

09:41:30AM 9         We heard from Gloria Varney, who said he was lucid,

09:41:33AM 10   who said he read the document, and he signed, and he was

09:41:37AM 11   lucid.

09:41:39AM 12        We heard from Dawn Brown yesterday, who said her

09:41:41AM 13   father sat up in the bed, indicated he was coherent,

09:41:45AM 14   looked at the document, read the document, signed the

09:41:47AM 15   document.

09:41:47AM 16        And we heard from Father Schimmel, the priest who was

09:41:51AM 17   there witnessing, who said Mr. Varney sat up in bed, held

09:41:56AM 18   the document, looked at the document, appeared to

09:41:58AM 19   understand the document, acknowledged he knew what the

09:42:01AM 20   document was, and signed the document.

09:42:06AM 21        There is ample evidence here to get past a directed

09:42:09AM 22   verdict.  Thank you, your Honor.

09:42:11AM 23            THE COURT:  Thank you, Mr. Adams.

09:42:18AM 24            MS. SERKO:  Your Honor, if I may respond?  Your

09:42:27AM 25   Honor, the material elements of the dying declaration

09:42:31AM 1   exception to the hearsay rule have not been met.  The two

09:42:34AM 2   elements are that it contains the statements of

09:42:38AM 3   Mr. Varney; and the second, his belief that death was

09:42:43AM 4   imminent, and that the cause and circumstances of his

09:42:47AM 5   death are discussed.

09:42:48AM 6        Just a signature at the bottom of a page, which

09:42:52AM 7   Mr. Parris said only means that Mr. Varney was Mr. Varney

09:42:56AM 8   on that date, does not ratify the document as his

09:43:02AM 9   statements.  And we do not believe that that has been

09:43:04AM 10  established in this case.

09:43:06AM 11       Without knowing where, when, and how the document was

09:43:10AM 12  created, drafted, and produced, the Court does not have

09:43:15AM 13  sufficient evidence upon which it could determine the

09:43:17AM 14  document was an exception to the hearsay rule or a dying

09:43:21AM 15  declaration.  Thank you.

09:43:26AM 16            THE COURT:  There is always the question at this

09:43:31AM 17  point of whether the judge wants to weigh the evidence

09:43:41AM 18  before him and try and rule on that basis or whether it

09:43:47AM 19  makes more sense to proceed to try and get a full picture

09:43:53AM 20  with any additional evidence available.  I think the

09:44:02AM 21  latter path is the more likely path to the right result.

09:44:15AM 22       With that in mind, the motion is denied, and we will

09:44:21AM 23  proceed with whatever evidence the defense wishes to

09:44:23AM 24  present.

09:44:28AM 25            MR. HORN:  Good morning, your Honor.  Ethan Horn

09:44:32AM 1   on behalf of the Varney family.  Before we get started

09:44:35AM 2   with Mr. Adams' testimony, I would like to file an oral

09:44:39AM 3   motion pursuant to RCW 5.60.060.  I have a copy of the

09:44:46AM 4   statute, if you would like.

09:44:49AM 5        Our motion is to disqualify Mr. Adams from

09:44:52AM 6   testifying, and preclude defense counsel from examining

09:44:59AM 7   relating to any communication made by the Varneys to

09:45:04AM 8   Mr. Adams or any of his advice back to the family.  That

09:45:07AM 9   is, like I said, pursuant to RCW 5.60.060.

09:45:13AM 10           THE COURT:  Let me see the statute.  I don't know

09:45:16AM 11  all of the law by memory.  Part of the problem is they

09:45:25AM 12  keep passing new laws.

09:45:39AM 13           MR. HORN:  Specifically sub (2), sub (a).

09:46:02AM 14           THE COURT:  That's not new.  I don't know if

09:46:12AM 15  Mr. Adams was your first witness or what here.

09:46:17AM 16           MR. VEGA:  Your Honor, Dennis Vega, Foster

09:46:22AM 17  Wheeler again.  At this point, and in light of your ruling

09:46:25AM 18  on the directed verdict application, we would like to

09:46:31AM 19  renew our application for the metadata.

09:46:37AM 20       The questions that you asked of Ms. Brown yesterday,

09:46:41AM 21  and that you relayed today in terms of when the document

09:46:45AM 22  was created, by whom the document was created, whether in

09:46:50AM 23  fact the document was edited, we will have all of that

09:46:54AM 24  information in the metadata.  We can know exactly when the

09:46:58AM 25  document was opened, for how long it was opened.  We will

09:47:02AM 1    know the keystrokes that were made on the document.  We

09:47:05AM 2    will have all of the information that your Honor needs to

09:47:08AM 3    decide this to determine in fact when this document was

09:47:11AM 4    created.

09:47:13AM 5          So we are renewing our request for the metadata so

09:47:16AM 6    that this way --  And just like you said, you would like

09:47:20AM 7    to have -- the latter path is the more likely path just to

09:47:25AM 8    make sure we are doing the right thing here.  If we have

09:47:27AM 9    that metadata, we can absolutely determine everything you

09:47:30AM 10   need to know about this document and whether in fact it

09:47:33AM 11   was made on the deathbed or made months or weeks earlier.

09:47:40AM 12          THE COURT:  I don't think the request is timely,

09:47:43AM 13   counsel.  I am not going to rule on it at this point.

09:47:48AM 14   Let's proceed with what evidence we have here.

09:47:51AM 15          MR. VEGA:  If I may just address that timeliness

09:47:54AM 16   issue.  We made the application for that material as soon

09:48:01AM 17   as we received Father Schimmel's declaration, which we

09:48:07AM 18   received not more than a week ago.

09:48:11AM 19          When it was received, that's the first time that we

09:48:14AM 20   knew that in fact Father Schimmel was at the hospital the

09:48:19AM 21   day before it was actually signed.  And he was there to

09:48:23AM 22   witness a notary, which did not happen.  And that was the

09:48:26AM 23   first time that we knew about that.

09:48:28AM 24          It was the first time that we knew that Ms. Brown was

09:48:32AM 25   even in the room.  And we made --  We got that on a

09:48:35AM 1    Thursday, and by Monday we had issued our subpoena.  And

09:48:41AM 2    pursuant to Rule 45, we gave them reasonable notice under

09:48:45AM 3    the circumstances, because it was information we just

09:48:47AM 4    learned.

09:48:48AM 5            THE COURT:  All right.  Let's put it this way:  I

09:48:51AM 6    am not going to rule on that motion at this time.  Got it?

09:48:56AM 7    Let's proceed with any evidence that you wish to present.

09:49:03AM 8            MR. VEGA:  Your Honor, in light of your not

09:49:07AM 9    ruling on that issue at this point in time, we are going

09:49:10AM 10   to move to introduce certain documents.

09:49:15AM 11           THE COURT:  All right.

09:49:18AM 12           MS. SERKO:  Your Honor, Foster Wheeler offers as

09:49:26AM 13   its first exhibit --  It is actually Docket 269-1.  I have

09:49:32AM 14   copies for counsel.  For the record, that is the redacted

09:49:54AM 15   excerpts from the records produced by plaintiff showing

09:49:56AM 16   Mr. Varney's signature.

09:50:00AM 17       Foster Wheeler's Exhibit 2, for the record --

09:50:03AM 18           THE COURT:  Wait a minute.  One at a time.

09:50:07AM 19           MS. SERKO:  Exhibit 1 for Foster Wheeler.

09:50:21AM 20           THE CLERK:  Let's do A for the defendants'

09:50:28AM 21   exhibits.

09:50:30AM 22           MS. SERKO:  Exhibit A-2 --

09:50:33AM 23           THE COURT:  Wait a minute.  Is there a question

09:50:46AM 24   as to whether the signature on Exhibit 1, which is already

09:50:54AM 25   in evidence -- is there any question about whether that

09:51:01AM 1   was actually made by Mr. Varney?  I did not understand

09:51:10AM 2   that was an issue.

09:51:12AM 3                MR. VEGA:  Your Honor, it is just to show the

09:51:14AM 4   distinction, and also the deterioration in just the

09:51:23AM 5   penmanship.

09:51:30AM 6                THE COURT:  Any objection to 1?

09:51:33AM 7                MR. ADAMS:  No.

09:51:33AM 8                THE COURT:  A-1 may be admitted.

09:51:37AM 9         (Exhibit No. A-1 admitted.)

09:51:37AM 10               MS. SERKO:  Your Honor, Foster Wheeler offers

09:51:40AM 11  Exhibit A-2, the medical records of Donald Varney for

09:51:45AM 12  treatment, dates February 2nd, 2018, through February 8th,

09:51:50AM 13  2018, from the Abrazo Community Health Network.  And we

09:51:55AM 14  have a copy for plaintiffs' counsel.  I would also note

09:51:58AM 15  for the record they are Bates stamped ACHN000406 through

09:52:08AM 16  -0003607.

09:52:20AM 17               MR. ADAMS:  Your Honor, we don't have any

09:52:21AM 18  objection to any medical records of Don Varney.

09:52:25AM 19               THE COURT:  All right.  A-2 may be admitted.

09:52:38AM 20        (Exhibit No. A-2 admitted.)

09:52:41AM 21               THE COURT:  These are for purposes of this

09:52:43AM 22  hearing only.

09:52:45AM 23               MS. SERKO:  Your Honor, as for Exhibit A-3, we

09:52:50AM 24  have additional medical records.  And actually for A-4.

09:52:54AM 25  If plaintiff has no objection to Mr. Varney's records, I

09:52:57AM 1    would offer those together.

09:52:59AM 2            MR. ADAMS:  No objection, your Honor.

09:53:00AM 3            THE COURT:  All right.  They may be admitted.

09:53:02AM 4        (Exhibit Nos. A-3 & A-4 admitted.)

09:53:17AM 5            MS. SERKO:  Foster Wheeler offers as Exhibit A-5,

09:53:24AM 6    defendants' first set of interrogatories propounded to

09:53:28AM 7    plaintiffs and their answers thereto.

09:53:53AM 8            MR. ADAMS:  Your Honor, for the purposes of this

09:53:55AM 9    hearing, we don't have an objection.  But the usual

09:53:59AM 10   practice is that interrogatories are read into the record

09:54:04AM 11   but they are not admitted.  But for purposes of this

09:54:08AM 12   hearing, it's fine.

09:54:09AM 13           THE COURT:  All right.  A-5 may be admitted.

09:54:17AM 14       (Exhibit No. A-5 admitted.)

09:54:17AM 15           MS. SERKO:  Foster Wheeler offers as Exhibit A-6,

09:54:21AM 16   additional medical records of Donald Varney, ACH360

09:54:26AM 17   through -390.

09:54:32AM 18           MR. ADAMS:  No objection.

09:54:33AM 19           THE COURT:  All right.  That may be admitted.

09:54:47AM 20       (Exhibit No. A-6 admitted.)

09:54:47AM 21           MS. SERKO:  Foster Wheeler offers as Exhibit A-7

09:54:52AM 22   the NIH drug fact sheet from MedlinePlus regarding

09:55:02AM 23   Mr. Varney's medications at the time of February 7th.

09:55:34AM 24           MR. ADAMS:  Your Honor, we would object to this

09:55:37AM 25   document.  It's not page numbered, but it appears to be 25

09:55:40AM 1    pages or so of something off the internet.  There has been

09:55:43AM 2    no foundation, and it is hearsay without exception.

09:55:52AM 3         MS. SERKO:  Your Honor, this document is a

09:55:54AM 4    reliable document.  It meets the exception, because it is

09:55:57AM 5    a publication established as reliable evidence.  And your

09:56:01AM 6    Honor may take judicial notice under 803(18)(b).

09:56:12AM 7         THE COURT:  A-7 will be rejected.  I think you're

09:56:18AM 8    gilding the lily to some extent, and I do not think it

09:56:24AM 9    would be helpful for me to spend time trying to analyze

09:56:29AM 10   the effects of all this medication on Mr. Varney.  It's

09:56:46AM 11   too much.  What's next?

09:56:55AM 12        MS. SERKO:  Your Honor, Foster Wheeler offers as

09:56:57AM 13   Exhibit A-8, excerpts from plaintiffs' responses to

09:57:03AM 14   defendant CBS Corporation's first seven interrogatories

09:57:07AM 15   and requests for production to Maria Varney.

09:57:55AM 16        MR. ADAMS:  No objection, your Honor, for

09:57:57AM 17   purposes of this hearing.

09:58:00AM 18        THE COURT:  All right.  A-8 may be admitted.

09:58:20AM 19     (Exhibit No. A-8 admitted.)

09:58:20AM 20        MS. SERKO:  Your Honor, Foster Wheeler's final

09:58:22AM 21   exhibit is A-9.  It is the declaration of Ben Adams, at

09:58:27AM 22   Docket 349, in response to declaration of Alice Serko

09:58:32AM 23   regarding subpoena to Dean Omar regarding the subpoena for

09:58:37AM 24   metadata.  Your Honor, I'm sorry.  Foster Wheeler offers

09:59:13AM 25   an additional exhibit.

09:59:14AM  1          THE COURT:  Wait a minute.  Let's deal with A-9.

09:59:34AM  2          MR. ADAMS:  Your Honor, I'm not sure of the

09:59:36AM  3    relevance of my declaration.  I don't think it is evidence

09:59:40AM  4    relevant to the case.  Just for the record, we would

09:59:49AM  5    object on relevance grounds.  That's it.

09:59:58AM  6          MS. SERKO:  Your Honor, if I may respond?

10:00:00AM  7          THE COURT:  Yeah, go ahead.

10:00:03AM  8          MS. SERKO:  Your Honor, this is relevant to the

10:00:04AM  9    claims of privilege asserted, both in work product and

10:00:08AM 10    attorney-client privilege over the metadata and the

10:00:11AM 11    drafting of the documents.  We believe it is directly

10:00:13AM 12    relevant to this hearing.

10:00:25AM 13          THE COURT:  Well, I think it may be admitted.

10:00:33AM 14    It's part of the public record anyway in the file.

10:00:42AM 15        (Exhibit No. A-9 admitted.)

10:00:42AM 16          MS. SERKO:  Your Honor, Foster Wheeler offers as

10:00:44AM 17    Exhibit A-10 the deposition of John Kercheval, the

10:00:51AM 18    designations and objections from plaintiff and from Foster

10:00:55AM 19    Wheeler.

10:00:55AM 20          MR. ADAMS:  No objection, your Honor.

10:00:57AM 21          THE COURT:  All right.  It may be admitted.

10:00:59AM 22        (Exhibit No. A-10 admitted.)

10:01:30AM 23          MS. SERKO:  Your Honor, we offer as Exhibit A-11

10:01:34AM 24    the complaint for personal injury filed by plaintiff --

10:01:38AM 25    plaintiffs Donald and Marie Varney, husband and wife, at

10:01:41AM 1   Case No. 2-17-CV-1902.

10:02:11AM 2        MR. ADAMS:  No objection, your Honor, for

10:02:14AM 3   purposes of this hearing only.

10:02:19AM 4        THE COURT:  Is this the original complaint that

10:02:26AM 5   started this case?

10:02:27AM 6        MS. SERKO:  Yes, your Honor.

10:02:28AM 7        MR. ADAMS:  Yes, your Honor.

10:02:32AM 8        THE COURT:  A-11 may be admitted.

10:02:36AM 9     (Exhibit No. A-11 admitted.)

10:02:36AM 10       MS. SERKO:  Your Honor, we would offer as

10:02:39AM 11  Exhibit A-12 email correspondence from plaintiffs'

10:02:44AM 12  counsel, dated February 1st, 2018, through February 7th,

10:02:55AM 13  2018, regarding Mr. Varney's condition and the deposition.

10:03:57AM 14       MR. ADAMS:  No objection, your Honor.  Although

10:03:59AM 15  we will have an offer of additional emails for

10:04:04AM 16  completeness once defense rests.

10:04:08AM 17       THE COURT:  A-12 may be admitted.

10:04:24AM 18    (Exhibit No. A-12 admitted.)

10:04:24AM 19       MS. SERKO:  We have no additional exhibits at

10:04:26AM 20  this time.

10:04:26AM 21       THE COURT:  All right.  I've got some reading to

10:04:35AM 22  do.

10:04:37AM 23       MS. WEGLARZ:  Your Honor, on behalf of all

10:04:39AM 24  defendants, we adopt Foster Wheeler's evidence that it has

10:04:43AM 25  offered into the record.

10:04:44AM 1          THE COURT:  Right.  Do you have a witness ready?

10:04:55AM 2          MR. VEGA:  Your Honor, with that, Foster Wheeler

10:04:59AM 3  rests.

10:05:05AM 4          THE COURT:  Do all defendants rest?  Okay.

10:05:15AM 5          MR. ADAMS:  Your Honor, we have one exhibit to

10:05:17AM 6  offer in rebuttal, if we may.

10:05:20AM 7          THE COURT:  Okay.

10:05:22AM 8          MR. ADAMS:  Plaintiffs offer as Exhibit 20 an

10:05:28AM 9  email chain from February 2nd, 2018, to February 5th,

10:05:36AM 10  2018, regarding Mr. Varney and his condition.  And I have

10:05:39AM 11  a copy for counsel.

10:05:42AM 12          THE COURT:  Any objection to 20?

10:05:45AM 13          MS. SERKO:  I would just like to review it.

10:06:43AM 14          MR. ADAMS:  Your Honor, I misspoke about the

10:06:44AM 15  dates on the document.  For Exhibit 20, it is from

10:06:48AM 16  January 26th to February 5th, the email chain offered as

10:06:53AM 17  Exhibit 20.

10:06:55AM 18          MS. SERKO:  There will be no objection.

10:06:57AM 19          THE COURT:  All right.  20 may be admitted.

10:07:02AM 20        (Exhibit No. 20 admitted.)

10:07:02AM 21          THE COURT:  Any further rebuttal?

10:07:06AM 22          MR. ADAMS:  No, your Honor.

10:07:08AM 23          THE COURT:  All right.  Well, now I have to read

10:07:13AM 24  all this stuff.  Come back at 1:30.  We will see how fast

10:07:21AM 25  I can read.  Okay?  We will hear argument at 1:30.

10:08:01AM 1        (Recessed.)

01:32:30PM 2            THE COURT:  Okay.  I have read all of the

01:32:33PM 3   exhibits filed -- admitted on behalf of the defendants.

01:32:41PM 4   And so I guess all of the evidence is in.

01:32:44PM 5        I wanted to say to you, I am mindful that I kind of

01:32:48PM 6   pushed you around a little bit in regard to objections

01:32:52PM 7   made and so forth.  I'm anxious to get to the bottom line

01:33:02PM 8   in this matter.  I think that we got everything in that we

01:33:09PM 9   are going to get.  I'm sorry if you took offense at my

01:33:19PM 10  ignoring some of your objections.

01:33:22PM 11       Mr. Adams, I guess the floor is yours.

01:33:29PM 12           MR. ADAMS:  Thank you, your Honor.  Your Honor, I

01:33:43PM 13  would like to start -- I would like to end where we

01:33:47PM 14  started.

01:33:48PM 15           THE COURT:  I'm sorry?

01:33:49PM 16           MR. ADAMS:  I would like to end where we started,

01:33:51PM 17  and that's the bottom line in this matter.  It's whether

01:33:57PM 18  or not Mr. Varney's declaration on February 7th, 2018, was

01:34:01PM 19  a dying declaration under ER 804(b)(2).

01:34:07PM 20       And there are five elements under 804(b)(2).  The

01:34:11PM 21  first element is that the witness be unavailable.  It's

01:34:16PM 22  completely undisputed that Mr. Varney is unavailable.

01:34:20PM 23       The second is that it be a civil case.  Again,

01:34:24PM 24  undisputed this is a civil case.

01:34:27PM 25       Mr. Varney had to make a statement.  And the evidence

01:34:32PM 1  has been that Mr. Varney made the same statement that

01:34:35PM 2  every witness makes when they sign a document under

01:34:39PM 3  penalty of perjury and attest to the truth of the facts in

01:34:44PM 4  the document.  He said he has read the foregoing,

01:34:48PM 5  understands it, and signed it under penalty of perjury.

01:34:52PM 6      ER 801, Evidence Rule 801, says nonverbal conduct

01:35:00PM 7  intended as an assertion is a statement.  And so if the

01:35:04PM 8  only thing we had was Mr. Varney's signature on the

01:35:08PM 9  document, that would be nonverbal conduct that qualifies

01:35:13PM 10 as a statement.

01:35:14PM 11     But we also have the evidence from Dawn Brown and

01:35:18PM 12 from Father Schimmel that Mr. Varney stated he was

01:35:23PM 13 coherent and he understood what the document was.

01:35:31PM 14     You will recall in Father Schimmel's declaration he

01:35:34PM 15 indicates that Mr. Varney acknowledged he knew what the

01:35:37PM 16 document was, which is entirely consistent with the

01:35:40PM 17 testimony from Mrs. Brown in court that Mr. Varney made a

01:35:46PM 18 statement that he was coherent and he understood what the

01:35:49PM 19 document was.

01:35:51PM 20     And so we have both a nonverbal assertion, which

01:35:55PM 21 qualifies as a statement, and oral statements by

01:35:58PM 22 Mr. Varney that qualify as statements.

01:36:01PM 23     The fourth requirement of ER 804 is that the witness'

01:36:09PM 24 or the signer's death -- the declarant's death must be

01:36:14PM 25 imminent, and the declarant must believe his death is

01:36:17PM 1      imminent.

01:36:19PM 2           We know that the evidence, which was largely

01:36:22PM 3      undisputed, is that Mr. Varney must have known his death

01:36:27PM 4      was imminent.  First of all, just the nature of the injury

01:36:31PM 5      that he had.  He had lost over 55 pounds.  The testimony

01:36:36PM 6      was that he was bones.  And there was skin, but it was

01:36:44PM 7      barely -- skin and bones.

01:36:47PM 8           He had increasing pain.  Dr. Kercheval stated in his

01:36:52PM 9      declaration that Mr. Varney's condition had decreased by

01:36:56PM 10     70 percent between his admission on January 26th and the

01:37:00PM 11     date of the declaration, February 7th.  Someone who is

01:37:04PM 12     already extremely ill and extremely sick had decreased by

01:37:10PM 13     70 percent.

01:37:10PM 14          Dr. Kercheval said that Mr. Varney had days to live,

01:37:16PM 15     not weeks.  Mr. Varney was having difficulty breathing,

01:37:22PM 16     and he was having all these different symptoms.

01:37:30PM 17          The defense would proffer to the Court that

01:37:32PM 18     Mr. Varney, with all these physical symptoms, and all this

01:37:35PM 19     pain he was going through, and all these things that were

01:37:38PM 20     happening to him, did not consciously understand he was

01:37:42PM 21     near death.

01:37:43PM 22          The testimony is also that Mr. Varney knew there was

01:37:47PM 23     no cure to his mesothelioma.  He knew it was incurable.

01:37:52PM 24     That was the testimony from the family members.  He knew

01:37:57PM 25     there was no cure.

01:37:58PM 1          Mr. Varney knew and told his daughter he wouldn't

01:38:05PM 2     make Gloria and his wedding anniversary from the date in

01:38:10PM 3     Mexico, which was February 25th, 2018.  The testimony was

01:38:14PM 4     that he bought a gift for Gloria for the earlier

01:38:18PM 5     anniversary because he knew he wouldn't be around for the

01:38:21PM 6     second anniversary at the end of February.

01:38:24PM 7          Dr. Kercheval's declaration --  By the way,

01:38:31PM 8     Dr. Kercheval is the basis of basically the entire

01:38:34PM 9     defense.  The defense rests most of their case on

01:38:38PM 10    Dr. Kercheval.  He is their guy.  And Dr. Kercheval said

01:38:44PM 11    that death is imminent.  Under penalty of perjury on

01:38:47PM 12    February 7th, 2018, Dr. Kercheval, the treating physician,

01:38:51PM 13    said that death is imminent.

01:38:52PM 14         And, of course, there was the priest there to give

01:38:56PM 15    Mr. Varney his last rites, and the sacrament and the

01:39:02PM 16    anointings, which in Catholicism mean the person is about

01:39:08PM 17    to die.

01:39:12PM 18         Mr. Varney said in his declaration, "I have no hope

01:39:17PM 19    or expectation of recovery from this terminal disease and

01:39:20PM 20    my death is imminent."

01:39:22PM 21         But most importantly, Mr. Varney died the next day.

01:39:26PM 22    So any debate about whether his death was imminent or not,

01:39:31PM 23    or he could have known, or the circumstantial evidence

01:39:36PM 24    shown -- showed that it was imminent and he knew, was

01:39:39PM 25    resolved when he passed away the very next day.

01:39:42PM 1        So while I think there may be some dispute, based on

01:39:46PM 2   the opening statements, about whether or not this fourth

01:39:48PM 3   element of ER 804 was satisfied, from the plaintiffs'

01:39:54PM 4   perspective the evidence is overwhelming.

01:39:56PM 5        The last element, Element 5 of ER 804(b)(2), is that

01:40:02PM 6   the content of the declaration must be about the cause and

01:40:05PM 7   circumstances of the witness' death.

01:40:09PM 8        Here we had undisputed testimony from Dr. Sharma,

01:40:14PM 9   undisputed testimony from Dr. Kercheval that mesothelioma

01:40:19PM 10  is a sigmoid tumor and is caused by asbestos.

01:40:24PM 11       And the medical records going back nearly a year from

01:40:28PM 12  Mr. Varney's death repeatedly reference asbestos exposure

01:40:34PM 13  in the Navy, asbestos exposure in the shipyard.  Over and

01:40:37PM 14  over and over in the medical records regarding

01:40:41PM 15  Mr. Varney's illness of mesothelioma there is reference to

01:40:43PM 16  asbestos.

01:40:46PM 17       In his declaration Mr. Varney said, "Here is how I

01:40:50PM 18  was exposed to asbestos.  Here is where I was exposed to

01:40:53PM 19  asbestos.  Here are the products I worked with that

01:40:56PM 20  exposed me to asbestos."

01:40:58PM 21       And I didn't see any evidence to dispute any of that,

01:41:06PM 22  as far as the content of the declaration, whether it was

01:41:10PM 23  about the cause and circumstances of his illness and

01:41:14PM 24  death.

01:41:14PM 25       And so the evidence has shown that we have met all

01:41:22PM  1    five elements of the dying declaration statute.

01:41:26PM  2         And so the question becomes, what is the defense?

01:41:33PM  3    What is the position that the defendants have presented to

01:41:39PM  4    the Court?  And I would submit to the Court that the

01:41:43PM  5    defense has sort of been a throw-anything-at-the-wall

01:41:47PM  6    defense and see if it sticks.

01:41:49PM  7         The first defense was truly, your Honor, an argument

01:41:57PM  8    only a lawyer could make.  It was that Mr. Varney's

01:42:02PM  9    declaration was too consistent with other evidence.

01:42:08PM 10    Consistency was presented to the Court as a weakness in

01:42:11PM 11    plaintiffs' case, in that the products in Mr. Varney's

01:42:17PM 12    declaration were the same products in his sworn responses

01:42:20PM 13    to written interrogatories, that the statements in the

01:42:24PM 14    declaration were consistent with the statements in the

01:42:26PM 15    complaint, that the statements in the declaration were

01:42:28PM 16    consistent with the statements made in the medical

01:42:30PM 17    records, that the statements in the declaration were

01:42:32PM 18    consistent with the statements Mr. Varney made to his

01:42:36PM 19    family, and that consistency somehow was a weakness in

01:42:41PM 20    plaintiffs' case.

01:42:44PM 21         But, your Honor, can you imagine if there was an

01:42:47PM 22    inconsistency in the declaration, if there was an

01:42:51PM 23    inconsistency in the declaration and the sworn

01:42:54PM 24    interrogatories or the medical records or what the family

01:42:57PM 25    said?  What would the defense present to the Court if

01:43:01PM 1    there was an inconsistency?

01:43:06PM 2        These sorts of arguments, where heads we win, tails

01:43:10PM 3    you lose, should be rejected by the court.

01:43:14PM 4        In any event, there is nothing about consistency in

01:43:17PM 5    ER 804(b)(2).

01:43:20PM 6        There was then an argument presented to the Court

01:43:23PM 7    about the spontaneity of the declaration, and that

01:43:28PM 8    Mr. Varney had made these same statements in medical

01:43:31PM 9    records and to his family long before he was sick.

01:43:35PM 10       Spontaneity is nowhere to be found in ER 804(b)(2).

01:43:40PM 11   It is simply not an element of that exception to the

01:43:43PM 12   hearsay rule.

01:43:45PM 13       Spontaneity is, however, an element of ER 803(2), the

01:43:50PM 14   excited utterance exception to the hearsay rule, which has

01:43:54PM 15   nothing to do with the proceeding that we are here on.

01:43:59PM 16   Spontaneity is specifically referenced as a key factor in

01:44:03PM 17   that exception.

01:44:04PM 18       So either the defense was confused about which

01:44:09PM 19   section we were here for or it was just a red herring.

01:44:17PM 20       There were arguments made about the policy

01:44:24PM 21   justifications for the dying declaration exception to the

01:44:30PM 22   hearsay rule.  I think Ms. Weglarz, John Crane's lawyer,

01:44:37PM 23   made a fairly strong argument about the policy

01:44:41PM 24   justifications behind the dying declaration, that when a

01:44:47PM 25   person is at the end of their life and they are going to

01:44:49PM 1    meet their maker, their only real motive is to tell the

01:44:54PM 2    truth.  That's why we have the dying declaration

01:44:57PM 3    exception.

01:44:58PM 4         But we also heard that Mr. Varney was a religious

01:45:02PM 5    man, that he had a priest come to give him the last rites

01:45:06PM 6    and the sacred anointments.  The defense would have the

01:45:14PM 7    Court believe that Mr. Varney as his last act as a

01:45:19PM 8    religious man told a lie.  I think the Court should give

01:45:28PM 9    very little weight to an argument that what Mr. Varney did

01:45:31PM 10   did not fit squarely into the policy justifications behind

01:45:36PM 11   the dying declaration exception.

01:45:38PM 12        Then there were all the arguments, which was a large

01:45:46PM 13   part of the defense, about the credibility of the

01:45:49PM 14   witnesses and the credibility of the evidence.  There were

01:45:55PM 15   the arguments that there was legalese in the declaration,

01:46:00PM 16   and so the declaration itself was not credible, that the

01:46:03PM 17   lawyers, quote, fabricated the declaration, and that what

01:46:06PM 18   the lawyers did was not credible, and that it was a,

01:46:09PM 19   quote, cut and paste from the complaint and from the

01:46:12PM 20   interrogatories and it wasn't credible.

01:46:16PM 21        There was testimony that I gave the notary a $100

01:46:20PM 22   bill.  It was designated by the defense.  It was proffered

01:46:23PM 23   by the defense to the Court.

01:46:26PM 24        There was evidence that the priest had some relation

01:46:30PM 25   to the family ahead of time and therefore what he said

01:46:33PM 1    should not be given as significant weight as if he had no

01:46:39PM 2    connection to the family.

01:46:41PM 3         There was a statement that the nursing notes were

01:46:43PM 4    automated, and so maybe the nurses just forgot to change

01:46:47PM 5    the automated entries in the nursing notes that uniformly

01:46:52PM 6    state Mr. Varney was alert and his mental status was

01:46:55PM 7    coherent.

01:46:57PM 8         There was the argument made during the

01:46:59PM 9    cross-examination of Mrs. Brown that she had a financial

01:47:02PM 10   interest in the lawsuit.

01:47:05PM 11        These arguments, whatever their weight, whatever

01:47:11PM 12   their legitimacy, go to the weight of the evidence, and

01:47:15PM 13   therefore the trier of fact.  As the Court knows, it is

01:47:21PM 14   the exclusive province of the jury to assess the

01:47:25PM 15   credibility of witnesses and the weight of the evidence.

01:47:29PM 16        Also, not a single one of those is in ER 804(b)(2).

01:47:37PM 17        There were a number of statements in opening about

01:47:39PM 18   what the evidence would show, and they never came in.

01:47:44PM 19   There was a statement in opening that Mr. Varney had

01:47:47PM 20   dizziness.  We never saw it.  There was a statement in

01:47:51PM 21   opening that Mr. Varney had blurred vision.  We never saw

01:47:54PM 22   it.  And there was a statement that I already covered,

01:47:58PM 23   that Mr. Varney's death was not imminent.

01:48:03PM 24        And so there is a tension, I would argue to the

01:48:06PM 25   Court, in the defense position.  The position is that

01:48:13PM 1    Mr. Varney was not sick enough to know his death was

01:48:16PM 2    imminent, while at the same time he was too sick and too

01:48:21PM 3    nonresponsive to have signed the declaration.  And we

01:48:25PM 4    would submit to the Court that it is one or the other, but

01:48:27PM 5    not both.  And the defense has proffered both.

01:48:30PM 6        We would submit to the Court that it is neither.  But

01:48:33PM 7    to say that it is both is inconsistent.

01:48:36PM 8        There was the argument that this was a, quote,

01:48:41PM 9    theatrical production, completely staged.  There was even

01:48:46PM 10   a priest there, your Honor, was the argument.  "There was

01:48:49PM 11   even a priest.  This was completely staged and

01:48:54PM 12   theatrical."

01:48:54PM 13       And, your Honor, it is true we brought a priest, we

01:48:58PM 14   brought a notary, we brought the family.  Can you imagine

01:49:03PM 15   the argument if we hadn't, if Mr. Adams had snuck into the

01:49:09PM 16   room with no witnesses, presented the declaration to

01:49:13PM 17   Mr. Varney, had him sign it, left, and no one else had

01:49:17PM 18   seen it?  Can you imagine the argument that would have

01:49:21PM 19   been made by defense?

01:49:24PM 20       With the same breath the defense presented to the

01:49:27PM 21   Court the argument that it wasn't theatrical enough, it

01:49:34PM 22   wasn't staged enough, because plaintiffs didn't bring a

01:49:39PM 23   cameraman and didn't film it on their cameras.  And so the

01:49:45PM 24   defense, again, has presented these

01:49:49PM 25   heads-we-win-tails-you-lose arguments, that it wasn't

01:49:52PM 1   theatrical enough, and it was too theatrical and staged,

01:49:58PM 2   and the Court should give those types of arguments very

01:50:00PM 3   little weight.  None of them are in ER 804(b)(2) either.

01:50:05PM 4        And so the evidence has shown that there really is

01:50:15PM 5   only one defense, one legitimate -- one real defense

01:50:18PM 6   presented by the defense.  And that's that Mr. Varney was

01:50:23PM 7   not competent to sign the declaration.  That's the real

01:50:28PM 8   defense.

01:50:30PM 9        The problem with that defense is that every single

01:50:36PM 10  person in the room when Mr. Varney signed the declaration

01:50:42PM 11  says that defense is wrong, and says he was --

01:50:45PM 12            THE COURT:  Except you.

01:50:48PM 13            MR. ADAMS:  I was here.  I was here.  I was ready

01:50:52PM 14  to take the stand, and the defense chose not to call me.

01:50:59PM 15  I understand I could have put myself on the stand in my

01:51:02PM 16  own case.  I understand that, your Honor.  I was here.  I

01:51:04PM 17  also could have not shown up and had another lawyer come

01:51:07PM 18  in my place and made them subpoena me.

01:51:11PM 19       They never subpoenaed me, your Honor.  I showed up

01:51:13PM 20  voluntarily, and I am here, and I was here on the date

01:51:15PM 21  they said they would put me on the stand.  And so I think

01:51:18PM 22  the only inference from that the Court can draw is that my

01:51:22PM 23  testimony would have been consistent with the other people

01:51:25PM 24  in the room.

01:51:27PM 25       All of these people have to have been wrong for the

01:51:35PM 1    defense to be accurate, including --  Let me take a step

01:51:46PM 2    back.  The defense is that Mr. Varney was unable to

01:51:50PM 3    respond.  That's the defense.  He was unable to respond,

01:51:57PM 4    he was obtunded and he was unable to respond, and

01:52:01PM 5    therefore the declaration lacks any indicia of reliability

01:52:07PM 6    and it should not be let in under any hearsay exception,

01:52:12PM 7    including the dying declaration.  That's my understanding

01:52:14PM 8    of what the defense is.

01:52:15PM 9        But the notary, Mr. Parris, said he would absolutely

01:52:19PM 10   not ever notarize a document if the witness -- if the

01:52:24PM 11   signer was unable to respond.  Because if you are unable

01:52:27PM 12   to respond, he said, I don't know if they are lucid or

01:52:32PM 13   not.

01:52:33PM 14       Nurse Kracke, who was one of the nurses repeatedly

01:52:40PM 15   referenced in the nursing notes, made this entry on

01:52:43PM 16   February 7th, 2018, about Mr. Varney, his level of

01:52:49PM 17   consciousness was alert.  His mental status, the very

01:52:55PM 18   issue in this case, his mental status, "Alert.  Oriented

01:53:01PM 19   times four."

01:53:02PM 20       Your Honor, if this was all we had --  This is

01:53:05PM 21   created by someone who has zero interest in this lawsuit.

01:53:09PM 22   Zero.  And she says Mr. Varney's mental status on

01:53:17PM 23   February 7th, 2018, was alert and oriented.

01:53:19PM 24       His thought process, what was going on in his head,

01:53:24PM 25   the very issue here, was coherent on February 7th, 2018.

01:53:31PM 1      They haven't brought a single document to dispute

01:53:35PM 2  this.

01:53:37PM 3      Then we had the second nurse, Nurse Alexander.  Nurse

01:53:42PM 4  Alexander, again, on February 7th, 2017 (sic), Mr. Varney,

01:53:47PM 5  when asked about his urinary issues, denied problems to

01:53:51PM 6  the nurse.  This was at 6:38 p.m., long after he signed

01:53:55PM 7  the declaration, but as his condition was deteriorating.

01:54:01PM 8  He was still denying problems to a separate, completely

01:54:04PM 9  independent nurse, which required communication.

01:54:08PM 10      We heard from Dr. Sharma.  And he testified about

01:54:15PM 11  these nursing notes and what they meant.  He said he

01:54:18PM 12  heavily relied on them as a doctor.  He said that for

01:54:23PM 13  these entries in which Mr. Varney denies problems, he must

01:54:29PM 14  have communicated this, the nurse must have asked him the

01:54:33PM 15  question, and he understood the question and he answered

01:54:38PM 16  it appropriately the way he felt.  And so when there is a

01:54:43PM 17  nursing note saying the patient is denying problems,

01:54:47PM 18  Dr. Sharma says there is a communication the patient

01:54:50PM 19  understands, and the patient answers appropriately.

01:54:53PM 20      Dr. Sharma also said, based on all of these nursing

01:54:57PM 21  records that he reviewed at his deposition, that when I

01:55:02PM 22  asked him the question, "Can you tell us whether or not

01:55:05PM 23  Mr. Varney would have been alert enough to understand this

01:55:08PM 24  document, the declaration that he signed," Dr. Sharma

01:55:12PM 25  said, "Based on the records which have been presented, I

01:55:15PM 1   think he was alert and oriented."  That's a question about

01:55:22PM 2   Mr. Varney signing the document, that his treating

01:55:26PM 3   physician says when he did that he was alert and oriented

01:55:30PM 4   based on these records.

01:55:32PM 5        And then we have Mr. Varney's wife, Gloria, who said,

01:55:38PM 6   "He knew he had to sign that paper.  If not, he would not

01:55:41PM 7   leave comfortably.  I don't know how, but at that moment

01:55:45PM 8   he was lucid.  He was lucid and he signed."

01:55:49PM 9        Mr. Varney himself signed the document.  That's his

01:55:53PM 10  signature on the document.  And so Mr. Varney committed an

01:56:00PM 11  act on the document, signing it in the right place with

01:56:03PM 12  his signature.

01:56:04PM 13       Mr. Varney's daughter came and testified, Marie (sic)

01:56:09PM 14  Brown.  She said about Don Varney, that when he was

01:56:14PM 15  presented with the document he sat up in bed, he said,

01:56:17PM 16  "I'm coherent" and "I know what I'm doing."

01:56:19PM 17       And finally, Father Schimmel, the priest who was in

01:56:23PM 18  the room at the time of the signing, said, "Mr. Varney was

01:56:27PM 19  handed the attached document and a pen.  Although he was

01:56:30PM 20  very sick, I was impressed that he sat up to sign the

01:56:33PM 21  document rather than stay lying in the bed and make a

01:56:36PM 22  scribble signature, lying down, that I have seen other

01:56:39PM 23  patients make when in hospital.  He opened his eyes, held

01:56:42PM 24  the document, responded positively that he knew what he

01:56:45PM 25  was signing, and he signed it.  He appeared to understand

01:56:48PM  1    the document."  And that was signed by Father Schimmel.

01:56:54PM  2         And, your Honor, you also heard that the defense

01:56:57PM  3    called Father Schimmel on the phone.  One of the defense

01:57:01PM  4    lawyers called Father Schimmel on the phone before I spoke

01:57:05PM  5    to him and obtained this declaration.

01:57:10PM  6         And so to the extent the Court will charge a party

01:57:18PM  7    with not having had a witness here live, or weigh that as

01:57:26PM  8    a strike against one of the parties, I would submit to the

01:57:30PM  9    Court that we got a declaration from Father Schimmel, the

01:57:35PM 10    defense contacted him, and the defense did not present any

01:57:38PM 11    evidence, subpoena Father Schimmel or bring him live.  So

01:57:42PM 12    at least we brought something under oath signed by Father

01:57:47PM 13    Schimmel for the Court to consider.

01:57:48PM 14         If the defense theory of the case were true --  We

01:57:56PM 15    have come to the Court, we have presented each of our

01:57:58PM 16    competing theories of the case of what happened.  If the

01:58:02PM 17    defense theory is correct, what else has to be true?

01:58:07PM 18    Every single one of those witnesses has to have gotten it

01:58:11PM 19    wrong, every single one of those medical records has to be

01:58:14PM 20    wrong.  And so, your Honor, what are the odds that they

01:58:19PM 21    are all wrong?

01:58:22PM 22         And if the defense theory is true, and Mr. Varney was

01:58:32PM 23    unable to respond, and all of these witnesses who have no

01:58:37PM 24    interest in the case whatsoever, the nurses, the notary,

01:58:42PM 25    the priest, and the doctor, are wrong, who signed the

01:58:45PM 1    document?

01:58:49PM 2         If Mr. Varney was unable to respond, how is his

01:58:53PM 3    signature on the document?  For the defense position to be

01:59:00PM 4    true, someone had to have guided his hand, signed for him,

01:59:07PM 5    or somehow otherwise got someone's signature on a document

01:59:13PM 6    who could not respond.  There would have to be something

01:59:20PM 7    nefarious with the signature to have happened in the

01:59:24PM 8    presence of all nine of those people.  And they all said

01:59:28PM 9    the exact opposite.  That's the logical sequence of

01:59:37PM 10   inferences from the defense theory of the case.  It is

01:59:40PM 11   just not believable, your Honor.

01:59:41PM 12        I want to end with some case law.  The defense put up

01:59:46PM 13   a bunch of case law in their opening statements.  I didn't

01:59:49PM 14   do that, because I tried to predict what the evidence

01:59:52PM 15   would be and not make argument.  But there are a number of

01:59:57PM 16   cases that I would just like to reference quickly.  The

02:00:00PM 17   first case is Pisano versus Alfa Laval.  This was a

02:00:04PM 18   case --

02:00:06PM 19             MS. WEGLARZ:  Your Honor, I am going to object.

02:00:09PM 20   This is not even precedent.  This is an unpublished case.

          21             MR. ADAMS:  She's next.  She can make any

02:00:20PM 22   argument --

02:00:20PM 23             THE COURT:  That doesn't mean you can't refer to

02:00:22PM 24   it.

02:00:23PM 25             MS. WEGLARZ:  I think there are rules that if a

02:00:25PM 1   case is not published, it should not be referred to.

02:00:29PM 2            THE COURT:  I choose not to follow that rule,

02:00:31PM 3   which is a very bad rule.  Some judge did that on the

02:00:35PM 4   record.  It's a matter of public record.  It's appropriate

02:00:40PM 5   to refer to it.

02:00:42PM 6            MS. WEGLARZ:  Thank you.

02:00:44PM 7            MR. ADAMS:  Your Honor, I agree this is not

02:00:45PM 8   binding authority, but it may be persuasive authority for

02:00:49PM 9   the Court to consider.

02:00:51PM 10      This is a case in which the court held that three

02:00:53PM 11  affidavits signed by a mesothelioma victim, nearly two

02:00:57PM 12  months before his death, with zero witnesses, no priest,

02:01:02PM 13  no notary, just the lawyers and the witness, three months

02:01:07PM 14  before he died met the hearsay exception for a dying

02:01:09PM 15  declaration, and the court denied summary judgment.

02:01:13PM 16      The court did so because mesothelioma is an always

02:01:20PM 17  terminal cancer, and the signer knew he was going to die.

02:01:24PM 18  Mr. Varney signed the declaration the day before he died,

02:01:28PM 19  and there were multiple witnesses, as the Court knows.

02:01:31PM 20      The next case is a Washington State Supreme Court

02:01:35PM 21  case, State versus Quinn, 56 Wn 295 at Page 299.  It is a

02:01:42PM 22  case that's over 100 years old, but still good law.  It

02:01:45PM 23  approved of the admission of a dying declaration

02:01:47PM 24  consisting of a statement written by the prosecuting

02:01:49PM 25  attorney, which was read and signed by the declarant.  The

02:01:54PM 1    defendant was then convicted of first-degree murder in a

02:01:58PM 2    trial involving the admission of that statement written by

02:02:01PM 3    the prosecuting attorney.  It has been good law for 110

02:02:05PM 4    years.  And it was from the Washington State Supreme

02:02:07PM 5    Court.

02:02:09PM 6        And lastly, your Honor, State versus Gallagher, 4

02:02:19PM 7    Wash. 2d 437.  This was a statement made by an individual

02:02:27PM 8    who was involved in an assault and a shooting, and had

02:02:31PM 9    been shot.  The court specifically referenced the fact

02:02:36PM 10   that the doctors did not tell him death was imminent.

02:02:39PM 11   Mr. Nelson was not advised by his physician that the death

02:02:43PM 12   was imminent.  There was no priest, and it was

02:02:46PM 13   specifically mentioned by the Washington State Supreme

02:02:49PM 14   Court that there was no spiritual advisor present.

02:02:52PM 15   Because, of course, having a spiritual advisor present is

02:02:56PM 16   an indication that death is imminent, as I just argued to

02:03:00PM 17   the Court earlier.

02:03:00PM 18       There was no family.  The court specifically

02:03:05PM 19   referenced the fact that the dying victim did not call his

02:03:08PM 20   family to gather at his deathbed.  Another indication that

02:03:14PM 21   death was not imminent.  Obviously, we have the exact

02:03:17PM 22   opposite in this case.

02:03:18PM 23       The victim did not die until eight days later, eight

02:03:22PM 24   days after he signed -- or he made the statement.

02:03:26PM 25       And the court -- but the court specifically admitted

02:03:33PM 1     the statement from the victim, because the nature of his

02:03:40PM 2     wounds indicated his knowledge of his imminent death.

02:03:43PM 3     "The nature of the wounds was such that surely Nelson must

02:03:48PM 4     have realized the situation, in view of which he was

02:03:52PM 5     conscious of approaching death."

02:03:57PM 6          And so, your Honor, the Washington State Supreme

02:04:01PM 7     Court has just verified and approved of the inferences and

02:04:04PM 8     the arguments I just made to your Honor at the very

02:04:08PM 9     beginning about Mr. Varney's last days, his condition, his

02:04:13PM 10    loss of weight, his pain, and that he was bones.  He must

02:04:19PM 11    have been conscious of his approaching death because of

02:04:22PM 12    the nature of the wounds.

02:04:23PM 13         And so, your Honor, I believe we have shown -- we

02:04:28PM 14    have met the elements of the dying declaration, and we

02:04:31PM 15    have created enough for the issue to go to the jury on

02:04:36PM 16    whether or not Mr. Varney was competent.  Thank you so

02:04:38PM 17    much for listening to me.

02:04:41PM 18              THE COURT:  Thank you, Mr. Adams.

02:05:42PM 19              MS. WEGLARZ:  Good afternoon.  May I start?  I

02:05:53PM 20    just want to address before I start with my presentation

02:05:58PM 21    that I have prepared with just a few things that Mr. Adams

02:06:01PM 22    just said.

02:06:03PM 23         First, this is in fact a preliminary fact hearing

02:06:08PM 24    under Federal Rule of Evidence 104.  As such, your Honor

02:06:12PM 25    is the judge, the trier of fact, and therefore should and

02:06:18PM 1   must weigh the evidence that was presented over the last

02:06:21PM 2   day and today.

02:06:23PM 3         Second, plaintiff is a proponent of evidence here.

02:06:28PM 4   Plaintiff is the one trying to admit this declaration.

02:06:32PM 5   Therefore, it is their burden to present the evidence to

02:06:36PM 6   prove admissibility of that declaration.

02:06:41PM 7         When we were told about this hearing, you had asked

02:06:44PM 8   us to come, and I have up on the projection, on the ELMO

02:06:49PM 9   right now, what you asked us to bring.  You said, "The

02:06:54PM 10  Court would welcome Mrs. Varney's testimony where

02:06:58PM 11  cross-examination is available."  The Court already did

02:07:01PM 12  have some of this testimony.  In particular, the defense

02:07:06PM 13  in several motions for summary judgment did rely on

02:07:10PM 14  Mrs. Varney's testimony.

02:07:11PM 15        Mrs. Varney is the wife of Donald Varney.  She could

02:07:15PM 16  have come here.  She did not come here to testify.  We

02:07:23PM 17  deposed her in Phoenix, maybe in the fall.  She is still

02:07:27PM 18  working.  She is not retired.  She is able-bodied.  She

02:07:31PM 19  could have been here in court today to tell us

02:07:34PM 20  specifically about the declaration, how it was made, what

02:07:40PM 21  happened in that room.  And she is not here.

02:07:42PM 22        The Court made note in that order that there is no

02:07:46PM 23  evidence as to the source of information in the affidavit

02:07:51PM 24  or who prepared it.  We still don't have that evidence.

02:07:56PM 25  It was not presented yesterday or today.

02:08:02PM 1       In the order the Court also said, "The Court is aware
02:08:04PM 2   that it may be necessary for one or more of Mr. Varney's
02:08:07PM 3   lawyers to testify."  Presumably, it seems like,
02:08:12PM 4   Mr. Varney's lawyers are the ones who have information
02:08:15PM 5   with regards to where the information in the affidavit
02:08:19PM 6   came from and how it was prepared, whose statements are
02:08:23PM 7   actually in that affidavit.
02:08:25PM 8       And, again, that is not the defense's burden to bring
02:08:29PM 9   that evidence into this court.  That's plaintiffs' burden.
02:08:34PM 10  And it did not happen.
02:08:36PM 11      I will see if I can get this to work.  We are going
02:09:53PM 12  to run it from over here.
02:10:23PM 13      I am going to start with Rule -- Federal Rule of
02:10:27PM 14  Evidence 804(b)(2), which is the dying declaration
02:10:30PM 15  exception.  I think when plaintiffs' counsel was
02:10:33PM 16  discussing this rule, it missed some of the important
02:10:36PM 17  points of it.  It is a point that looks at the time when
02:10:44PM 18  the statement by the declarant is actually made.  There is
02:10:48PM 19  two parts of this rule that I think we need to concentrate
02:10:51PM 20  on for this hearing.
02:10:52PM 21      One, there needs to be proof that the statement was
02:10:55PM 22  actually made by the declarant.  Again, in order to note
02:10:59PM 23  these statements were made by the declarant, we have to
02:11:02PM 24  know how that affidavit was put together, who put it
02:11:07PM 25  together, how it was put together, when it was put

02:11:10PM 1     together.

02:11:12PM 2         The second part that I think is very important in

02:11:15PM 3     this case is that that statement had to have been put

02:11:20PM 4     together for the first time at the time the declarant

02:11:26PM 5     thought his death was imminent, not something he said

02:11:30PM 6     eight or nine times, and now he is saying it again.  It

02:11:34PM 7     had to have been said at that moment when he thought death

02:11:40PM 8     was imminent.

02:11:41PM 9         I had brought up when we -- I guess it was just

02:11:46PM 10     yesterday, the case of King versus Woodcock, that famous

02:11:51PM 11     English case.  This is where this exception comes from.

02:11:57PM 12     And, again, it has that temporal element, where the party

02:12:01PM 13     when the statement is made -- that it has to be at the

02:12:06PM 14     point of death the first time it is made.  But it also has

02:12:09PM 15     to be made when every motive to falsehood is silenced.

02:12:13PM 16     There cannot be any motives.

02:12:16PM 17         Those same justifications for this exception are also

02:12:21PM 18     found in United States jurisprudence, Kirby versus United

02:12:27PM 19     States.  Again, we talk about when every motive for

02:12:29PM 20     falsehood must be supposed to have been silenced.

02:12:33PM 21         And, again, here is our temporal evidence that I

02:12:37PM 22     brought up yesterday, in Shepard versus United States,

02:12:42PM 23     that says the declarant must have spoken that statement at

02:12:49PM 24     the time that he was in the shadow of impending death.

02:12:53PM 25         So here is what I think the evidence over the last

02:12:57PM 1    two days is:  I think we still have absolutely no evidence

02:13:03PM 2    regarding how his declaration was created, when it was

02:13:05PM 3    created, who created it, where it was created.  We don't

02:13:10PM 4    know any circumstances regarding this declaration.  We are

02:13:14PM 5    still in the same spot we were -- as we were last Friday.

02:13:19PM 6         This declaration contains statements made for

02:13:23PM 7    purposes of litigation.  It's made with motivation because

02:13:28PM 8    it was made for purposes of litigation.

02:13:33PM 9         At the time when this declaration was presented to

02:13:36PM 10   Mr. Varney in his hospital bed, in his hospital room, we

02:13:42PM 11   still don't have any evidence that he actually read it,

02:13:45PM 12   that he actually knew the contents of it.  We don't know

02:13:50PM 13   if he meant to adopt all the contents in it.  All we know

02:13:54PM 14   is that he signed it.  That's all we know.

02:13:58PM 15        We just don't have any evidence that he knew what he

02:14:02PM 16   was actually signing, what it said, where the content came

02:14:05PM 17   from, or whether it was even his own statements.  We don't

02:14:09PM 18   know that, because we don't know how the declaration was

02:14:11PM 19   created, or where the information came from.

02:14:15PM 20        We know that some of the statements in the

02:14:18PM 21   declaration had been said as early as December 20th, when

02:14:23PM 22   he was not fearing imminent death.  We knew that some of

02:14:29PM 23   the statements had been said even a year before.  These

02:14:33PM 24   are things that he had just been saying for a year.

02:14:37PM 25        Now, there may be a reason why no one at this point

02:14:43PM 1   remembers the circumstances of how this declaration was

02:14:45PM 2   made, and that's because the plaintiffs never disclosed

02:14:51PM 3   this declaration to the defendants until June 2018.  It

02:14:56PM 4   was not disclosed in their initial disclosures.  It was

02:14:59PM 5   only disclosed more than four months after it was actually

02:15:02PM 6   signed, when memories had already started to dissipate.

02:15:08PM 7       I think even Mr. Parris said if he had been asked

02:15:11PM 8   about the circumstances surrounding what happened in that

02:15:14PM 9   room, if it had even been a few months earlier it might

02:15:21PM 10  have made a difference.

02:15:22PM 11      I mentioned I thought the evidence in this case shows

02:15:27PM 12  that these were litigation statements.  And that legalese

02:15:31PM 13  language in Paragraph 1 of the declaration is an example

02:15:34PM 14  of how it is a litigation statement.  It mirrors the exact

02:15:39PM 15  language of the evidence rule.  Mr. Varney was not a

02:15:45PM 16  lawyer.  This is not the kind of language that would have

02:15:48PM 17  come out of his mouth, his own statements.

02:15:51PM 18      The other paragraphs mirror other language of legal

02:15:58PM 19  documents in this case, and particularly the December 20th

02:16:02PM 20  complaint and the January 11th interrogatory responses.

02:16:09PM 21      What's notable is in those interrogatory responses

02:16:15PM 22  this is the language that is in there:  "I believe my

02:16:18PM 23  attorneys have information suggesting that I was exposed

02:16:21PM 24  to the defendants' asbestos products during my time

02:16:25PM 25  working as a marine machinist at the shipyards."  This

02:16:30PM  1   suggests that information is coming from the attorneys.

02:16:35PM  2      If we go paragraph by paragraph in this declaration

02:16:40PM  3   we see it mirrored with the interrogatory responses and

02:16:45PM  4   the complaint.

02:16:46PM  5      For example, Paragraph 2 in the declaration

02:16:49PM  6   corresponds to Interrogatory Response No. 13.  Paragraph 2

02:16:57PM  7   corresponds with complaint paragraphs 17 and 54(c).

02:17:08PM  8      Paragraph 3 in the declaration corresponds to

02:17:16PM  9   Plaintiffs' Interrogatory Response No. 11, which, again,

02:17:21PM 10   is the, "I believe my attorneys have information

02:17:24PM 11   suggesting that I was exposed to" language.  That

02:17:29PM 12   Paragraph 3 also corresponds to Paragraph 54(b) in the

02:17:34PM 13   December complaint.

02:17:38PM 14      Paragraph 4 in the declaration corresponds almost

02:17:42PM 15   exactly to the Interrogatory Response No. 12.  This is the

02:17:52PM 16   response that lists out all the product manufacturers

02:17:56PM 17   specifically.

02:18:02PM 18      Declaration Paragraph 4 corresponds with Paragraphs 1

02:18:06PM 19   through 47, and 54(d) in the complaint.  For illustrative

02:18:10PM 20   purposes I only have John Crane's paragraph up here.  But

02:18:14PM 21   every defendant in this case has a similar paragraph as

02:18:20PM 22   ascribed to it in the complaint.

02:18:25PM 23      Paragraphs 5 and 6 --

02:18:30PM 24          THE COURT:  Hold on a second.

02:18:30PM 25          MS. WEGLARZ:  Do you want me to go back?  If the

02:18:38PM 1    Court would like, we can give you copies of that if you

02:18:41PM 2    don't want --

02:18:42PM 3              THE COURT:  Just a minute.  Give me a minute.  Go

02:19:39PM 4    ahead.

02:19:42PM 5              MS. WEGLARZ:  Paragraphs 5 and 6 are more

02:19:47PM 6    general, but they are still indicated in the Interrogatory

02:19:52PM 7    Response No. 12 that we find in that set of January 11th

02:19:55PM 8    responses to interrogatories.

02:19:59PM 9        Paragraph 7 of the declaration directly corresponds

02:20:04PM 10   to the Interrogatory Response No. 12 in that January 11th

02:20:09PM 11   set of interrogatories.  I think that is supposed to say

02:20:19PM 12   Paragraph 7, not Paragraph 4.  Paragraph 7 of the

02:20:22PM 13   declaration also corresponds to Paragraph 58 of the

02:20:26PM 14   complaint, which has to do with the warnings.

02:20:32PM 15       The complaint and the interrogatory responses, these

02:20:38PM 16   were statements made well in advance of Mr. Varney ever

02:20:45PM 17   going into the hospital.  They were made well in advance

02:20:48PM 18   of him ever being under fear of imminent death.

02:20:53PM 19             THE COURT:  Just one more second.  I am trying to

02:20:56PM 20   figure something out here.  I'm sorry.  Go ahead.

02:21:47PM 21             MS. WEGLARZ:  These statements about Mr. Varney's

02:21:54PM 22   asbestos exposures had also been spoken about by

02:21:58PM 23   Mr. Varney months before he was in the hospital.

02:22:05PM 24   Mrs. Varney told us that.

02:22:08PM 25       She also told us he did not use specifics, like

02:22:12PM 1    talking about gaskets and packing, but he did talk about

02:22:16PM 2    how he thought it was, in general, asbestos exposures,

02:22:19PM 3    causing his mesothelioma, at the shipyards.  But, again,

02:22:23PM 4    these were not statements made for the first time while

02:22:27PM 5    his death is imminent.

02:22:30PM 6         She says that these statements were made to her by

02:22:39PM 7    her husband before he was even diagnosed with

02:22:43PM 8    mesothelioma, before he even knew he had a terminal

02:22:49PM 9    cancer.

02:22:50PM 10        These kind of statements about his asbestos exposures

02:22:54PM 11   in the shipyard were also made to his doctor more than six

02:22:59PM 12   months before his mesothelioma diagnosis, a year before

02:23:03PM 13   that declaration was ever executed in the hospital room.

02:23:09PM 14        It says in the medical records that Mr. Varney

02:23:18PM 15   discussed with Dr. Sharma extensively regarding

02:23:23PM 16   asbestos-induced lung disease, and that the patient was

02:23:28PM 17   exposed to asbestos from the age of 18 to 30 when he was

02:23:32PM 18   working in the shipyards.

02:23:33PM 19        However, the fact that Mr. Varney is saying the same

02:23:39PM 20   thing four, five different kinds of ways, at least that we

02:23:44PM 21   know of in the evidence, that does not make those

02:23:47PM 22   statements some sort of magical dying declaration when

02:23:51PM 23   they are said another time during the course of

02:23:55PM 24   litigation, whether or not it is in a hospital room or

02:23:59PM 25   not.  It does not magically transform these words into

02:24:03PM 1   something without motivation, without this fear of meeting

02:24:10PM 2   your maker with a lie upon your lips.  It does not fit the

02:24:17PM 3   policy considerations for this exception.

02:24:20PM 4       The context of all those prior statements, at least

02:24:24PM 5   the ones in December and January, they are made in the

02:24:28PM 6   context -- they were made in the context of litigation

02:24:32PM 7   that was started by the declarant himself.  There was

02:24:37PM 8   motivation there.

02:24:38PM 9       With regards to the evidence that plaintiffs brought

02:24:43PM 10  into this courtroom to support the admissibility of this

02:24:49PM 11  declaration, here is the evidence that they brought:  They

02:24:52PM 12  brought you Mr. Parris, who has absolutely no memory of

02:24:55PM 13  Mr. Varney or the notarization event whatsoever, except

02:25:00PM 14  for the fact that there was a $100 bill.  That's all he

02:25:05PM 15  remembers.  Other than that, he couldn't tell us anything.

02:25:08PM 16      And, again, he doesn't know when the declaration was

02:25:12PM 17  created.  He doesn't know who created it.  He doesn't know

02:25:17PM 18  if Mr. Varney read it.  He said it is not a requirement

02:25:21PM 19  that a document be read before it is notarized.  He never

02:25:26PM 20  sees documents read.

02:25:30PM 21      And, again, the acknowledgment that he put on that

02:25:34PM 22  document merely said that it was Mr. Varney signing it.

02:25:37PM 23  He said it does not verify the trustworthiness of the

02:25:41PM 24  document, it just identifies the signer.

02:25:44PM 25      The plaintiffs also brought you Dr. Sharma by way of

02:25:50PM 1  deposition.  Again, he had no testimony regarding who

02:25:55PM 2  drafted the declaration, how it was drafted, when it was

02:25:59PM 3  drafted, or why it was drafted.

02:26:03PM 4        We know that Dr. Sharma saw Mr. Varney maybe around

02:26:08PM 5  8:30 or earlier that day.  We also know that Dr. Kercheval

02:26:12PM 6  saw him closer in time to the declaration.  Dr. Kercheval

02:26:18PM 7  saw him within a half hour of that declaration being

02:26:21PM 8  executed.  So even Dr. Sharma, when he saw Mr. Varney, the

02:26:29PM 9  time is more attenuated than when Dr. Kercheval saw

02:26:32PM 10 Mr. Varney.

02:26:34PM 11       And Dr. Sharma said in his deposition, with regards

02:26:37PM 12 to those nurses' notes, "I don't vouch for the nurses."

02:26:42PM 13 And he did describe how sometimes nurses' notes have

02:26:46PM 14 auto-populated parts to them.

02:26:52PM 15       And he, in the end, deferred to Dr. Kercheval's

02:26:54PM 16 findings when he was asked with regards to whether or not

02:26:58PM 17 Dr. Kercheval using the term "obtunded" was in fact

02:27:03PM 18 correct.

02:27:05PM 19       Plaintiffs, by declaration, brought you Father

02:27:13PM 20 Schimmel's testimony.  Again, Father Schimmel does not say

02:27:17PM 21 when this document was created, doesn't know who created

02:27:21PM 22 it, doesn't say how the document was created.

02:27:24PM 23       He confirmed that they actually put off the signing

02:27:28PM 24 because there was no notary in the room.  However, they

02:27:31PM 25 could have just videotaped him signing the document that

02:27:35PM 1  evening, or even the next day.

02:27:38PM 2       But the fact that they even put off signing it kind

02:27:41PM 3  of just shows you that it is an orchestrated plan.  It was

02:27:45PM 4  not something on your deathbed.  If you are doing

02:27:47PM 5  something on your deathbed, you do it then, you make it

02:27:51PM 6  happen at that point if it is really -- you are thinking

02:27:54PM 7  that death is imminent.  You don't put it off.

02:27:57PM 8       Dawn Brown -- I think the Court knows this, but the

02:28:10PM 9  defense did not have the ability to depose Ms. Brown

02:28:13PM 10 before she took the stand the other day.  So that was our

02:28:16PM 11 first chance to talk to Ms. Brown.

02:28:18PM 12      And what she did tell us was a little different from

02:28:22PM 13 how we had heard the events before.  But we do know that

02:28:26PM 14 she is the one who found Mr. Adams and his law firm.  And

02:28:31PM 15 she has a financial stake in the outcome of this case.

02:28:35PM 16 That's the only person they brought you live to testify

02:28:39PM 17 here today, someone with a financial stake in the outcome

02:28:42PM 18 of this hearing and this case.

02:28:44PM 19      She also said that her father had been telling her

02:28:49PM 20 about these asbestos exposures, not for the first time on

02:28:53PM 21 his deathbed, but for months before.

02:28:56PM 22      She said she had never seen the declaration before

02:28:59PM 23 the day it was signed.  She doesn't know who created it.

02:29:04PM 24 She doesn't know how it was created.  She doesn't know

02:29:07PM 25 when it was created.  She doesn't know where it was

02:29:10PM 1    created.  And she doesn't know where the information in

02:29:13PM 2    the affidavit came from.

02:29:15PM 3         She doesn't know if anyone told her father what the

02:29:20PM 4    declaration said.  She doesn't know if he read it.  She

02:29:23PM 5    doesn't know if it was read to him.

02:29:27PM 6         She told us that her father felt like, when he got

02:29:33PM 7    diagnosed, he needed to do something about it.  He wanted

02:29:38PM 8    something to happen because of what happened to him.

02:29:44PM 9    That, and also he wanted to take care of his wife Gloria.

02:29:48PM 10   That's motive right there for making --  Even if those

02:29:53PM 11   were his own statements, he had motive in making those

02:29:57PM 12   statements that were made for this complaint and for this

02:30:00PM 13   lawsuit that wound up in another declaration.  Even if he

02:30:05PM 14   knew what was in that declaration when he signed it, they

02:30:08PM 15   were just statements that he had prepared in anticipation

02:30:11PM 16   of litigation, with a motive.

02:30:13PM 17        Mrs. Varney, Gloria, you were given her deposition to

02:30:21PM 18   read.  Again, she gives no information regarding who

02:30:25PM 19   created that declaration, how it was created, when it was

02:30:29PM 20   created, where it was created, or where the information

02:30:32PM 21   came from.

02:30:35PM 22        And I think what is notable about Mrs. Varney is that

02:30:38PM 23   her testimony completely contradicts Mrs. Brown's

02:30:45PM 24   testimony.  When we deposed Mrs. Varney in the fall -- I

02:30:51PM 25   deposed her in the fall in Phoenix, she told us that on

02:30:55PM 1  the day that this declaration was signed, her husband

02:30:59PM 2  couldn't talk.  He did not talk.  Her husband's last words

02:31:04PM 3  were said to her three or four days before he died, so a

02:31:09PM 4  few days before the declaration was signed.  I asked her,

02:31:11PM 5  "What were your husband's last words?"  He said, "I love

02:31:16PM 6  you, Gloria," or something to that effect, three or four

02:31:19PM 7  days before.  That is something memorable.

02:31:22PM 8      She told us --  The question was, "Was there any

02:31:29PM 9  conversation that happened during this time when the

02:31:32PM 10 priest and the notary were present in the hospital room

02:31:36PM 11 when your husband signed the declaration?"  She said, "No.

02:31:40PM 12 Everyone was quiet.  The priest was to his side, the

02:31:44PM 13 notary was in front, watching.  I was next to my husband.

02:31:47PM 14 The lawyer was here.  We were just looking at him.  I was

02:31:50PM 15 the one that was next to him, but we were just there,

02:31:54PM 16 watching.  The notary was watching everything.  But no one

02:31:58PM 17 talked.  He just looked at me when they gave him the paper

02:32:02PM 18 and he held the paper, and then he signed.  He signed it

02:32:06PM 19 and he laid backwards."

02:32:09PM 20     This is in stark contrast to Ms. Brown coming in here

02:32:15PM 21 and saying that he in fact said something to the effect

02:32:18PM 22 of, "I am coherent.  I know what I am signing," something

02:32:24PM 23 to that effect.  It is completely contradictory to what

02:32:28PM 24 Ms. Varney told us back in November.

02:32:37PM 25     I think Ms. Varney also gives us evidence showing

02:32:42PM  1   that Mr. Varney did have motive in making this sort of a

02:32:47PM  2   declaration, if in fact he did have any sort of

02:32:52PM  3   cooperation in drafting it.  The question to her at the

02:32:57PM  4   deposition was, "You said when he started he wanted to do

02:33:02PM  5   this."  "What do you mean by 'when he started'?"  And we

02:33:06PM  6   are talking about the lawsuit here.  Her answer was, "When

02:33:08PM  7   they told him that he was ill from the asbestos he wanted

02:33:13PM  8   to do something because of his illness.  So he knew that

02:33:17PM  9   if he did that paperwork, he would help me.  So he wanted

02:33:21PM 10   me to be okay.  And that's what he was waiting for, to

02:33:25PM 11   sign those papers."  That's motive.

02:33:27PM 12       This takes us back to the case law, where it says for

02:33:35PM 13   a dying declaration that motive is supposed to have been

02:33:39PM 14   silenced, it is not supposed to be present like it was

02:33:43PM 15   here.

02:33:44PM 16       This brings us back to the summary of evidence, as

02:33:46PM 17   least with regard to why there was no evidence to support

02:33:50PM 18   admissibility of this document as a dying declaration

02:33:53PM 19   under FRE 804(b).  And I think it still comes down to the

02:34:01PM 20   fact that we don't know how that declaration was made, we

02:34:05PM 21   don't know that Mr. Varney knew the information in that

02:34:09PM 22   declaration, even what it was.  We have no idea.  We don't

02:34:13PM 23   know if he collaborated with it.  We don't know if it was

02:34:18PM 24   him helping the lawyers draft it.  We still don't know

02:34:22PM 25   nothing -- don't know anything.  Take out the double

02:34:26PM 1    negative.

02:34:26PM 2         I also want to address just really briefly the

02:34:30PM 3    residual exception that is found in Federal Rule of

02:34:34PM 4    Evidence 807, because this was also an issue raised for

02:34:38PM 5    this hearing.  There are four elements that need to be met

02:34:47PM 6    in order for a declaration or statement to come into

02:34:53PM 7    evidence under this hearsay exception.

02:34:56PM 8         The first element is circumstantial guarantees of

02:34:59PM 9    trustworthiness.  The Ninth Circuit does give us twelve

02:35:03PM 10   different steps to show how that trust -- the guarantee of

02:35:09PM 11   trustworthiness is established.  None of those steps are

02:35:13PM 12   met here, none of those elements.

02:35:16PM 13        We have a declarant --  Well, this one, actually.  It

02:35:20PM 14   says whether declarant was under oath.  I know that

02:35:24PM 15   declaration says "signed under penalty of perjury," but if

02:35:29PM 16   we don't have the evidence that he knew what he was

02:35:31PM 17   signing, or that he actually read it, I think just having

02:35:34PM 18   a document that says "under penalty of perjury" doesn't

02:35:37PM 19   mean anything if the person doesn't know -- there is no

02:35:42PM 20   evidence he knows what he is actually signing.

02:35:44PM 21        Again, the statement about whether or not the

02:35:49PM 22   statement is voluntary.  We don't even know if it is his

02:35:52PM 23   statement or not, because we don't know how that

02:35:54PM 24   declaration was created.

02:35:56PM 25        Whether or not it is based on personal knowledge.

02:35:59PM 1    Again, we don't know this because we don't know how that

02:36:02PM 2    declaration was created.  We do know in the

02:36:06PM 3    interrogatories it says that same information was told to

02:36:09PM 4    him by his attorneys.  And that, again, is in response to

02:36:14PM 5    Interrogatory No. 11.

02:36:18PM 6         Contradicted by previous statements.  We don't have

02:36:21PM 7    that here.

02:36:22PM 8         Statement preserved on videotape.  That could have

02:36:26PM 9    happened here.  Everyone pretty much has smartphones now.

02:36:31PM 10   It could have been videotaped.  It wasn't.

02:36:35PM 11        Mr. Varney is not available for cross-examination,

02:36:38PM 12   which is the sixth element.

02:36:40PM 13        Seven, which is the proximity of the statement in

02:36:46PM 14   time to the events it describes.  Well, this declaration

02:36:48PM 15   is describing events that were 40 and 50 years ago.

02:36:51PM 16        Whether or not the statement has been corroborated.

02:36:55PM 17   Here, it has not been.

02:36:57PM 18        Nine, whether there is motivation to fabricate.  I

02:37:02PM 19   think I have addressed that throughout this presentation,

02:37:04PM 20   with regard to Mr. Varney being the declarant and

02:37:09PM 21   Mr. Varney having brought his own lawsuit.

02:37:11PM 22        Ten, whether it was a statement prepared in

02:37:15PM 23   anticipation of litigation.  Again, those same statements

02:37:18PM 24   do show up in the complaint and the interrogatories.

02:37:22PM 25        The statement's spontaneity.  By the mere fact that

02:37:26PM 1   it is in this prepared declaration, I think that takes

02:37:29PM 2   away from that spontaneity completely.

02:37:32PM 3        Whether or not the declarant's perception or memory

02:37:36PM 4   is faulty.  We didn't really address that in this

02:37:40PM 5   particular hearing.

02:37:42PM 6        I think when you take all of these steps together, we

02:37:47PM 7   don't come back to that -- we don't have that guarantee of

02:37:51PM 8   trustworthiness that would allow it to fit under the

02:37:54PM 9   residual exception of Federal Rule of Evidence 807.

02:38:01PM 10        And I think --  Again, the summary of the evidence is

02:38:08PM 11   in fact that this was merely another piece of paper that

02:38:16PM 12   was made in the context of litigation.  And without

02:38:23PM 13   knowing, again, how, who, or when, or what, or anything

02:38:29PM 14   about that declaration, we are still left in the same spot

02:38:32PM 15   we were last Friday.

02:38:33PM 16        And with that, I am going to end, and I would ask

02:38:38PM 17   this Court to rule that declaration is in fact not

02:38:44PM 18   admissible under either 804 or 807.  Thank you.

02:38:50PM 19            THE COURT:  Counsel.  Let's take ten so I don't

02:39:01PM 20   have to interrupt you.

02:50:01PM 21        (Recessed.)

02:54:45PM 22            THE COURT:  Counsel, I trust you are not going to

02:54:49PM 23   tell me anything that your colleague just told me?

02:54:53PM 24            MR. VEGA:  I am going to try not to.  We do have

02:54:56PM 25   some duplicate slides, and I intend to gloss over those

02:55:00PM 1    very quickly.   I am mindful of your time and everyone

02:55:03PM 2    else's time.

02:55:04PM 3          Your Honor, this particular case and these particular

02:55:10PM 4    set of circumstances create a serious problem in this

02:55:17PM 5    litigation and, quite frankly, may have drastic

02:55:21PM 6    implications throughout the country, as you have already

02:55:26PM 7    seen.

02:55:27PM 8          In fact, one of the decisions that I believe

02:55:31PM 9    plaintiffs' counsel referenced earlier, the Pisano case

02:55:35PM 10   out of Rhode Island --  I believe that is one of their

02:55:38PM 11   cases, also.  And this has become the standard -- or a

02:55:43PM 12   practice that this firm is engaging in, and I fear that it

02:55:48PM 13   is going to spread.  I fear that this particular situation

02:55:50PM 14   that we are seeing here is -- will mark the end of

02:55:56PM 15   mesothelioma depositions for defendants in all of these

02:56:01PM 16   cases.

02:56:02PM 17             THE COURT:  What does that mean to me?

02:56:05PM 18             MR. VEGA:  What it means to you is this is really

02:56:07PM 19   just a way of using an evidentiary rule not the way it is

02:56:13PM 20   intended, and to basically just, "You know what, I am just

02:56:19PM 21   going to get a declaration from my witness, and so long as

02:56:23PM 22   I get a declaration" -- "basically I create a contract,"

02:56:27PM 23   as the plaintiffs' counsel, "create a contract and just

02:56:30PM 24   have my client sign it."  All of a sudden now it becomes

02:56:36PM 25   affirmative evidence against all of the other defendants.

02:56:40PM 1    That cannot be allowed to happen.

02:56:43PM 2        In fact, that is the definition of a self-serving

02:56:47PM 3    statement.  That's never admissible anywhere.  In fact,

02:56:51PM 4    the only way it is admissible is if the defendants want to

02:56:54PM 5    use it -- so thank you -- if the defendants want to use it

02:56:58PM 6    to prove up shares, because now it is a statement made by

02:57:00PM 7    the plaintiff.  But the plaintiff can't use it

02:57:02PM 8    affirmatively, which is what they are trying to do here.

02:57:05PM 9        The key issue, and this is something that we have to

02:57:12PM 10   keep in mind, it's when the statement was first uttered,

02:57:17PM 11   not when it was last uttered.  When was it first uttered?

02:57:22PM 12   And we have to distinguish between when those words were

02:57:26PM 13   first made versus when the declaration was signed.  Who

02:57:32PM 14   cares when the declaration was signed?  It's when were

02:57:37PM 15   those words said.  That's what we are interested in here.

02:57:41PM 16       What we have here -- and this is, again, the danger

02:57:46PM 17   in this situation -- is that we have declarations that

02:57:52PM 18   were prepared by attorneys all throughout.  That is

02:57:57PM 19   essentially their case.

02:57:58PM 20       So with Dr. Kercheval, who they say is our star

02:58:02PM 21   witness -- they say it is our star witness, but then they

02:58:04PM 22   say Dr. Sharma is their star witness.

02:58:08PM 23       Look.  I guarantee you Dr. Kercheval did not put that

02:58:12PM 24   caption on that document.  That was prepared by

02:58:16PM 25   plaintiffs' counsel.

02:58:17PM 1      And we see a doctor who was alert and oriented times

02:58:23PM 2  four, I'm sure, when he signed this.  He signed this

02:58:26PM 3  document that was given to him by plaintiffs' counsel, and

02:58:31PM 4  it actually had two mistakes.  But you know what, we would

02:58:35PM 5  not have known that the document had two mistakes.  The

02:58:37PM 6  only way we knew the document had two mistakes is because

02:58:41PM 7  we took his deposition.  In fact, this doctor, who

02:58:44PM 8  graduated from medical school, actually signed a

02:58:46PM 9  declaration saying he went to the wrong medical school,

02:58:50PM 10  and absolutely signed the document saying that he was on

02:58:53PM 11  staff for a hospital that he was never on staff for.

02:58:57PM 12      At his deposition on Page 53 he corrects those.

02:59:01PM 13  Fortunately, we had the opportunity to depose him.  We did

02:59:04PM 14  not have that opportunity with Mr. Varney.

02:59:06PM 15      Here, also --  And the interesting thing --  I don't

02:59:11PM 16  know why --  I see that they had to bill -- Mr. Parris had

02:59:16PM 17  to bill them for the remainder $25.  But this declaration

02:59:19PM 18  was signed on the same day as Mr. Varney signed his

02:59:23PM 19  declaration.  But for some reason on this one there is no

02:59:26PM 20  acknowledgment.  I don't know why they didn't notarize

02:59:29PM 21  this one.

02:59:31PM 22      Another --  Look.  So this is another

02:59:35PM 23  attorney-prepared document.  This is the declaration of

02:59:38PM 24  Father Schimmel.  Interesting thing here is that Father

02:59:46PM 25  Schimmel never mentions the daughter by name.  Right?

02:59:49PM 1        The other thing is this document -- this document

02:59:52PM 2   wasn't signed contemporaneous with the act that occurred

02:59:57PM 3   in the hospital.  Right?  They didn't have Father Schimmel

03:00:01PM 4   sign a declaration also.  We know they had declarations.

03:00:04PM 5   Right?  They had Mr. Varney sign a declaration.  They had

03:00:08PM 6   Dr. Kercheval sign a declaration.  This one was signed 14

03:00:12PM 7   months later, and Father Schimmel is supposed to recount

03:00:16PM 8   the events of what happened, and he doesn't even remember

03:00:18PM 9   the daughter by name.

03:00:20PM 10       The other attorney-prepared document is Mr. Varney's

03:00:25PM 11  interrogatory responses from January 16 --  That year is

03:00:32PM 12  wrong.  That wasn't the year.  Sorry.  But this one

03:00:36PM 13  contains a mistake, as well.

03:00:38PM 14            THE COURT:  They were 2018.

03:00:42PM 15            MR. VEGA:  2018, that's right.  This one, if you

03:00:45PM 16  notice where Donald Varney signed -- now, this is three

03:00:49PM 17  weeks before he signs the declaration -- it says that

03:00:54PM 18  plaintiff, Maria Varney, being duly deposed.  He signs the

03:00:59PM 19  document.  He doesn't cross out.  He doesn't make the

03:01:02PM 20  change.  He doesn't correct the paper.  And we see that

03:01:05PM 21  they corrected stuff.  Right?  They had the wrong state,

03:01:08PM 22  state of Washington.  That's crossed out, Arizona.  No

03:01:11PM 23  attempt to correct the error here in plaintiffs' document.

03:01:15PM 24       Another one.  Again, this is Donald Varney's

03:01:22PM 25  declaration of February 7, 2018.  And look at what we see

03:01:26PM 1    here.  It says, "I make these statements regarding the

03:01:30PM 2    cause and circumstances of my death."  But he is still

03:01:36PM 3    alive.  Again, we don't have an opportunity to ask him

03:01:39PM 4    questions about these documents.

03:01:42PM 5          Again, the attorney-prepared documents.  Plaintiffs'

03:01:51PM 6    responses to CBS on October 26th of 2018.  He doesn't

03:01:56PM 7    provide any information.  He is specifically asked, "Tell

03:02:00PM 8    us how this declaration was made."  Quite frankly, the

03:02:03PM 9    defendants have the same question your Honor had of this

03:02:07PM 10   same document, how is it made?  They claim attorney work

03:02:11PM 11   product.

03:02:14PM 12         And we asked him who was present at the signing of

03:02:16PM 13   the declaration.  Who was missing?  Mr. Varney's daughter

03:02:22PM 14   is not listed there.  That is precisely why we asked for

03:02:25PM 15   the metadata, because we need information about how, and

03:02:30PM 16   when, and who created this document.

03:02:35PM 17         Plaintiffs' counsel actually said, you know, he was

03:02:37PM 18   present.  Take the stand if you were present.  Right?  It

03:02:42PM 19   is not our burden.  He is the proponent of the evidence.

03:02:46PM 20   And never once attempted --  He wants us to cure his

03:02:49PM 21   mistake.  Give us the metadata.  If he gave us the

03:02:52PM 22   metadata, we would be crossing him on the stand.  Without

03:02:55PM 23   the metadata, we weren't going to cross him.

03:02:58PM 24         This is the spouse.  On four separate occasions when

03:03:06PM 25   we take her deposition she has an opportunity to tell us

03:03:10PM 1   whether Dawn is present in the hospital.  And she never

03:03:13PM 2   does.  The first time on Page 60, "Other than Mr. Parris,

03:03:18PM 3   you, your husband, was anyone else present when your

03:03:21PM 4   husband signed this document?"  Answer:  "There was a

03:03:24PM 5   priest there."  "Anyone else?"  "Just Ben, the priest, the

03:03:27PM 6   notary, myself, and my husband."

03:03:32PM 7        Skip a little further.  Next time this comes up as to

03:03:35PM 8   who is present:  "You indicated that you were present when

03:03:38PM 9   your husband signed this document, correct?"  Answer:

03:03:41PM 10  "Yes.  When he signed this document there was a priest,

03:03:44PM 11  there was a notary.  My husband was awake, he was awake."

03:03:47PM 12  No mention of Dawn.

03:03:49PM 13       Again, Page 75.  "No.  Everyone was quiet.  The

03:03:56PM 14  priest was to his side, the notary was in front, watching.

03:03:59PM 15  I was next to my husband.  The lawyer was there.  We were

03:04:02PM 16  just looking at him."  No mention of Dawn.

03:04:07PM 17       Page 95, the same deposition transcript which we have

03:04:11PM 18  given to your Honor:  Answer:  "No.  We were all there.

03:04:14PM 19  The priest was there.  The attorney was there.  I was next

03:04:16PM 20  to my husband.  And the notary had the book."  No mention

03:04:22PM 21  of Dawn.

03:04:23PM 22       And we know when we spoke with Dawn she said she

03:04:28PM 23  would ride in with Ms. Varney every morning after

03:04:31PM 24  Ms. Varney would come home and take a shower.  We also

03:04:34PM 25  know from Ms. Varney's deposition that she said that

03:04:37PM 1    day -- because she knew the declaration was going to be

03:04:40PM 2    signed that day, and she didn't want to miss it, she never

03:04:42PM 3    went home that day.

03:04:44PM 4        The deposition of Ms. Varney.  "Was there any

03:04:50PM 5    conversation that happened during this time when the

03:04:53PM 6    priest and the notary were present in the hospital room

03:04:56PM 7    with your husband -- when your husband signed this

03:05:00PM 8    declaration?"  "No.  Everyone was quiet.  The priest was

03:05:04PM 9    to his side."  She goes --  We have read this.  And then

03:05:07PM 10   she says, "But no one talked."

03:05:12PM 11       Again, this is the deposition of Mr. Parris that we

03:05:16PM 12   heard yesterday.  And he is asked, "Can you tell us

03:05:21PM 13   whether or not it's your pattern and practice to have an

03:05:24PM 14   individual read a document and comprehend the document

03:05:27PM 15   before signing it and placing your notary seal on the

03:05:30PM 16   document?"  "That has never happened."  Never happened.

03:05:38PM 17       This is the progress note of Dr. Kercheval.  And a

03:05:42PM 18   lot has been said about it.  Again, this is at -- this is

03:05:46PM 19   on February 7th, 11:30, a half hour before he signs it.

03:05:50PM 20   He is now --  And Dr. Kercheval, who was his attending

03:05:54PM 21   physician, and unlike --

03:05:57PM 22       Plaintiffs' counsel has told you several times

03:05:59PM 23   already how much they love Sharma.  Dr. Sharma was a

03:06:04PM 24   specialist there.  He was not involved in Mr. Varney's

03:06:07PM 25   day-to-day care.  The individual who saw him from the

03:06:11PM 1    first day he entered until the very last day he was there.

03:06:15PM 2    Even more so than the nurses, because the nurses, they

03:06:18PM 3    rotate.  This doctor works 14 days in a row, says that he

03:06:23PM 4    is now unable to provide any information and is nearly

03:06:27PM 5    obtunded.  And we went through the definition of obtunded:

03:06:33PM 6    Diminished arousal, awareness, neurological catastrophe.

03:06:39PM 7        When we are talking to Dr. Kercheval, "What was

03:06:43PM 8    Mr. Varney's condition on the 7th?"  "He had actually at

03:06:46PM 9    that point -- I make a note that he was essentially

03:06:48PM 10   obtunded.  In other words, he was not responding to verbal

03:06:51PM 11   stimuli."

03:06:55PM 12       Two days --  And so --  Again, we don't know, because

03:07:03PM 13   there was an objection on attorney-client privilege, which

03:07:08PM 14   does not exist in this instance when they have actually

03:07:12PM 15   turned over the document.  That privilege has been waived.

03:07:14PM 16   But two days before the declaration is signed we have

03:07:19PM 17   Dr. Kercheval, who, again, is seeing him every single day,

03:07:22PM 18   is saying that they have had discussions with the family

03:07:26PM 19   but the patient is unable to significantly contribute to

03:07:30PM 20   the discussion.

03:07:32PM 21       When we asked him about -- we asked Dr. Kercheval

03:07:35PM 22   about that February 5th examination he tells us, "He just

03:07:40PM 23   wasn't cognitively able to contribute to that discussion?"

03:07:45PM 24   And he answers, "Yes."

03:07:48PM 25       When we spoke with Ms. Varney, we learned that

03:07:55PM 1    four -- he was last out of the bed at least four days

03:07:58PM 2    before he passed, and he last spoke three to four days

03:08:02PM 3    before.  She is asked, "How many days before he died did

03:08:06PM 4    he stop getting out of bed?"  Answer:  "Okay.  He died on

03:08:10PM 5    the 7th.  About four days before he wouldn't get out."

03:08:14PM 6         Going to Page 85.  Question:  "Ms. Varney, do you

03:08:18PM 7    remember the last thing your husband said?"  Answer:

03:08:21PM 8    "Well, when we talked, I was telling him that I loved him.

03:08:24PM 9    The last thing he said to me was, 'Gloria, I love you.'

03:08:28PM 10   That was it.  And then after that we didn't talk.  He said

03:08:32PM 11   that to me."  Question:  "Do you remember what day that he

03:08:35PM 12   said that he loved you?"  Answer:  "Before he died, about

03:08:38PM 13   three days, I think.  Three or four days before, yes."

03:08:43PM 14        And then we get Ms. Dawn Brown, the daughter, who

03:08:50PM 15   says that she recalls hearing her father say, "I'm

03:08:58PM 16   coherent.  I know what I'm signing."

03:09:02PM 17        When you give that some thought, I mean, who says

03:09:08PM 18   that, really?  You get pulled over -- someone gets pulled

03:09:13PM 19   over for driving while intoxicated, driving while

03:09:18PM 20   impaired, who says, "I'm coherent"?  Why is that the first

03:09:22PM 21   thing that comes out of his mouth?  Out of nowhere he just

03:09:26PM 22   pops up and he says, "I'm coherent."

03:09:28PM 23        And then the most curious thing is, why do we wait

03:09:34PM 24   until yesterday to learn that that's what he said?

03:09:39PM 25        They asserted attorney-client privilege.  This is

03:09:44PM 1    someone they had access to.  We filed motions in the case.

03:09:50PM 2    Why do we go to talk to Mr. Parris?  Why do we go over

03:09:54PM 3    talking to all of the doctors?  Why didn't we just depose

03:09:57PM 4    Dawn Brown?  Why didn't they just produce Dawn Brown?

03:10:02PM 5    They wait until yesterday, and we all learn it at the same

03:10:05PM 6    time, this incredible statement, "I am coherent" and "I

03:10:09PM 7    know what I'm saying."

03:10:10PM 8        The priest tells us that when --  At that point he

03:10:13PM 9    opened his eyes.  Right?  So everyone is like, "He opened

03:10:17PM 10   his eyes."  What does that mean?  His eyes were closed,

03:10:20PM 11   yet somehow he knows what he is signing.  How?  He hasn't

03:10:24PM 12   spoken for days.

03:10:25PM 13       We know that he is heavily medicated, and he is

03:10:31PM 14   not -- he is on palliative care.  We know that his

03:10:36PM 15   situation is dire.  We know that he is on some serious

03:10:40PM 16   medication.  We know that he is a 78-year-old man.  We

03:10:44PM 17   know that -- from the daughter that he wears glasses.  He

03:10:48PM 18   has been laying in bed, essentially nonresponsive, for

03:10:51PM 19   three to four days.  So much medication.

03:10:56PM 20       Even aside from --  The side effects from the

03:10:59PM 21   medication, you are sleeping three to four days.  All of a

03:11:02PM 22   sudden you can pop up?  He has bed sores for a reason.

03:11:07PM 23   The medical records show the nurses have to move him every

03:11:11PM 24   two hours.  And somehow he is able to say he knows what he

03:11:16PM 25   is signing, "I am coherent"?

03:11:19PM 1        Dr. Kercheval also tells us that patients such as

03:11:28PM 2   Mr. Varney -- he actually said Mr. Varney when we deposed

03:11:32PM 3   him -- but this is his declaration -- that their mental

03:11:36PM 4   faculties often diminish due to the disease process and

03:11:41PM 5   the medications.  Unfortunately, Mr. Varney is suffering

03:11:45PM 6   with both of those conditions right now -- back then.

03:11:48PM 7        So the evidence has shown that he is unable to

03:11:50PM 8   testify.  He could not speak, had not spoken for days.

03:11:54PM 9   He's unable to provide (sic) any medication.

03:11:58PM 10       Ms. Varney was shocked that he could sit and look at

03:12:01PM 11  the declaration.

03:12:03PM 12       Even Mr. Parris, who walked into the room --  We

03:12:08PM 13  learned that also yesterday for the first time from

03:12:11PM 14  Ms. Brown, who has --  "Well, is he going to be able to

03:12:14PM 15  sign?"  Someone who doesn't even know Mr. Varney

03:12:17PM 16  recognizes the condition he is in.

03:12:19PM 17       I don't think it is any secret that that's why we

03:12:22PM 18  don't have a photo to know what he looked like then.

03:12:25PM 19  Everyone had, I'm sure, their cellphones.  No one pulled

03:12:29PM 20  anything out.  They had a video scheduled for that day.

03:12:34PM 21       Specifically in the Court's order you actually tell

03:12:44PM 22  all of us -- the Court tells all of us, "There is no

03:12:47PM 23  evidence as to the source of the information in the

03:12:50PM 24  affidavit or who prepared it."  The Court puts us on

03:12:55PM 25  notice.

03:12:57PM 1      And so for the last several weeks everyone has been

03:13:01PM 2  running around doing depositions, trying to get

03:13:03PM 3  information.  We are not getting it.  We get piecemeal

03:13:08PM 4  information.  We issue subpoenas for metadata, so that

03:13:12PM 5  this way we can get to the bottom of it, because it is

03:13:14PM 6  clear that information is not forthcoming.

03:13:16PM 7      Yet, the two things that the Court referenced in its

03:13:20PM 8  order are not provided.  Plaintiff provided no evidence as

03:13:24PM 9  to the source of the information.  Plaintiff provided no

03:13:28PM 10 evidence as to who prepared the declaration.  But we kind

03:13:33PM 11 of know who prepared the declaration, because before we

03:13:35PM 12 started today they cite RCW 5.60.060.  What's the point of

03:13:45PM 13 that?  Right?  We know who prepared it.  Why else would

03:13:49PM 14 they have that objection?

03:13:51PM 15     When I was asking Ms. Brown yesterday some questions

03:13:53PM 16 they objected because it might cause the witness to inform

03:14:01PM 17 the Court about conversations that they had with her.  We

03:14:07PM 18 know who is giving the information.  It is not Mr. Varney.

03:14:10PM 19     I won't belabor this, but this is --  Where did the

03:14:15PM 20 information come from?  That was in the Court's order,

03:14:19PM 21 where did the information come from?  It is obvious where

03:14:22PM 22 the information came from, because we know three weeks

03:14:24PM 23 before Varney signs that declaration -- we have a

03:14:31PM 24 document -- we have the plaintiffs' interrogatories

03:14:34PM 25 listing out places where he worked.

03:14:38PM 1        It's clear in the interrogatories, which are verified

03:14:42PM 2   by the plaintiff himself, even though he signed under

03:14:46PM 3   Maria's spot, he says, "I believe my attorneys have

03:14:50PM 4   information suggesting."

03:14:52PM 5        Yet, three weeks later --  And, again, this is why

03:14:57PM 6   it's important to know when the statement was made.  It

03:15:00PM 7   does not matter when the document was signed.  It is when

03:15:04PM 8   the statement was made.

03:15:06PM 9        Because what we have here is --  If you keep telling

03:15:08PM 10  a witness about, "This is the information I have, this is

03:15:12PM 11  the information I have, this is the information I have,"

03:15:15PM 12  eventually it goes from three weeks ago "I believe my

03:15:19PM 13  attorneys have information," to now it is, "No, I have

03:15:21PM 14  personal knowledge."  All of a sudden he has personal

03:15:24PM 15  knowledge.

03:15:25PM 16       His condition is significantly deteriorating, as

03:15:29PM 17  documented in the medical records.  Yet, somehow what he

03:15:33PM 18  could not recall three weeks ago he now has personal

03:15:36PM 19  knowledge of.

03:15:40PM 20       And I won't go through --  This has already been

03:15:44PM 21  done, so I won't go through this.  This is, again, the

03:15:47PM 22  similarities between the information that's in the

03:15:49PM 23  interrogatories three weeks earlier, and then all of a

03:15:52PM 24  sudden the information that he magically has personal

03:15:54PM 25  knowledge about, even though he is moments away --

03:15:59PM 1      It's clear that this is not a statement by

03:16:12PM 2  Mr. Varney, that declaration.  That was absolutely a

03:16:16PM 3  premeditated act by counsel.  It was absolutely prepared

03:16:21PM 4  for litigation.  And it was signed by Mr. Varney at a time

03:16:27PM 5  when he could not speak, he had been nonresponsive for

03:16:32PM 6  three to four days, and hadn't been out of his bed for

03:16:35PM 7  about three to four days.

03:16:37PM 8      And, again, going back to when were these statements

03:16:46PM 9  made.  At the time that these statements were made --  And

03:16:50PM 10  I think that the evidence is clear that the statements

03:16:53PM 11  were never made by Mr. Varney, the statements were made by

03:16:56PM 12  his attorney.  But at the time that these statements were

03:16:58PM 13  made back in December, there was no imminent death back

03:17:03PM 14  then.

03:17:04PM 15      And how do we know that?  We know that from the email

03:17:07PM 16  chains.  We know that from the testimony of Ms. Dawn

03:17:11PM 17  Brown, that he wanted to do this for his wife.  We know

03:17:14PM 18  that at the time that the statements were being uttered he

03:17:18PM 19  was planning to make these statements at some future time.

03:17:22PM 20  And then it progressed over time.  This is how over the

03:17:27PM 21  course of three weeks he eventually has personal knowledge

03:17:30PM 22  of the things he never knew before.

03:17:32PM 23      Even when you look at the declaration itself there is

03:17:38PM 24  no specificity.  It is just opinion and conclusions.

03:17:44PM 25  There is no --  He will mention a product, but he doesn't

03:17:48PM 1   tell us what he did with that product.  He doesn't tell

03:17:51PM 2   us --  He worked at a shipyard.  He doesn't tell us on

03:17:55PM 3   what --  We are entitled to know this.  "Well, what ship

03:17:59PM 4   did you see Foster Wheeler boilers on?  Did you personally

03:18:02PM 5   do that work or did somebody else do that work?  What kind

03:18:05PM 6   of work was being done?  Was it firesides?  Was it

03:18:08PM 7   watersides?  Were you working on the burners?  What were

03:18:12PM 8   you doing?"

03:18:13PM 9        An interesting thing --  These records aren't before

03:18:16PM 10  the Court, unfortunately.  But Ms. Brown mentioned

03:18:21PM 11  yesterday something about periscopes, that she thought he

03:18:24PM 12  worked on periscopes.  In fact, when we see his military

03:18:27PM 13  records, he is actually working on optical gauges.  He is

03:18:32PM 14  in the shipyard working on the optical gauges, not on the

03:18:35PM 15  actual equipment.  Again, we didn't have the opportunity

03:18:37PM 16  to cross him.  Nor will we ever have an opportunity to

03:18:41PM 17  cross-examine these plaintiffs if we allow this to happen

03:18:44PM 18  in this court, because it will spread throughout the

03:18:47PM 19  country.

03:18:47PM 20       Your Honor, this evidence has shown the statements on

03:18:59PM 21  there were not spontaneous.  Counsel referenced, "Oh, this

03:19:04PM 22  is not an excited utterance."  It is the same concept, the

03:19:08PM 23  same principal.  That is why it is listed as one of the

03:19:11PM 24  twelve factors in the residual exception, because that is

03:19:14PM 25  a way that you gauge the truthfulness of a statement.

03:19:17PM  1        And, of course, counsel took a little bit --

03:19:21PM  2   addressed this.  But that is exactly what this was.  It

03:19:25PM  3   was absolutely orchestrated.  That is exactly why they had

03:19:29PM  4   the priest there, and they had the notary there.

03:19:31PM  5        Here we have the information --  I won't go through

03:19:36PM  6   this.  This has already been done.

03:19:47PM  7        And this here, your Honor --  If you will indulge me

03:19:51PM  8   for a moment on this, this is kind of why we were -- we

03:19:57PM  9   were so much after the metadata.  And this is a really

03:20:01PM 10   important issue here.  So with a dying declaration there

03:20:08PM 11   is an immediacy about it.  Here, the very fact that

03:20:14PM 12   plaintiffs' counsel raised attorney work product, Judge,

03:20:21PM 13   that's --  Sorry, your Honor.  This is an awesome

03:20:26PM 14   admission.  How can it be the dying declaration of

03:20:31PM 15   Mr. Varney if it's attorney work product?  They just

03:20:37PM 16   admitted the entire thing, your Honor.  This was attorney

03:20:42PM 17   work product.

03:20:43PM 18        If it's attorney work product, which they have

03:20:46PM 19   alleged in this court several times, and the documents

03:20:50PM 20   when they refused to turn over the metadata, which we

03:20:53PM 21   absolutely believe we are entitled to, then it is -- this

03:20:57PM 22   is their document.  This is no more than just answers to

03:21:03PM 23   interrogatories.  This is not a dying declaration.

03:21:07PM 24        At every step Mr. Varney's declaration lacks the

03:21:14PM 25   spontaneity that is the hallmark of the dying declaration.

03:21:19PM 1    This document has no guarantee of trustworthiness, as we

03:21:23PM 2    have seen.

03:21:23PM 3         And Mr. Varney's declaration, we are asking this

03:21:27PM 4    Court to hold it inadmissible for all purposes, other than

03:21:31PM 5    for defendants to prove up shares if they make it past

03:21:35PM 6    summary judgment.  And it cannot be relied upon by

03:21:38PM 7    Dr. Maddox.  Thank you.

03:21:40PM 8              THE COURT:  Thank you, counsel.  Any other --

03:21:42PM 9              MR. CRAIG:  Your Honor, very briefly.  May I

03:21:53PM 10   proceed?  Kevin Craig, your Honor.  Just very briefly.

03:21:59PM 11        Plaintiffs brought up the Pisano case out of Rhode

03:22:04PM 12   Island.  The Rhode Island rule is substantially different

03:22:06PM 13   than the federal rule.  In Rhode Island the courts have

03:22:09PM 14   ruled in terminal illness cases it is not necessary to

03:22:12PM 15   apprehend immediate death.  So I think that case would not

03:22:15PM 16   apply here, because the federal rule does require that.

03:22:19PM 17        Regarding Dr. Kercheval's note and testimony that on

03:22:29PM 18   February 5th Mr. Varney did not have the cognitive ability

03:22:34PM 19   to contribute to discussions regarding his care at the

03:22:39PM 20   hospital, plaintiffs have brought up the fact that on the

03:22:43PM 21   morning that he signed the declaration he is able to

03:22:45PM 22   respond to simple commands, you know.  I want to point out

03:22:50PM 23   to the Court, there is a big gulf between being able to

03:22:53PM 24   follow simple commands like blinking your eyes or opening

03:22:56PM 25   your eyes and having the cognitive ability to contribute

03:23:00PM 1   to your healthcare decisions or be able to give testimony

03:23:05PM 2   under oath in a court of law.

03:23:08PM 3        I think the plaintiffs --  On the issue of him

03:23:14PM 4   knowing that death was imminent, there is a bit of a

03:23:19PM 5   Catch-22 for plaintiffs here, because we have the

03:23:21PM 6   testimony that he was in bad shape before, but then

03:23:25PM 7   suddenly when his declaration is going to be signed, he

03:23:30PM 8   rallies, sits up, and signs the declaration.

03:23:35PM 9        I think at that point you have a hard time saying at

03:23:38PM 10  that particular moment he knew that his death wasn't going

03:23:42PM 11  to be delayed.  Apparently he was stronger then.  He was

03:23:46PM 12  able to respond better.

03:23:48PM 13       I mean, the rule is designed to be you are at death's

03:23:53PM 14  door.  Here we have evidence that he is suddenly better,

03:23:56PM 15  if only temporarily.  I don't think you can construe that

03:24:00PM 16  to mean that he knew that he was dying at that moment.

03:24:04PM 17       Very lastly, since this is regarding the

03:24:09PM 18  admissibility of the evidence, we do assert an objection

03:24:11PM 19  under Rule 403, the admission of the declaration and the

03:24:18PM 20  portions of the declaration in the doctor's report as

03:24:22PM 21  highly prejudicial.

03:24:26PM 22       You asked why this matters to you.  Well, if you have

03:24:28PM 23  a system where the plaintiffs only need to come up with a

03:24:30PM 24  declaration that the defendants were not privy to before,

03:24:33PM 25  have no opportunity to cross-examine, the jury and the

03:24:38PM 1   court lose the ability to view the witness provide the

03:24:43PM 2   testimony, and there is no opportunity to evaluate

03:24:46PM 3   credibility or the competency of the witness.  So we would

03:24:48PM 4   ask that it be excluded under Rule 403, in addition to the

03:24:52PM 5   reasons already cited.  Thank you, your Honor.

03:24:55PM 6          THE COURT:  Anyone else from the defense?  All

03:24:58PM 7   right.

03:25:01PM 8          MR. ADAMS:  Quickly, your Honor.  Your Honor, we

03:25:06PM 9   just heard a little over an hour and a half of argument

03:25:11PM 10  from some very skilled trial lawyers.  They are very

03:25:16PM 11  skilled trial lawyers.  They are first chair trial

03:25:18PM 12  lawyers, and I have seen them in trial before.

03:25:20PM 13     Almost all of the arguments went to the weight of the

03:25:24PM 14  evidence if it is -- once admitted.  They have very strong

03:25:31PM 15  arguments to make to a jury about the credibility, the

03:25:35PM 16  conspiracy, the staging of the event.  All of these

03:25:42PM 17  arguments are strong arguments to be made to a jury.

03:25:48PM 18     But we are here about ER 804(b)(2).  That is what

03:25:54PM 19  this hearing is about.  And there was very little mention

03:25:57PM 20  of that statute.

03:26:00PM 21     What they did mention is all of these other elements

03:26:06PM 22  that aren't in ER 804(b)(2).  And so what they invited the

03:26:11PM 23  Court to do was create new law.

03:26:14PM 24     They said there cannot be a motive when the person

03:26:18PM 25  signs the dying declaration.  When a person is shot and

03:26:22PM 1   murdered, and with their last breath they say, "John Smith

03:26:26PM 2   killed me," does that person not have a motive that John

03:26:30PM 3   Smith will be convicted of their murder?  There is always

03:26:33PM 4   a motive.

03:26:34PM 5        So that was just an element, not in ER 804(b)(2),

03:26:42PM 6   that the lawyers asked and invited the Court to create.

03:26:45PM 7   It is just not there.

03:26:46PM 8        There was the argument about Don Varney didn't say it

03:26:53PM 9   for the first time upon his death.  He said it in the

03:26:58PM 10  medical records.  He said it to his kids.  He said it all

03:27:01PM 11  these other times.  That is not an element of ER

03:27:05PM 12  804(b)(2).  It is just not there.

03:27:07PM 13       There was the argument that the witnesses didn't come

03:27:10PM 14  live to the evidentiary hearing.  That is not an element

03:27:13PM 15  in the dying declaration statute.

03:27:14PM 16       There was the argument that it wasn't videotaped.

03:27:17PM 17  That is not an element in the dying declaration statute.

03:27:20PM 18       There was the argument that Dawn Brown's credibility

03:27:25PM 19  about what she saw and what Mr. Varney said at the time

03:27:29PM 20  was in question.  Well, she is the fifth witness that was

03:27:32PM 21  there.  There is nothing in the dying declaration statute

03:27:35PM 22  that says you have to have five witnesses for a dying

03:27:38PM 23  declaration.  So even if the Court believed and

03:27:40PM 24  discredited Ms. Brown entirely, which I don't think the

03:27:45PM 25  Court should do, that has nothing to do with ER 804(b)(2).

1    There was the argument that it cannot have anything

2 to do with attorney work product.  I showed your Honor the

3 Supreme Court case from Washington state where the

4 prosecutor prepared the declaration, the witness signed

5 it, and they convicted someone of first-degree murder

6 under the highest burden in law, with the highest burden

7 of proof, with the most serious consequences.  It was

8 admitted.  And a prosecutor prepared it.  So that element

9 about attorneys cannot have anything to do with it, it is

10 just not there.

11    There was all of this testimony about four days

12 before Mr. Varney died he never said a word, and he never

13 said a word in the room, and he couldn't speak, and there

14 was all that argument about that.  That came from Gloria's

15 deposition testimony.  Mrs. Varney's deposition testimony

16 was the basis for that entire argument that Mr. Varney

17 could not speak, and so Mrs. Brown -- Ms. Brown's

18 testimony should be disbelieved, the priest's declaration

19 should be disbelieved.

20    Here is what Mrs. Varney actually said:  "It was in

21 the hospital.  He was laying back in his bed, and he asked

22 for them to raise the bed so that he was sitting up

23 straight."  And so even in Gloria Varney's testimony about

24 what happened, which is what the defense relied upon, she

25 said Mr. Varney spoke and asked that the bed be lifted up

03:29:40PM 1    when the declaration was presented to him.

03:29:43PM 2        Mrs. Varney's second language is English.  The entire

03:29:49PM 3    deposition was translated.  But she said right here he

03:29:53PM 4    spoke when they came in the room.

03:29:56PM 5        And then later she said, "The last word he said to me

03:30:01PM 6    was 'I love you'."  Not the last word he spoke.  You keep

03:30:07PM 7    hearing argument that the last word he spoke was that he

03:30:10PM 8    loved his wife, and that was before he signed the

03:30:14PM 9    declaration.  That is the last word he spoke to her.

03:30:17PM 10       There was this argument about the metadata, which the

03:30:29PM 11   Court already ruled on, which they didn't seek until two

03:30:32PM 12   days before they demanded that it be produced.

03:30:35PM 13       There was this repeated suggestion that our assertion

03:30:38PM 14   of the attorney-client privilege was improper.  Your

03:30:42PM 15   Honor, I would submit to you that is just an improper

03:30:45PM 16   argument for the Court to consider.  It is not our

03:30:49PM 17   decision as lawyers to waive the attorney-client

03:30:52PM 18   privilege.  The law says we may not make that decision.

03:30:54PM 19   We do not hold the privilege.  It's not ours.  It's the

03:30:58PM 20   client's privilege.  And so to somehow be dinged or

03:31:05PM 21   diminished because we didn't waive the attorney-client

03:31:08PM 22   privilege is just an improper argument.

03:31:10PM 23       But the metadata issue, if your Honor looks at the

03:31:15PM 24   emails, Exhibit 20, which is in evidence, it's going to

03:31:19PM 25   tell you what the metadata would have shown.  Because all

03:31:22PM 1    of those emails are me desperately trying to get this

03:31:27PM 2    deposition going, and the defense resisting the

03:31:33PM 3    deposition, demanding 18 hours for cross-examination, even

03:31:36PM 4    though the federal rules limit it to seven, delaying the

03:31:40PM 5    deposition, saying they won't start questioning at the

03:31:43PM 6    deposition until the week after I ask my questions.  I am

03:31:46PM 7    so desperate I tell them, "I will limit my questioning to

03:31:49PM 8    one hour," because this witness is so sick, and we are

03:31:52PM 9    trying to preserve his testimony, and we've got the

03:31:55PM 10   videographer, and we are setting up a live feed from the

03:31:59PM 11   hospital to get his deposition done.

03:32:02PM 12        If their theory of the case were true, that entire

03:32:06PM 13   time I am preparing a declaration to secretly have him

03:32:11PM 14   sign, to cancel the deposition, and it is already ahead of

03:32:17PM 15   time.

03:32:17PM 16        What they have asked you to do, your Honor, is to

03:32:21PM 17   believe the biggest conspiracy imaginable, to enter a

03:32:25PM 18   fantasy land where every witness is on the take from me, I

03:32:30PM 19   am secretly preparing a declaration long before, I am

03:32:35PM 20   calling videographers, I am setting up a live video feed,

03:32:40PM 21   and I have bought off every witness.  And the whole time I

03:32:43PM 22   am secretly Machiavellianly planning to cancel the whole

03:32:49PM 23   thing and have him sign the declaration.

03:32:52PM 24        And I secretly bring all these witnesses, not because

03:32:55PM 25   they are disinterested witnesses who can observe what

03:32:58PM 1   happened and then come testify and say, "This is what

03:33:02PM 2   happened," but because they are all on the take with

03:33:05PM 3   hundred dollar bills.

03:33:06PM 4        And every one of them lied under oath, the priest,

03:33:13PM 5   the notary, the family, the nurses, Sharma -- Dr. Sharma.

03:33:19PM 6   The Court should decline their invitation to enter fantasy

03:33:26PM 7   conspiracy land.

03:33:27PM 8        Quickly, your Honor, the consistency as a weakness

03:33:53PM 9   argument was again raised.  It was the vast majority of

03:33:56PM 10  Ms. Weglarz's closing argument.  "Mr. Varney said this so

03:34:03PM 11  many times before the declaration, and so it wasn't a

03:34:09PM 12  statement when he made it the last time with belief of

03:34:13PM 13  imminent death."  I think that was the argument.

03:34:17PM 14       And then the order the Court sent out advising the

03:34:22PM 15  parties what the Court wanted to know was presented.  The

03:34:26PM 16  Court wanted to know who -- where did this information in

03:34:31PM 17  the declaration come from.  The charge against plaintiffs

03:34:35PM 18  was I hadn't taken the stand and provided that direct

03:34:38PM 19  testimony.

03:34:41PM 20       First of all, I cannot waive the attorney-client

03:34:46PM 21  privilege.  And the idea that presenting a declaration to

03:34:51PM 22  the other side waives the attorney-client privilege, then

03:34:54PM 23  every lawyer in this room waives the attorney-client

03:34:56PM 24  privilege every time they file a summary judgment motion

03:34:59PM 25  and attach a declaration from their corporate

03:35:02PM 1  representative, or a witness, which they do -- which every

03:35:06PM 2  lawyer in here does pretty much in every case.  That is

03:35:09PM 3  not the law, and there was no citation to the law.

03:35:11PM 4      There is circumstantial evidence of where the

03:35:25PM 5  information in the declaration came from.  Even though

03:35:27PM 6  there is not the direct evidence from me, there is very

03:35:30PM 7  strong circumstantial evidence.

03:35:32PM 8      And that circumstantial evidence is the fact that

03:35:36PM 9  Mr. Varney said, "I was exposed to asbestos in the

03:35:40PM 10 shipyards."  He said it in his medical records.  He said

03:35:43PM 11 it to his family.  He said it to his daughters.  He said

03:35:47PM 12 it to his wife.  He said it to his doctors.  He said it in

03:35:50PM 13 the declaration.

03:35:53PM 14     And so the most reasonable inference to make from all

03:35:56PM 15 of those other statements that we know Mr. Varney made is

03:36:03PM 16 that he made the same statements in the declaration.

03:36:06PM 17     I don't know if I made that point clearly.  But the

03:36:09PM 18 circumstantial inferences are since he said it everywhere

03:36:12PM 19 else, he probably said it in the declaration with his

03:36:15PM 20 signature on it, his name on it, that he said -- that

03:36:21PM 21 eight witnesses have said he made.

03:36:34PM 22     There was the last thing --  And I will end with

03:36:39PM 23 this, your Honor, because I know it has been long.  There

03:36:42PM 24 was the argument that the sky will fall if the Court finds

03:36:47PM 25 that this meets the dying declaration elements.

03:36:51PM 1       First of all, the law is the law.  The law is about

03:36:56PM 2   as settled in this area as the law can ever be.  For 110

03:37:02PM 3   years the Washington State Supreme Court has said this is

03:37:06PM 4   the law and these are the elements.

03:37:10PM 5       And the invitation to change the law, and add more

03:37:13PM 6   elements, and to weigh the policies, and to do all of

03:37:16PM 7   these external things out of the statute --  If that were

03:37:19PM 8   the case, the legislature would have changed it.

03:37:22PM 9       But here is why --  Even if the Court is going to

03:37:25PM 10  consider these arguments that asbestos litigation will be

03:37:31PM 11  declarations from here on out, first of all, the Pisano

03:37:35PM 12  case was not my firm.  That was plucked out of thin air.

03:37:39PM 13  That was not my firm.  My firm --  I don't even think my

03:37:42PM 14  firm existed when the Pisano case came out.  Maybe it did.

03:37:46PM 15  Mine is a relatively new firm.  It was not my case.  We

03:37:50PM 16  had nothing to do with it.  This isn't a pattern and

03:37:53PM 17  practice.  That was just made up.

03:37:55PM 18      But take a look at the emails, Exhibit 20, your

03:37:58PM 19  Honor.  I know it wasn't the focus of the hearing.  What

03:38:01PM 20  happens in these cases is that the plaintiffs' lawyers are

03:38:08PM 21  desperate to complete the deposition.  Desperate.  And

03:38:12PM 22  they really have -- they are forced to give up basically

03:38:19PM 23  everything to get the deposition done before their client

03:38:21PM 24  dies.

03:38:22PM 25      Not every lawyer, but there is an incentive from the

03:38:26PM 1    defense bar --  I will say it this way:  If the client

03:38:32PM 2    dies and is never heard from, one party's case gets

03:38:38PM 3    better, and not the other.  If the deposition is

03:38:40PM 4    completed, the client is heard from, another party's case

03:38:44PM 5    gets better.  And so there are certain incentives that are

03:38:49PM 6    just a fact and reality of life on each side of the

03:38:52PM 7    litigation.

03:38:53PM 8         The incentive for the plaintiffs is to desperately

03:38:56PM 9    get the dying person's deposition done as soon as

03:38:59PM 10   possible.  If you read those emails, your Honor, that is

03:39:01PM 11   what I am trying to do.  I gave up the farm.  I said, "One

03:39:05PM 12   hour.  Please.  I will give you 18 hours, whatever you

03:39:07PM 13   want.  Here is all the documents that we have.  Here is

03:39:10PM 14   everything we have.  Can we please get this person's

03:39:12PM 15   deposition done before he dies?"  And they said, "No.  No.

03:39:16PM 16   No.  Eighteen hours.  Maybe next week."  They put it off

03:39:19PM 17   from the 7th to the 8th.

03:39:23PM 18        If we are going to consider the policy, this gives

03:39:26PM 19   them an incentive to get the deposition done, too.  I

03:39:31PM 20   don't even think the Court should consider it, but it

03:39:33PM 21   gives them a small incentive to get the deposition done

03:39:37PM 22   quickly.

03:39:37PM 23        There was this idea that we delayed, that the initial

03:39:41PM 24   disclosures didn't disclose Mr. Varney's declaration until

03:39:47PM 25   June of 2018.  I don't think the initial disclosures were

03:39:52PM 1   in evidence.  I haven't even looked at them.  I'm sure his

03:39:55PM 2   name is in there.

03:39:58PM 3        But there was the argument that the witnesses'

03:40:02PM 4   memories have faded and we somehow deprived the defense --

03:40:06PM 5   this is my last point -- we somehow deprived the defense

03:40:10PM 6   of the opportunity to question these witnesses before

03:40:12PM 7   their memories dissipated.  And there is some superficial

03:40:15PM 8   appeal to that argument.  Obviously, the law understands

03:40:17PM 9   as time passes witnesses' memories dissipate.

03:40:21PM 10   The problem is, after we served the declaration and

03:40:24PM 11   we disclosed the declaration in discovery, the defense

03:40:28PM 12   didn't depose a single witness for six months.  And it was

03:40:33PM 13   Dr. Kercheval.  It wasn't even one of the witnesses in the

03:40:35PM 14   room.  They didn't even depose Mrs. Varney until February

03:40:41PM 15   of 2019, over a year after -- over eight months after we

03:40:45PM 16   gave them the declaration.

03:40:47PM 17        So this notion that we have somehow robbed them of

03:40:50PM 18   the opportunity is not supported.  They never deposed the

03:40:54PM 19   priest.  They never deposed the notary.  We did.  And so

03:40:58PM 20   this notion that we have stolen from them the opportunity

03:41:00PM 21   to get the truth from these witnesses is just not reality.

03:41:04PM 22        Your Honor, all of the witnesses and all of the

03:41:09PM 23   medical records support our version of the case.  I urge

03:41:15PM 24   the Court not to enter the fantasy land where this was one

03:41:18PM 25   of the biggest and most unimaginable conspiracies ever,

03:41:24PM 1    where I paid everyone to tell a lie.  Thank you so much.

03:41:30PM 2            MS. JOHNSON:  Your Honor, if I could?  Obviously

03:41:33PM 3    we didn't make --

         4            THE COURT:  I'm sorry.

03:41:35PM 5            MS. JOHNSON:  Obviously we didn't make any

03:41:36PM 6    objections during closing argument, because there is no

03:41:39PM 7    need to make evidentiary objections during a closing

03:41:42PM 8    argument to your Honor.  Just for the purposes of the

03:41:45PM 9    record, the last two cases that counsel cited to here

03:41:51PM 10   today were not included in their briefing before this

03:41:55PM 11   Court.  All the parties have submitted substantial

03:41:59PM 12   briefing with respect to this -- the issues before the

03:42:02PM 13   Court today, and those two cases that were cited by

03:42:06PM 14   counsel --  The Pisano case was included.  The other two

03:42:11PM 15   cases were not included.

03:42:14PM 16           THE COURT:  I understand.  Well, it is 20 to

03:42:19PM 17   4:00.  It is my habit, a long-standing habit, to make oral

03:42:24PM 18   findings and conclusions under Rule 52.  I will be ready

03:42:32PM 19   to do that like at 10:30 in the morning.  If you want to

03:42:38PM 20   hear the result, you can show up.  If you don't want to

03:42:41PM 21   hear the result, it will be on the record.

         22                    (Proceedings recessed.)

         23

         24

         25

85

```
1                    C E R T I F I C A T E

2

3

4       I, Barry Fanning, Official Court Reporter for the

5    United States District Court, Western District of

6    Washington, certify that the foregoing is a true and

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9

10

11

12    _____
      /s/ Barry Fanning
13    Barry Fanning, Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```